# EXHIBIT 3

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3                   SOUTHERN DIVISION
 4
 5   EQUAL EMPLOYMENT
 6   OPPORTUNITY COMMISSION,
 7           Plaintiff,
 8                              Civil Action
 9   -vs-                      Case No. 2:17-cv-13195
10                             Magistrate:  R. Steven Whalen
11   G4S SECURE SOLUTIONS
12   USA, INC.,
13           Defendant.
14
15   PAGE 1 TO 47
16
17   The Deposition of DONALD DRENT,
18   Taken at 101 W. Big Beaver Road,
19   Troy, Michigan,
20   Commencing at 9:30 a.m.,
21   Tuesday, July 31st, 2018,
22   Before Kelly Forfar, CSR-3618.
23
24
25
```

Page 2

```
1    APPEARANCES:
2    MS. NEDRA CAMPBELL (P58768)
3    Equal Employment Opportunity Commission
4    477 Michigan Avenue
5    Room 865
6    Detroit, MI  48226
7    (313)226-3410
8    Nedra.campbell@eeoc.gov
9           Appearing on behalf of the Plaintiff.
10
11   MR. J. TRAVIS MIHELICK (P73050)
12   Dinsmore & Shohl, LLP
13   900 Wilshire Drive
14   Suite 300
15   Troy, MI  48084
16   (248)203-1655
17   travis.mihelick@dinsmore.com
18           Appearing on behalf of the Defendant.
19
20
21
22
23
24
25
```

Page 3

```
1                 TABLE OF CONTENTS
2    Witness                                  Page
3    DONALD DRENT
4
5    Examination by Ms. Campbell                 4
6
7
8
9
10                    EXHIBITS
11   Exhibit                                  Page
12   DEPOSITION EXHIBIT NUMBER 1                38
13   DEPOSITION EXHIBIT NUMBER 2                39
14   DEPOSITION EXHIBIT NUMBER 3                39
15   DEPOSITION EXHIBIT NUMBER 4                39
16
17        (Exhibits attached to transcript)
18
19
20
21
22
23
24
25
```

Page 4

1 Troy, Michigan
2 Tuesday, July 31st, 2018
3 About 9:42 a.m.
4
5                 DONALD DRENT,
6 having first been duly sworn, was examined and testified on
7 his oath as follows:
8
9                 EXAMINATION
10 BY MS. CAMPBELL:
11     Q.  Can you please state your name for the record.
12     A.  Donald Drent.
13     Q.  And your middle name?
14     A.  Russell.
15     Q.  Mr. Drent, my name is Nedra Campbell, I am a trial
16 attorney for the Equal Employment Opportunity Commission, and
17 I represent the Equal Employment Opportunity Commission in a
18 case that has been filed against G4S Secure Solutions.  I am
19 going to be deposing you today, and I am going to ask you
20 some questions.
21     First, have you ever been deposed before?
22     A.  Yes.
23     Q.  About how many times?
24     A.  About fifteen.
25     Q.  Okay.  So you understand the ground rules?

Page 5

1     A.  Yes.
2     Q.  I ask that you please give a verbal response to all
3 of my questions because the court reporter to my left is
4 trying to take everything down today.  I would also ask that
5 you please ask me to rephrase any questions that you don't
6 understand because if you do answer the question, I am going
7 to assume you understood it; is that fair?
8     A.  Yes.
9     Q.  If you need a break, you know, let me know.  I
10 don't anticipate that this will be an extremely long
11 deposition but if you do need a break at any time, please let
12 me know, okay?
13     A.  I will.
14     Q.  Are you taking any medications that could impair
15 your ability to testify today?
16     A.  No.
17     Q.  Have you ever been arrested for anything?
18     A.  No.
19     Q.  What is your current residence address?
20     A.  6817 Kingdon Avenue, Holt, Michigan.
21     Q.  And is the Don, D-O-N?
22     A.  Uh-huh, yes.
23     Q.  And are you familiar with where the Eastern
24 District Court of Michigan is in downtown Detroit?
25     A.  No.

EEOC vs G4S Secure Solutions USA, Inc.
DRENT, DONALD 07/31/2018

Job 7214
6..9

Page 6

1    Q.  Are you familiar with downtown Detroit?
2    A.  Only to get to the Ren-Cen and -- and back home
3  every day.
4    Q.  Okay.  So you work downtown Detroit?
5    A.  Yes.
6    Q.  Okay.  So if there was a trial in downtown Detroit,
7  you wouldn't have a problem with going there, right?
8    A.  No.
9    Q.  Okay.  I am going to ask you some background
10  questions about your education.  Where did you go to high
11  school?
12    A.  Belding.
13      THE COURT REPORTER:  What is it?
14      THE WITNESS:  Belding, B-E-L-D-I-N-G, High School,
15  Belding, Michigan.
16  BY MS. CAMPBELL:
17    Q.  Did you graduate?
18    A.  Yes.
19    Q.  What year did you graduate?
20    A.  1976.
21    Q.  After you graduated from high school, did you
22  pursue any further education?
23    A.  I went in the Air Force.
24    Q.  How long were you in the Air Force for?
25    A.  17 years, five months, 12 days.

Page 7

1    Q.  What was your last rank?
2    A.  E-5 staff sergeant.
3    Q.  Beyond the Air Force, did you pursue any other
4  education?
5    A.  While I was in the Service, of course I took the
6  technical training for both security police and firefighting
7  and pursued my associate's degree in fire science, and I
8  completed 68 hours of credit for that, as well as the
9  numerous certifications for firefighting, from basic
10  firemanship all the way up to command officer, leadership.
11    Q.  Where did you complete your associate's degree?
12    A.  Through the Community College of the Air Force.
13    Q.  What year did you graduate?
14    A.  I completed 68 hours.  I didn't, actually, formally
15  graduate.
16    Q.  Oh, okay.  So you completed high school in 1976 and
17  you also went to the associate Community College of the Air
18  Force?
19    A.  Yes.
20    Q.  And you completed 68 hours there?
21    A.  Yes.
22    Q.  When was the last time that you were enrolled in
23  any type of formal education, formal course?
24    A.  1989.
25    Q.  Okay.  So it sounds like from your testimony your

Page 8

1  first, excuse me, real job was in the Air Force; is that
2  right?
3    A.  I was a dairy farmer growing up.
4    Q.  How long were you a dairy farmer?
5    A.  From the age of 11 until 18.
6    Q.  Okay.  And what was your next position?
7    A.  Air Force.
8    Q.  And were you an active Air Force person?
9    A.  Yes.
10    Q.  The whole time?
11    A.  Yes.
12    Q.  Were you ever on the Reserve or --
13    A.  No, ma'am.
14    Q.  Once you left the Air Force, what did you do next
15  in terms of employment?
16    A.  When I retired, I came back to Michigan, I worked
17  in the automotive industry in a metal stamping facility.  It
18  was a basic entry level job, worked on the floor doing --
19  running parts, working in the tool shop.
20    Q.  Okay.  What is the name of the company that you
21  worked for?
22    A.  Autodie.
23    Q.  How long did you work there?
24    A.  Six months.
25    Q.  And what did you do next?

Page 9

1    A.  Then I pursued the industry that I am in now which
2  is private security with Pinkerton Security.
3    Q.  What was your first position with Pinkerton?
4    A.  I was what they called a site coordinator.
5    Q.  And where did you first work as a site coordinator?
6    A.  In Kalamazoo, Michigan.
7    Q.  Approximately what year was that?
8    A.  1994.
9    Q.  And when did you work for Pinkerton?
10    A.  All the way up until 2007, and then they basically
11  changed names and Pinkerton was acquired by Securitas.
12    Q.  Okay.  What was your last position at Pinkerton?
13    A.  I was a division security manager.
14    Q.  And in relationship to the site coordinator
15  position, where is that in terms of --
16    A.  I managed other site coordinators, security chiefs
17  and fire chiefs.
18    Q.  Okay.  And so when Pinkerton was acquired by
19  Securitas, did you remain in the same position?
20    A.  Yes.
21    Q.  And how long did you work at that Securitas?
22    A.  Up until 2012.
23    Q.  And what happened in 2012?
24    A.  Securitas lost the contract with General Motors and
25  G4S Secure Solutions was awarded the contract.

Page 10

1    Q.   Okay.  So in 2012 you started working for G4S
2   Secure Solutions?
3        A.   Yes.
4        Q.   And what was your first position with G4S?
5        A.   Division security manager.
6        Q.   Okay.  And how long were you the division security
7   manager?
8        A.   Through May of 2013.
9        Q.   And were you then promoted?
10       A.   Yes.
11       Q.   What position did you have next?
12       A.   U.S. operations manager.
13       Q.   What does a U.S. operations manager do?
14       A.   I managed all of the General Motors security
15   contracts for G4S throughout the United States.
16       Q.   Okay.  So you started that in May 2013.  How long
17   did you do that?
18       A.   Basically, I stayed in that exact same role but
19   they changed -- the titles changed through the end of -- or
20   the middle of 2014 and I became a director.
21       Q.   Okay.  So what was your formal title in the middle
22   of 2014 when you changed the titles?
23       A.   Director --
24       Q.   Okay.
25       A.   -- of U.S. operations.

Page 11

1        Q.   But it is still basically -- you were doing the
2   same thing?
3        A.   Yes.
4        Q.   And your responsibility was to manage GM contracts?
5        A.   Yes.
6        Q.   How long did you remain in that position?
7        A.   Approximately a year and a half, and then I
8   received another title change to senior director.
9        Q.   Was that a promotion?
10       A.   Yes.
11       Q.   And what were your responsibilities as senior
12   director?
13       A.   Managing all of the General Motors accounts
14   throughout the U.S.
15       Q.   Okay.  How does that differ from what you were
16   doing?
17       A.   It didn't.  It just -- in the structural
18   realignments that were happening from corporate, they aligned
19   the various positions in relationship to the corporate
20   organization.
21       Q.   Okay.  And how long did you remain in that
22   position?
23       A.   All the way until February of '18.
24       Q.   And what happened in February of '18?
25       A.   G4S lost the contract.

Page 12

1        Q.   And what did that mean for your employment?
2        A.   My position was eliminated and I was retained by
3   G4S to work on the General Motors/Renaissance Center.
4        Q.   And what is General Motors/Renaissance Center, what
5   does that mean?
6        A.   That's General Motors' global headquarters.
7        Q.   And what do you do currently?
8        A.   I am the fire and emergency response specialist.
9        Q.   Did you retain your pay?
10       A.   No.
11       Q.   Did you have a pay cut?
12       A.   Yes.
13       Q.   So from 2014 through February 2018, you were the
14   senior director?
15       A.   Yes.
16       Q.   And you managed all of the GM accounts?
17       A.   Yes, ma'am.
18       Q.   About how many security offices did G4S Secure
19   Solutions have in 2015?
20       A.   On the GM account, there was approximately 1450.
21       Q.   Do you know how many it had overall?
22       A.   With supervisors and management all blended into
23   that, it was approximately 2200.
24       Q.   Okay.  And that is just on the GM account, right?
25       A.   Yes.  Yes.

Page 13

1        Q.   Do you know how many approximate security officers
2   -- or we will just say employees that G4S Secure Solutions
3   had in 2015?
4        A.   No.
5             MR. MIHELICK:  Objection, foundation.
6   BY MS. CAMPBELL:
7        Q.   I am going to back up a little bit.
8             Did you do anything to prepare for your deposition
9   today?
10       A.   Other than consulting with legal representatives,
11   Travis.
12       Q.   Okay.  So I don't want you to tell me anything
13   that you might have discussed.
14             But did you review any documents, though?
15       A.   Just the original notification that was provided
16   for setting up the deposition.
17       Q.   Okay.  So you reviewed the Deposition Notice and
18   that was all?
19       A.   Yes.
20       Q.   Most of the extremely important facts in this case
21   occurred in 2015, so that's why I was asking if you reviewed
22   anything.
23       A.   Right.
24       Q.   Okay.  Do you know who Christine Ross is?
25       A.   I know her by name, I don't physically remember her

Page 14

1 from a character perspective.
2    Q.  Okay.  So if she were to walk by you, you wouldn't
3 be able to say that's Christine Ross?
4    A.  No.
5    Q.  Okay.  And at the time in the 2015, how many
6 indirect reports/security officers would you say you
7 supervised?
8    A.  None.
9    Q.  So no supervisor --
10       When I say indirect reports, I mean the chain of
11 command.  If you were overseeing the GM accounts, I mean,
12 naturally there were security officers assigned to the GM
13 accounts, right?
14    A.  That is correct.
15    Q.  So you didn't supervise any of them on an indirect
16 basis?
17    A.  The security chiefs, the fire chiefs, and the site
18 coordinators and shift supervisors managed those people.
19    Q.  So did you have any input in terms of whether a
20 person would be suspended or terminated?
21    A.  Yes, yes.
22    Q.  And what types of input did you have?
23    A.  It would be recommendations for disciplinary
24 processes in relationship to our policy and/or the violation
25 of the contract in determining that we followed the

Page 15

1 progressive disciplinary path based upon an individual's
2 performance and/or attendance.
3    Q.  Okay.  Have you ever had any training on the
4 Americans with Disabilities Act?
5    A.  We had several different HR led meetings that
6 talked about ADA in relationship to the workplace, things to
7 consider as you evaluate an individual's ability to do their
8 job, their performance, those types of things.
9    Q.  When was the last time you had this training?
10    A.  Probably in 2013.
11    Q.  Have you ever participated in any type of meeting
12 regarding an employee's request for reasonable accommodations
13 under the ADA?
14    A.  Telephone conferences.
15    Q.  So you have?
16    A.  Yes.
17    Q.  Okay.  As we sit here today, when was the last time
18 you participated in a meeting regarding an employee's request
19 for a reasonable accommodation under the ADA?
20    A.  I can't recall.
21    Q.  Do you think it was more than five years ago?
22    A.  More than likely.  I could not attest to the exact
23 date.
24    Q.  Did you ever participate in any type of meeting
25 regarding Christine Ross's request for a reasonable

Page 16

1 accommodation under the ADA?
2    A.  No.
3    Q.  Do you know whether G4S Secure Solution has any
4 policies or like written policies regarding how an employee
5 should request an accommodation?
6    A.  I can only speak to what happened on the GM account
7 in relationship to if an individual needed a special
8 accommodation, they would have to request that through our HR
9 organization, and it would be arranged through HR.
10    Q.  And when you say arranged, what do you mean by
11 that?
12    A.  Any of the appointments for clarification or
13 justification for a need for an accommodation, that would all
14 be managed by the human resources department.
15    Q.  Okay.  And when you say appointments for
16 justification, what does that mean?
17    A.  My understanding is that they would be scheduled
18 for a fitness of duty examination based upon their job
19 description, and whatever their accommodation needs were,
20 they would be evaluated and a determination from that.
21    Q.  Okay.  So if you could just walk me through this.
22 If a security officer needs a request for accommodation, she
23 or he is supposed to contact human resources, right?
24    A.  We would refer them to human resources, yes.
25    Q.  Okay.  Does the person have to put anything in

Page 17

1 writing or can they verbally request an accommodation?
2       MR. MIHELICK:  Objection, foundation.
3       You can answer if you know.
4       THE WITNESS:  It was typically required that they
5 put it in writing so that HR would have the documentation, be
6 able to get the questions that they needed answered and
7 process it.
8 BY MS. CAMPBELL:
9    Q.  Okay.  So after the request is made, what happens
10 next?
11    A.  My understanding is that HR would work with that
12 particular employee directly to arrange for the necessary
13 paperwork to be filled out, and then schedule the appointment
14 with the doctor or physician that was going to administer the
15 exam.
16    Q.  Okay.  So the person makes the request of HR, and
17 then the person is sent for a fitness for duty; is
18 that right?
19    A.  That's my understanding, yes.
20    Q.  And who -- is it like a Concentra doctor or some
21 other type of doctor that they are sent to?
22    A.  G4S in Michigan used Concentra.
23    Q.  Okay.  So once the person is sent to Concentra for
24 a fitness for duty, what happens next?
25    A.  Then that -- whatever the results of the physical

Page 18

1  are then, in turn, sent back to HR for determination.
2      Q.  Okay.  And what if Concentra -- the Concentra
3  doctor just administers a routine physical?
4          MR. MIHELICK:  Objection, foundation.  You can
5  answer if you know.
6          THE WITNESS:  I have no knowledge of what happens
7  on that.
8  BY MS. CAMPBELL:
9      Q.  Okay.  Well, I am just trying to understand this.
10  I mean, if a person has a physical condition that is not
11  necessarily going to be noticed by Concentra, it sounds like
12  they could run the risk of not getting accommodation?
13          MR. MIHELICK:  I am objecting as to the form and
14  foundation.  I don't think that's a question.
15          I don't think you have to answer.
16  BY MS. CAMPBELL:
17      Q.  You can answer.
18          MR. MIHELICK:  If you understand the question.  I
19  didn't think it was a question.
20          THE WITNESS:  I wouldn't be involved in that
21  process, HR is dealing with that.  And based upon whatever
22  the individual cites that they need that accommodation,
23  that's between HR and how the exam was conducted.
24  BY MS. CAMPBELL:
25      Q.  Okay.  Do you know who Juanita Resar is?

Page 19

1      A.  Yes.
2      Q.  I take it that based upon your testimony that you
3  have not read her deposition testimony because you have only
4  looked at the Deposition Notice, right?
5      A.  That's correct.
6      Q.  So you are not familiar with -- basically, she
7  testified that you were involved and you were the decision
8  maker, and now I am hearing from you that HR is the decision
9  maker, so I am just trying to understand the process.  Let me
10  ask you this --
11          MR. MIHELICK:  I am going to object -- hold on, I
12  am going to object to that statement that you made.
13  BY MS. CAMPBELL:
14      Q.  Who is Juanita Resar?
15      A.  She, at the time -- she was the HR manager for the
16  Detroit office.
17      Q.  Okay.  So she is HR in this respect.
18          Okay.  So it sounds like, from your understanding,
19  HR makes a decision on whether an accommodation is provided?
20      A.  HR administers the process.
21      Q.  Okay.  What does that mean?
22      A.  So if you were the employee and you came to us and
23  you said you couldn't physically do your job, whatever that
24  may entail, and within the confines, if you will, of the
25  General Motors' account and the contract stipulations within

Page 20

1  the account of what the officer is responsible to do, if you
2  can't do those physical functions, we would refer that -- in
3  this case, I am using you -- we would refer you to HR to get
4  a physical to prove your fitness for duty.
5      Q.  Okay.  What if I were to tell you that I have heel
6  spurs and I can't engage in excessive walking and I need a
7  reasonable accommodation of being allowed to be in a seated
8  security position?
9      A.  We are going to refer you to HR for that
10  determination.  We don't have the authority within our
11  management structure to accommodate without having
12  documentation to say there is a need for accommodation.
13      Q.  So what if you -- and I am sorry, it sounds like if I
14  have heel spurs and I have already contacted HR and I have
15  said, hey, I need a reasonable accommodation, I need to just
16  be in a seated position.  So then what happens next?
17      A.  We have to get a medical evaluation to determine
18  fitness for duty.
19      Q.  Okay.  So would you get a medical evaluation to
20  determine fitness for duty even if an employee already has a
21  request from their doctor?
22      A.  I wouldn't know that.
23      Q.  You don't know either way?
24      A.  No.
25      Q.  Okay.  So you were involved in Christine Ross's

Page 21

1  case and her request for an accommodation, right?
2      A.  I was contacted by the site indicating that she
3  couldn't perform her job because of prolonged standing and
4  walking, and I told them that they needed to get a hold of HR
5  to recommend -- and recommend that they have a fitness for
6  duty.
7      Q.  Okay.  So who contacted you?
8      A.  Landon Pickens.
9      Q.  Okay.  Did Landon Pickens tell you that she could
10  not do her job?
11      A.  What he told me was that -- if I recall correctly,
12  is that she stated she couldn't do prolonged standing and
13  walking.
14      Q.  Okay.  Were you aware that she, for years, had been
15  in a seated security position where she did not have to
16  engage in prolonged walking?
17          MR. MIHELICK:  I'll object to form and foundation.
18          Go ahead.  You can answer if you know that to be
19  true.
20          THE WITNESS:  I don't know that she was permanent
21  in a sitting post, if you will, or a desk position, because
22  of the way our structure is set up on the accounts, is
23  officers rotate through posts and have varying
24  responsibilities through the course of an eight-hour day.
25  BY MS. CAMPBELL:

EEOC vs G4S Secure Solutions USA, Inc.
DRENT, DONALD 07/31/2018

Job 7214
22..25

Page 22

1     Q.  Okay.  So you are saying that -- let's break this
2  down.
3        Why are you saying that people rotated?
4     A.  Because they do.
5     Q.  Okay.  Well I have people who testified that they
6  don't.
7        MR. MIHELICK:  I'll object.  It is not a question
8  and I think it is a mischaracterization.
9        MS. CAMPBELL:  It is not a mischaracterization.
10  Not only that, I mean, I have personal knowledge that G4S
11  Secure Solutions has had security officers in positions for
12  years in seated positions.
13        MR. MIHELICK:  It is not a question.
14        MS. CAMPBELL:  It is not -- I mean, it is an
15  observation.  I mean, G4S Secure Solutions used to have
16  the contract at the McNamara building and the same person sat
17  there every single morning when I came in.  So anyway --
18        MR. MIHELICK:  That's a different contract.
19        MS. CAMPBELL:  That's what we are here for, so I
20  can get information about this particular case.
21  BY MS. CAMPBELL:
22     Q.  You know that Christine Ross testified this way.
23  And you also know that Deborah Williams testified this way.
24  Christine Ross -- what shift was Christine Ross on?
25        MR. MIHELICK:  Objection, form and foundation.

Page 23

1     You can answer, if you know.
2        THE WITNESS:  I am not --
3        MS. CAMPBELL:  What is the objection to what shift
4  is Christina Ross on?
5        MR. MIHELICK:  You have to lay a foundation that he
6  knows.
7        MS. CAMPBELL:  The only --
8        MR. MIHELICK:  I am allowed --
9        MS. CAMPBELL:  You can make silly objections if you
10  want to.
11        MR. MIHELICK:  You can ask silly questions.
12        MS. CAMPBELL:  It is not a silly question as to
13  what shift she is on.
14        MR. MIHELICK:  If you don't lay a foundation, it
15  is.
16        MS. CAMPBELL:  No, it is not.
17        MR. MIHELICK:  Okay.  Whatever.
18        MS. CAMPBELL:  Immature, anyway.
19        MR. MIHELICK:  You can answer, if you know.
20        THE WITNESS:  I don't recall what shift she was on.
21  BY MS. CAMPBELL:
22     Q.  Okay.  So were there any distinctions between
23  shifts?
24     A.  It varied from site to site on what the shifts
25  looked like and what the activities on a shift were.

Page 24

1     Q.  What is your familiarity with the GM Warren Tech
2  Center?
3     A.  It is the second largest General Motors location in
4  the United States.  We provide everything from basic security
5  check points at the entrances to the facility from the public
6  domain, we conduct emergency response for medicals,
7  firefighting activities, hazardous material spills, we make
8  traffic stops, we issue hot work permits, we do building
9  patrols, we check inbound trucks at various locations to
10  verify the delivery and make sure that the trailer has got a
11  safety sticker on it so that if they have to put a fork truck
12  in it it doesn't fall through the floor; do a whole host of
13  activities.
14     Q.  Okay.  What is the largest contract?  You said it
15  is the second largest.
16     A.  It is the second largest facility.
17     Q.  Okay.  Second largest facility.  What is the
18  largest facility?
19     A.  The Renaissance Center.
20     Q.  How many security officers are at the GM Warren
21  Tech Center?
22     A.  I couldn't tell you today, but during that
23  timeframe, we had approximately 150.
24     Q.  Okay.  And you just testified that the security
25  officers rotated.  Can you give me some more information

Page 25

1  about that.
2     A.  So, as an example, when you come to work today and
3  you were assigned the west gate, as an example, you typically
4  would work the west gate for anywhere between two to four
5  hours and then you would rotate into another function, it
6  could be a patrol -- a foot patrol, it could be a vehicle
7  patrol, they could be doing a standby for a special event, it
8  could be moving from the truck gate to the desk to relieve
9  the desk officer, and then moving from there to relieve the
10  next officer, so on and so forth.
11     Q.  Okay.  And what if you were assigned to Dock 10?
12     A.  It would still be part of our rotation, where they
13  would get rotated through the course of the day to various
14  activities.
15     Q.  Okay.  So your testimony today is that people who
16  are assigned to Dock 10 rotate on a daily basis?
17     A.  Yes.
18     Q.  So it is not a weekly basis?
19     A.  Correct.
20     Q.  And it is not a monthly basis?
21     A.  Correct.
22     Q.  It is a daily basis?
23     A.  Yes.
24     Q.  Okay.  So if Christine Ross testified that she
25  worked the Dock 10 position exclusively, then what would you

Page 26

1  say to that?
2      A.  That wouldn't be a normal operational mode that we
3  were in.
4      Q.  Okay.  And if Richard Bova testified that he worked
5  the Dock 10 exclusively and that was a seated position, what
6  would you say to that?
7      A.  I am unaware.
8      Q.  You would say the same thing?
9      A.  Yes.
10      Q.  Did you ever work as a security officer at GM
11  Warren Tech?
12      A.  No, ma'am.
13      Q.  Would you think that people who did work as a
14  security officer at GM Warren Tech would be in a better
15  position to testify as to what they did?
16      A.  I guess on an individual site basis versus what the
17  contract language called for, they probably would know it
18  better than me, because they were there every day.
19      Q.  Who did the security officers at the GM Warren Tech
20  facility report to?
21      A.  Landon Pickens, Jeremy Paul, DeShon Hill; there are
22  several layers of supervision within that.
23      Q.  Okay.  So what's the first layer of supervision,
24  the supervisor?
25      A.  Yes.

Page 27

1      Q.  And what's the next layer?
2      A.  Then it would be the site coordinator.
3      Q.  And what's the next layer?
4      A.  It would be the security specialist or security
5  chief.
6      Q.  And after the security specialist or chief, what
7  layer is next?
8      A.  There would be an operations level person that
9  oversaw multiple locations, at the 10,000 mile view, if you
10  will; they weren't physically there every day and involved in
11  the scheduling practices and those types of things.
12      Q.  Isn't that the position that you held?
13      A.  It was one of the positions that I held, yes.
14      Q.  So you weren't involved in the scheduling of
15  security officers?
16      A.  That's correct.
17      Q.  Have you ever seen a GM Warren Tech Center
18  schedule?
19      A.  Not at the micro level.
20      Q.  So you haven't seen individuals being assigned to
21  different posts and rotated on a daily basis?
22      A.  Not physically watching it happen, no.
23      Q.  So when you testified that security officers rotate
24  on a daily basis, what is that based on?
25      A.  That is based upon the standard operating practice

Page 28

1  that is defined by General Motors that they want the security
2  officers to be rotated throughout the course of their work
3  activities to ensure that they don't become complacent.
4      Q.  And is there anything in the contract that says
5  that they have to rotate on a daily basis?
6      A.  I don't recall specifically.
7      Q.  I just want to understand.  So it sounds like you
8  are saying that they are, in fact, rotated on a daily basis
9  simply because there is this contract language about
10  complacency, right?
11      A.  Yes.
12      Q.  Is it possible that they are not, you know, rotated
13  on a daily basis?
14      A.  It is possible.
15      Q.  I mean, I am just trying to understand this.
16      A.  All I can do is attest to the fact that the
17  contract says that we are required to rotate officers and
18  posts throughout the course of the shift at every site.
19      Q.  Okay.  So what happens if you have a security
20  officer who cannot engage in excessive walking and needs a
21  reasonable accommodation?
22      A.  Then we would have to evaluate that through getting
23  the medical evaluation to determine whether they are fit for
24  that job.
25      Q.  Okay.  Well, I mean, I am saying like what if you

Page 29

1  had the medical evaluation that says a person can do the job,
2  they simply can't engage in excessive walking; what would you
3  do then?
4      A.  Then we would have to consider other alternatives
5  because every security officer is an emergency responder.
6      Q.  I don't understand that answer.  Are you saying
7  that if a person can't engage in excessive walking, that they
8  can't do the security job at G4S Secure Solutions GM Warren
9  Tech Center?
10      A.  They may not be able to do the requirements of the
11  job.
12      Q.  Why not?
13      A.  Because of the inability to move agilely and walk
14  great distances as an emergency responder.
15      Q.  I am kind of lost.  Okay.  So say a person is in a
16  seated position, right, seated security position, and a
17  person has a medical emergency; they could walk over there
18  and render assistance, you would agree with that, right?
19      A.  Potentially, yes.
20      Q.  Okay.  So I guess my question is, what does the
21  inability to engage in excessive walking have to do with a
22  person's ability to be in a seated security position?
23      A.  You would have to define what excessive walking is,
24  in relationship.  Is there a distance that they can only
25  walk?  Is they can only be on their feet for five minutes

EEOC vs G4S Secure Solutions USA, Inc.
DRENT, DONALD 07/31/2018

Job 7214
30..33

Page 30

1 at a time?

2    Q. Would you inform Juanita Resar that a person who

3 cannot engage in excessive walking cannot do their security

4 job?

5    A. By the -- again, by the language of the contract,

6 the security officer has to be able to function in all

7 capacities.

8    Q. Okay. So it sounds like the answer is yes?

9    A. Yes.

10    Q. So you would have informed -- or not would have, I

11 don't want to put words in your mouth.

12     Let me ask you this way. Did you ever inform

13 Juanita Resar that if a person cannot engage in excessive

14 walking, they cannot do the security job at GM Warren Tech

15 Center?

16    A. If they couldn't physically do the demands of the

17 job, then they couldn't work because we didn't have the

18 allowance within the contract to accommodate.

19    Q. Okay. What about the ADA, the Americans with

20 Disability Act, how does that, you know, play into --

21    A. By the job description, they have to be able to

22 climb ladders, they have to be able to bend and twist, lift

23 up to 50 pounds, they have to be able to get down on the

24 floor and do CPR, administer in lifting or transferring a

25 patient from the ground to a cot, those are all of the key

Page 31

1 and critical elements within the job description. And if

2 they cannot do those things physically because there is

3 something that potentially would be defined under the

4 Americans for Disabilities Act, they would not be fit for

5 that position.

6    Q. And no exceptions?

7    A. No.

8    Q. I want to ask you some questions just generally

9 about suspensions. Were you involved in suspending security

10 officers? I think you said you were.

11    A. Yes.

12    Q. Can you walk me through that. How does that work

13 and what was your involvement?

14    A. So if you have an individual, an officer that has a

15 job performance -- substandard performance, we go through a

16 progressive disciplinary process, based upon the occurrence

17 and seriousness of the event. In any case, as they get to a

18 point in that disciplinary process, then there is an

19 investigatory suspension that is administered so we can look

20 at the totality of the particular performance issue. If it

21 is something of a serious nature then -- you know, the one

22 that's most commonly used is we have a security officer that

23 is sleeping on the job, they will be placed on an immediate

24 investigatory suspension so we can evaluate the number of

25 shifts they worked, how many of those were back to back 12s,

Page 32

1 was there any underlying medical condition that we didn't

2 know about that may have caused them to fall asleep or was it

3 just they came to work and they weren't rested and so on.

4    If it was attendance in relationship to that,

5 again, going through the progressive process, prior to them

6 being terminated or, in our case, removed from the account,

7 we would place them on an investigatory suspension, again to

8 evaluate, is there a pattern, if there's any outlying factors

9 that may be causing this person to miss work.

10    Q. Okay. So when they are placed on a suspension, are

11 they always unpaid?

12    A. Yes.

13    Q. Are there ever any paid suspensions?

14    A. Not that I am aware of, no.

15    Q. Does the person retain his or her badge?

16    A. Typically, no.

17    Q. Anything else that's taken away from the employee?

18    A. If they were -- if they had keys to the facility,

19 we would get the keys, we would get their badge; they would

20 be advised that we are going to contact them at their last

21 known address and phone number.

22    Q. Okay. How about parking pass, is that taken, too?

23    A. Typically, yes.

24    Q. Does G4S Secure Solutions at the GM Warren Tech

25 Center require uniforms?

Page 33

1    A. Yes.

2    Q. Are those taken at the suspension stage?

3    A. At that point, no.

4    Q. Who does the security officer return the uniform to

5 if they are terminated?

6    A. Once the final disposition is made by G4S area

7 office, those uniforms are to be returned to the local

8 office.

9    Q. Where is the local office?

10    A. Farmington Hills.

11    Q. So I understand how a person is placed on

12 suspension -- well, let me ask you this. Is there like a

13 certain document that you issue to place someone on

14 suspension there?

15    A. There's an actual form that's an investigatory

16 suspension form that has the date and who it is being issued

17 to, by whom; there are check boxes for the various incidents,

18 if you will, or events that would lead to an investigatory

19 suspension; and then at the bottom of that there is a place

20 where we verbalize where we are to contact them at their last

21 known address and phone number.

22    Q. And how is a person removed from the suspension?

23    A. Typically they are notified by telephone to report

24 either to the site or to the local office.

25    Q. Is there a record, if you know, of the telephone

EEOC vs G4S Secure Solutions USA, Inc.
DRENT, DONALD 07/31/2018

Job 7214
34..37

Page 34

1  calls being made?
2      A.  That I am not aware of.
3      Q.  Who typically makes those calls?
4      A.  If they are going to the -- directly to the office
5  for that final disposition, it is a combination between HR
6  and the site to notify them that they are to report to the
7  local office at such and such a time and date to meet with
8  HR.
9      Q.  And if the suspension results in a termination,
10 what happens?
11     A.  They meet with HR and HR advises them of the
12 termination.
13     Q.  Do you know if there is a letter that is supposed
14 to be sent to the employee when they are terminated?
15     A.  Not to my knowledge.
16     Q.  Do you know if there is any written documentation
17 that would signify termination?
18     A.  Not to my knowledge.
19     Q.  Were you involved in Christine Ross's termination?
20     A.  No.
21     Q.  Did you play any role in having Christine Ross
22 removed from her seated security position?
23     A.  No.
24     Q.  As you sit here today, what do you know about
25 Christine Ross?

Page 35

1      A.  I know that she was a security officer at the site;
2  I know that she had worked in the various assignments.  There
3  was a situation that arose that warranted that a request be
4  made for the Independent Medical Evaluation for fitness for
5  duty, and then that came back and basically said she could
6  work, and then she was a no call, no show.
7      Q.  Okay.  I am going to break that down.
8          Okay.  So how do you know that Christine Ross
9  worked in various assignments?
10     A.  Because that's what they do at the Tech Center.
11     Q.  Okay.  Well, you just testified that -- I mean, it
12 is my understanding that -- it is your belief that's what
13 they do based on the contract, right?
14     A.  If there is overtime and she would have to work
15 overtime, it could be in any position; it wouldn't
16 necessarily be the same position that she worked on her
17 scheduled shift.
18     Q.  What positions did Christine Ross work in?
19     A.  She was a security officer.
20     Q.  Okay.  You said she worked in various assignments.
21 What assignments did she work?
22     A.  She could have been doing the dock, she could have
23 been working a vehicle gate, she could have been doing
24 patrols, she could have done special standbys for special
25 events, construction projects, issue hot work permits,

Page 36

1  respond to medical emergencies.
2      Q.  Okay.  And so when you say that -- you know, that
3  she worked on various assignments, you are basing that on
4  what?
5      A.  Based upon that's the everyday activity for a
6  security officer.
7      Q.  But you haven't witnessed a security officer doing
8  that, right?
9      A.  I guess you need to define when you say witness a
10 security officer doing that --
11     Q.  You haven't seen a person doing that?  You haven't
12 seen a security officer doing that?
13     A.  I have seen the security officers at the Warren
14 Tech Center rotate their posts through a course of a day, a
15 week, a month, a year.
16     Q.  Okay.  Who have you seen do that?
17     A.  I don't remember all of the officer's names.
18     Q.  Any names?  Because all I have talked to is Richard
19 Bova and Christine Ross and Deborah Williams.  I don't want
20 to have to subpoena all of the G4S security officers.
21     A.  Deborah Williams worked in the control center for a
22 period of time, she also worked on patrol, she worked in
23 lobbies, she did mobile patrol, which includes walking
24 building patrols to verify security.  I don't recall Richard
25 Bova off the top of my head but, again, traditional security

Page 37

1  officer work encompasses multiple tasks through the course of
2  a day based upon the events, the line up, what is occurring
3  at the site.
4      Q.  And none of them -- when I say none, I mean Richard
5  Bova, Christine Ross, Deborah Williams, none of the security
6  officers have testified that they rotated on a daily basis,
7  so that's why I am trying to understand when you said you
8  know that she rotated, I am trying to understand, why do you
9  know that she rotated when she did not testify that she
10 rotated?
11     A.  I can't speak for why she answered the way she did.
12     Q.  Okay.  Well, we have three people that testified
13 that they did not rotate on a daily basis, and you haven't
14 seen the schedules.  I might be able to get Counsel to copy
15 the schedules that we had produced for us, but it doesn't
16 appear that they rotate on a daily basis.
17         The next question that I have for you regards her
18 request.  You said that she made a request.  What type of
19 request did she make?  What is your familiarity with
20 Christine Ross's request?
21     A.  I know that she indicated that she couldn't perform
22 those jobs.  I referred back to Landon and DeShon Hill that
23 they needed to contact HR to set up for a medical evaluation.
24     Q.  And when you say you know that she indicated she
25 could not perform those jobs, what are you talking about?

EEOC vs G4S Secure Solutions USA, Inc.
DRENT, DONALD 07/31/2018

Job 7214
38..41

Page 38

1 Did she tell you that she could not perform those jobs?
2 **A. No, I got a phone call from Landon.**
3 Q. Okay. So you got the phone call from Landon
4 Pickens?
5 **A. Right.**
6
7 **(Deposition Exhibit No(s) 1**
8 **marked for identification.)**
9
10 BY MS. CAMPBELL:
11 Q. Mr. Drent, you have been handed a document that has
12 been marked as Exhibit 1. I would ask that you review the
13 document and look up when you have done so.
14 Do you recall reviewing this document?
15 **A. No, ma'am.**
16 Q. Have you ever seen this before?
17 **A. No.**
18 Q. So if Juanita Resar testified that she provided you
19 with this document and that it was your decision as to what
20 to do with it, what would you say to that?
21 **A. I don't recall ever seeing this.**
22 Q. Okay. Having reviewed the document, you understand
23 that, you know, she asked for an accommodation or -- this is
24 Juanita Resar, right?
25 **A. Correct.**

Page 39

1 Q. And Juanita Resar is human resources, right?
2 **A. Correct.**
3 Q. And so it is your testimony today that you have
4 never seen this document before?
5 **A. That's correct.**
6 Q. If you had seen this document when Juanita Resar
7 indicated that she had given it to you, what would you have
8 done with it?
9 **A. I would have referred -- based upon the information**
10 **that's in here, I would have referred back to Juanita to say**
11 **that we need to get an independent medical evaluation to**
12 **determine her fitness for duty.**
13 Q. And an independent medical evaluation would be
14 ordered even if doctor's notes have already been provided,
15 right?
16 **A. Correct.**
17 MS. CAMPBELL: Off the record for a second.
18
19 (Whereupon a break was held.)
20
21 (Deposition Exhibit No(s) 2 - 4
22 marked for identification.)
23 MS. CAMPBELL: We are back on the record after
24 taking a brief break.
25 BY MS. CAMPBELL:

Page 40

1 Q. Mr. Drent, what is the date on Exhibit 1, the
2 letter that you said that you hadn't seen before?
3 **A. The date on this is May 26th, 2015.**
4 Q. Okay. And you have been handed the document that
5 has been marked as Exhibit 2. Can you identify this document
6 for the record.
7 **A. Exhibit 2 appears to be an e-mail from me to DeShon**
8 **Hill, Landon Pickens, and Juanita Resar, who is the HR**
9 **manager.**
10 Q. And that e-mail says: We need to place Officer
11 Ross on investigatory suspension pending further medical
12 evaluation. Right?
13 **A. Correct.**
14 Q. What caused you -- well, let me ask you this, what
15 is the date of the e-mail?
16 **A. The date of the e-mail is May 29th, 2015.**
17 Q. What caused you to send this e-mail -- and you have
18 a carbon copy to Juanita Resar, what caused you to send this
19 e-mail to DeShon and Landon?
20 **A. I believe it was a telephone conversation that I**
21 **had had with Landon and DeShon referencing the discussion**
22 **that they had with Juanita Resar concerning Ms. Ross's**
23 **situation.**
24 Q. Okay. So if Juanita Resar testified that she
25 provided you with Exhibit 1, and in response, you know, you

Page 41

1 guys discussed it and you sent that e-mail to DeShon and
2 Landon, you would dispute that or --
3 **A. I don't recall ever seeing this letter.**
4 Q. Okay. Do you recall prior to sending the e-mail
5 having a conversation with Juanita Resar?
6 **A. I don't believe I talked to her, I think, if I**
7 **recall correctly, I spoke directly with DeShon and Landon.**
8 Q. Okay. So is it that you don't recall but you are
9 not necessarily saying it didn't happen?
10 **A. I don't recall.**
11 Q. Okay. So you don't recall either way speaking to
12 Juanita Resar before the e-mail was sent?
13 **A. That is correct.**
14 Q. Okay. But you do recall speaking to Landon Pickens
15 before the e-mail was sent?
16 **A. Yes.**
17 Q. Okay. So why did you make the decision to place
18 Ross on an investigatory suspension pending further medical
19 evaluation?
20 **A. Based upon the discussion, as I recall it, that she**
21 **indicated that she couldn't perform the essential functions**
22 **of the security officer.**
23 Q. So she was placed on the suspension to test whether
24 she could, in fact, perform the essential functions of the
25 security officer position?

EEOC vs G4S Secure Solutions USA, Inc.
DRENT, DONALD 07/31/2018

Job 7214
42..45

Page 42

1   A. Correct.
2   Q. And if you look at Exhibit 3, the document that you
3   have been handed, can you identify that for the record.
4   A. This is a form that we used when we place an
5   officer on an investigatory suspension.
6   Q. Okay. And whose handwriting is that under where it
7   says Security Chief/Ops/SM/or designee?
8   A. That's -- I believe that is DeShon Hill's.
9   Q. Okay. But you were the person who decided that she
10  should be placed on the suspension, right?
11  A. I provided direction to place her on investigatory
12  suspension.
13  Q. So you were the person who decided that she should
14  be placed on an investigatory suspension, right?
15  A. I provided that direction, yes.
16  Q. Okay. And if you look on this form, it says:
17  Inability to meet minimum standards for a security officer
18  assigned to the GM/Delphi account.
19      Do you see that?
20  A. Yes.
21  Q. Is that the reason why she was suspended?
22  A. Yes.
23  Q. Where are the minimum standards outlined, if
24  anywhere, in writing?
25  A. They are defined in the job description, as well as

Page 43

1   in the GM contract.
2   Q. And I have requested the GM contract. Do you know
3   approximately where in the GM contract they are outlined?
4   A. I can't tell you the specific page and paragraph
5   off the top of my head.
6   Q. Okay. Is it a large contract?
7   A. Yes.
8   Q. About how many pages?
9   A. Over 400.
10  Q. Okay. Are the minimum standards outlined in the
11  contract similar to the ones in the job description?
12  A. Yes.
13  Q. Do you know if they are identical?
14  A. I couldn't attest to them being identical.
15  Q. Okay. Do you know what happened once Christine
16  Ross was placed on the investigatory suspension?
17  A. No, I do not.
18  Q. And it appears from this exhibit she was placed on
19  a suspension June 2nd, 2015; is that correct?
20  A. Yes.
21  Q. So you don't know anything beyond her being placed
22  on the investigatory suspension; is that right?
23  A. Can you define that? Or redefine that?
24  Q. Well, I asked you what happened after this, and you
25  said you don't know. After she was placed on the suspension,

Page 44

1   what happened next? You don't know, right?
2   A. She should have been -- and it is strictly an
3   assumption on my part, but she should have been scheduled for
4   a physical.
5   Q. Okay. Well, I'll show you the next exhibit is
6   actually Exhibit 4, where it says authorization for
7   examination or treatment; do you see that?
8   A. Yes.
9   Q. Okay. Can you tell me if you have ever seen this
10  before?
11  A. I have seen the form. I am not engaged in the
12  issuance of this form to any of the officers.
13  Q. Okay. So you have seen the form but you haven't
14  seen a completed form, right?
15  A. Correct.
16  Q. Okay. And you haven't seen Exhibit 4 before?
17  A. No.
18  Q. Okay. And it looks like Exhibit 4 is an
19  authorization for examination which was authorized by Juanita
20  Resar, right?
21  A. Correct.
22  Q. So let me just understand. It sounds like you
23  recall Landon speaking to you and then making a decision to
24  place Christine Ross on investigatory suspension, right?
25  A. That is correct.

Page 45

1   Q. And then after that you don't know what happened
2   next or didn't have any involvement in what happened next?
3   A. Correct.
4   Q. Were you involved in Christine Ross being
5   terminated?
6   A. No.
7   Q. Do you know, as we are sitting here today, why she
8   was terminated?
9   A. My understanding of Ms. Ross's incident involved
10  being unable to perform the job; she was sent for a fitness
11  for duty physical, and she was cleared to return to work, and
12  then she was a no call, no show.
13  Q. Okay. And where do you get the understanding that
14  she was cleared to return to work?
15  A. She was scheduled for work and then she failed to
16  come to work for three days, and then we removed her from the
17  account for no call, no show.
18  Q. Okay. Where do you get the understanding that she
19  was cleared to return to work?
20  A. If I recall correctly, I received a notification
21  via telephone that she was eligible to return to work with no
22  restrictions.
23  Q. Do you know who notified you?
24  A. I believe it was Juanita Resar.
25  Q. And where do you get the understanding that she was

EEOC vs G4S Secure Solutions USA, Inc.
DRENT, DONALD 07/31/2018

Job 7214
46..48

Page 46

1 a no call, no show?
2    A.  She didn't show up for work when she was scheduled,
3 and that was the information that was provided to me by
4 Landon Pickens.
5    Q.  So you weren't involved in the scheduling, right?
6    A.  That's correct.
7    Q.  And you don't know if she was ever removed from her
8 suspension, right?
9    A.  She was notified to be placed back on the schedule
10 to report to work.  She would have been removed from that
11 suspension at that time.
12    Q.  But you don't know if she actually was notified,
13 right?
14    A.  No, I do not.
15    Q.  I mean, I haven't been able to talk to anyone who
16 actually notified her, so that's why I am asking you.
17        And you don't know if she was actually placed on
18 the schedule, right?
19    A.  Only that I was told that she was.
20    Q.  And her termination had nothing to do with her not
21 performing CPR to someone, right?
22    A.  To my knowledge.
23    Q.  To your knowledge it has nothing to do --
24    A.  That is correct.
25    Q.  Do you recall an incident where a security officer

Page 47

1 was suspended and ultimately terminated because the officer
2 did not provide CPR to a client?
3    A.  Not that I can recall.
4    Q.  When was the last time you spoke to Landon Pickens?
5    A.  Oh, back in February of 2018, as the contract
6 ended.
7    Q.  Okay.  In January of 2018, was he a direct report
8 to you?
9    A.  Yes.
10    Q.  So since he is no longer a direct report, you
11 haven't communicated with him?
12    A.  No.
13
14        (Whereupon a discussion was
15        held off the record.)
16
17    MS. CAMPBELL:  I have no further questions, Mr.
18 Drent.
19    THE WITNESS:  Thank you.
20    MR. MIHELICK:  You are all done.
21
22        (Whereupon deposition was concluded at
23        about 11:02 a.m.)
24
25

Page 48

CERTIFICATE OF REPORTER

STATE OF MICHIGAN )
        SS      )
COUNTY OF  OAKLAND)

            I hereby certify that on the date and at
the place hereinbefore set forth, I reported stenographically
the proceedings held in the matter hereinbefore set forth,
and that the testimony so recorded was subsequently
transcribed by me with the use of computer-aided
transcription under my direction and supervision, and that
the foregoing is a full, true and accurate transcript of my
original stenotype notes.

DATE: 8/10/18                 *Kelly Forfar*

                Kelly Forfar

                (CSR-3618)

                Certified Reporter

Notary Public:

County of Oakland

My Commission Expires:

January 4, 2021

**Exhibits**

**Exhibit 1** 3:12 38:12 40:1,25
**Exhibit 2** 3:13 40:5,7
**Exhibit 3** 3:14 42:2
**Exhibit 4** 3:15 44:6,16,18

**1**

**1** 38:7,12 40:1,25
**10** 25:11,16,25 26:5
**10,000** 27:9
**11** 8:5
**11:02** 47:23
**12** 6:25
**12s** 31:25
**1450** 12:20
**150** 24:23
**17** 6:25
**18** 8:5 11:23,24
**1976** 6:20 7:16
**1989** 7:24
**1994** 9:8

**2**

**2** 39:21 40:5,7
**2007** 9:10
**2012** 9:22,23 10:1
**2013** 10:8,16 15:10
**2014** 10:20,22 12:13
**2015** 12:19 13:3,21 14:5 40:3,16 43:19
**2018** 4:2 12:13 47:5,7
**2200** 12:23
**26th** 40:3
**29th** 40:16

**2nd** 43:19

**3**

**3** 42:2
**31st** 4:2

**4**

**4** 39:21 44:6,16,18
**400** 43:9

**5**

**50** 30:23

**6**

**68** 7:8,14,20
**6817** 5:20

**9**

**9:42** 4:3

**A**

**a.m.** 4:3 47:23
**ability** 5:15 15:7 29:22
**able** 14:3 17:6 29:10 30:6,21,22, 23 37:14 46:15
**about** 4:3,23,24 6:10 12:18 15:6 22:20 25:1 28:9 30:19 31:9 32:2, 22 34:24 37:25 43:8 47:23
**accommodate** 20:11 30:18
**accommodation** 15:19 16:1,5, 8,13,19,22 17:1 18:12,22 19:19 20:7,12,15 21:1 28:21 38:23
**accommodations** 15:12
**account** 12:20,24 16:6 19:25 20:1 32:6 42:18 45:17
**accounts** 11:13 12:16 14:11,13 21:22

**acquired** 9:11,18
**Act** 15:4 30:20 31:4
**active** 8:8
**activities** 23:25 24:7,13 25:14 28:3
**activity** 36:5
**actual** 33:15
**actually** 7:14 44:6 46:12,16,17
**ADA** 15:6,13,19 16:1 30:19
**address** 5:19 32:21 33:21
**administer** 17:14 30:24
**administered** 31:19
**administers** 18:3 19:20
**advised** 32:20
**advises** 34:11
**after** 6:21 17:9 27:6 39:23 43:24, 25 45:1
**again** 30:5 32:5,7 36:25
**against** 4:18
**age** 8:5
**agilely** 29:13
**ago** 15:21
**agree** 29:18
**ahead** 21:18
**Air** 6:23,24 7:3,12,17 8:1,7,8,14
**aligned** 11:18
**allowance** 30:18
**allowed** 20:7 23:8
**already** 20:14,20 39:14
**also** 5:4 7:17 22:23 36:22
**alternatives** 29:4
**always** 32:11
**Americans** 15:4 30:19 31:4
**and/or** 14:24 15:2
**another** 11:8 25:5
**answer** 5:6 17:3 18:5,15,17 21:18 23:1,19 29:6 30:8

**answered** 17:6 37:11

**anticipate** 5:10

**any** 5:5,11,14 6:22 7:3,23 13:14 14:15,19 15:3,11,24 16:3,12 23:22 31:17 32:1,8,13 34:16,21 35:15 36:18 44:12 45:2

**anyone** 46:15

**anything** 5:17 13:8,12,22 16:25 28:4 32:17 43:21

**anyway** 22:17 23:18

**anywhere** 25:4 42:24

**appear** 37:16

**appears** 40:7 43:18

**appointment** 17:13

**appointments** 16:12,15

**approximate** 13:1

**approximately** 9:7 11:7 12:20, 23 24:23 43:3

**are** 5:14,23 6:1 17:21 18:1 19:6 20:9 22:1,3,19 24:20 25:16 26:21 28:8,12,17,23 29:6 30:25 32:10, 13,20 33:2,5,7,17,20,23 34:4,6,14 36:3 37:25 39:23 41:8 42:23,25 43:3,10,13 45:7 47:20

**area** 33:6

**arose** 35:3

**arrange** 17:12

**arranged** 16:9,10

**arrested** 5:17

**ask** 4:19 5:2,4,5 6:9 19:10 23:11 30:12 31:8 33:12 38:12 40:14

**asked** 38:23 43:24

**asking** 13:21 46:16

**asleep** 32:2

**assigned** 14:12 25:3,11,16 27:20 42:18

**assignments** 35:2,9,20,21 36:3

**assistance** 29:18

**associate** 7:17

**associate's** 7:7,11

**assume** 5:7

**assumption** 44:3

**attendance** 15:2 32:4

**attest** 15:22 28:16 43:14

**attorney** 4:16

**authority** 20:10

**authorization** 44:6,19

**authorized** 44:19

**Autodie** 8:22

**automotive** 8:17

**Avenue** 5:20

**awarded** 9:25

**aware** 21:14 32:14 34:2

**away** 32:17

---

## B

**B-E-L-D-I-N-G** 6:14

**back** 6:2 8:16 13:7 18:1 31:25 35:5 37:22 39:10,23 46:9 47:5

**background** 6:9

**badge** 32:15,19

**based** 15:1 16:18 18:21 19:2 27:24,25 31:16 35:13 36:5 37:2 39:9 41:20

**basic** 7:9 8:18 24:4

**basically** 9:10 10:18 11:1 19:6 35:5

**basing** 36:3

**basis** 14:16 25:16,18,20,22 26:16 27:21,24 28:5,8,13 37:6,13,16

**became** 10:20

**because** 5:3,6 19:3 21:3,21 22:4 26:18 28:9 29:5,13 30:17 31:2 35:10 36:18 47:1

**become** 28:3

**been** 4:6,18,21 5:17 21:14 35:22, 23 38:11,12 39:14 40:4,5 42:3 44:2,3 46:10,15

**before** 4:21 38:16 39:4 40:2 41:12,15 44:10,16

**being** 20:7 27:20 32:6 33:16 34:1 43:14,21 45:4,10

**Belding** 6:12,14,15

**belief** 35:12

**believe** 40:20 41:6 42:8 45:24

**bend** 30:22

**better** 26:14,18

**between** 18:23 23:22 25:4 34:5

**beyond** 7:3 43:21

**bit** 13:7

**blended** 12:22

**both** 7:6

**bottom** 33:19

**Bova** 26:4 36:19,25 37:5

**boxes** 33:17

**break** 5:9,11 22:1 35:7 39:19,24

**brief** 39:24

**building** 22:16 24:8 36:24

---

## C

**call** 35:6 38:2,3 45:12,17 46:1

**called** 9:4 26:17

**calls** 34:1,3

**came** 8:16 19:22 22:17 32:3 35:5

**Campbell** 4:10,15 6:16 13:6 17:8 18:8,16,24 19:13 21:25 22:9,14, 19,21 23:3,7,9,12,16,18,21 38:10 39:17,23,25 47:17

**can** 4:11 16:6 17:1,3 18:4,17 21:18 22:20 23:1,9,11,19 24:25 28:16 29:1,24,25 31:12,19,24 40:5 42:3 43:23 44:9 47:3

**can't** 15:20 20:2,6 29:2,7,8 37:11 43:4

**cannot** 28:20 30:3,13,14 31:2

**capacities** 30:7

carbon 40:18

case 4:18 13:20 20:3 21:1 22:20 31:17 32:6

caused 32:2 40:14,17,18

causing 32:9

center 12:3,4 24:2,19,21 27:17 29:9 30:15 32:25 35:10 36:14,21

certain 33:13

certifications 7:9

chain 14:10

change 11:8

changed 9:11 10:19,22

character 14:1

check 24:5,9 33:17

chief 27:5,6

Chief/ops/sm/or 42:7

chiefs 9:16,17 14:17

Christina 23:4

Christine 13:24 14:3 15:25 20:25 22:22,24 25:24 34:19,21,25 35:8, 18 36:19 37:5,20 43:15 44:24 45:4

cites 18:22

clarification 16:12

cleared 45:11,14,19

client 47:2

climb 30:22

College 7:12,17

combination 34:5

come 25:2 45:16

command 7:10 14:11

Commission 4:16,17

commonly 31:22

communicated 47:11

Community 7:12,17

company 8:20

complacency 28:10

complacent 28:3

complete 7:11

completed 7:8,14,16,20 44:14

Concentra 17:20,22,23 18:2,11

concerning 40:22

concluded 47:22

condition 18:10 32:1

conduct 24:6

conducted 18:23

conferences 15:14

confines 19:24

consider 15:7 29:4

construction 35:25

consulting 13:10

contact 16:23 32:20 33:20 37:23

contacted 20:14 21:2,7

contract 9:24,25 11:25 14:25 19:25 22:16,18 24:14 26:17 28:4, 9,17 30:5,18 35:13 43:1,2,3,6,11 47:5

contracts 10:15 11:4

control 36:21

conversation 40:20 41:5

coordinator 9:4,5,14 27:2

coordinators 9:16 14:18

copy 37:14 40:18

corporate 11:18,19

correct 14:14 19:5 25:19,21 27:16 38:25 39:2,5,16 40:13 41:13 42:1 43:19 44:15,21,25 45:3 46:6,24

correctly 21:11 41:7 45:20

cot 30:25

could 5:14 15:22 16:21 18:12 21:9 25:6,7,8 29:17 35:5,15,22, 23,24 37:25 38:1 41:24

couldn't 19:23 21:3,12 24:22 30:16,17 37:21 41:21 43:14

Counsel 37:14

course 7:5,23 21:24 25:13 28:2, 18 36:14 37:1

court 5:3,24 6:13

CPR 30:24 46:21 47:2

credit 7:8

critical 31:1

current 5:19

currently 12:7

cut 12:11

D

D-O-N 5:21

daily 25:16,22 27:21,24 28:5,8,13 37:6,13,16

dairy 8:3,4

date 15:23 33:16 34:7 40:1,3,15, 16

day 6:3 21:24 25:13 26:18 27:10 36:14 37:2

days 6:25 45:16

dealing 18:21

Deborah 22:23 36:19,21 37:5

decided 42:9,13

decision 19:7,8,19 38:19 41:17 44:23

define 29:23 36:9 43:23

defined 28:1 31:3 42:25

degree 7:7,11

delivery 24:10

demands 30:16

department 16:14

deposed 4:21

deposing 4:19

deposition 5:11 13:8,16,17 19:3, 4 38:7 39:21 47:22

description 16:19 30:21 31:1 42:25 43:11

# DEPOSITION EXHIBITS

# OF

# DONALD DRENT

May. 27. 2015  9:00AM                                               No. 0281     P. 1

May 26, 2015

Juanita Resar
G4S Solutions
Human Resources Specialist
Fax: 248-374-0230

Dear Ms. Resar:

My name is Christine Ross. I work at the Warren Tech Center. I am writing you this letter to
discuss an issue that I am having with my patrol. My post was Dock 10, a desk position and a 32-
hour position. After shift preference Deshon Hill (site coordinator), who does the scheduling,
changed my position to a 37-hour position and Dock on Monday and Tuesday and Wednesday,
Thursday and Friday, patrolling the building. I called her and stated that I have the highest
seniority on my shift. I asked her why did she change my hours and post?

I have FMLA and cannot do excessive walking. Deshon stated that she's designated to place an
officer wherever she wants and asked me if I can perform my duties. I stated that I can perform
my duties but due to my medical condition (Mixed Connective Tissue Disease), I cannot do
excessive walking and she said I will look into your situation and get back with you. On Tuesday,
May 5, I saw Sgt. Tracy Williams and asked her did Deshon Hill look into my situation and she
said Deshon said she's not going to change anything. On Wednesday, May 6, I reported to work.
I began to conduct my patrols and was not trained to use the scanner or the locations of
barcodes to scan the building. It took me eight hours to complete the building patrol. At
approximately 2030, I saw Sgt Phil and stated to him that my foot was in a lot of pain and I
don't know if I can handle this excess walking and he said to just take your time. The next day, I
couldn't stand on my foot. I was bed-ridden for two days and the pain lasted a week. My doctor
has ordered me to limit my walking (see FMLA report).

Ms. Resar, I'm a faithful employee, never a complaint against me and always at work on time. I
never missed work. I always show courtesy to clients. I always perform my duties. I enjoy my
job, but I am unable to do the foot patrols. Due to my medical condition, I am requesting that
you please return me to my post at DK10.

If you require additional information or would like to speak with me, please feel free to call me
at 313-372-7628.



**Don Drent (C)** <don.drent@gm.com>                                    Fri, May 29, 2015 at 3:15 PM
To: "Deshon Hill (C)" <deshon.hill@gm.com>, "Landon Pickens (C)' <landon.pickens@gm.com>
Cc: Juanita Resar <juanita.resar@usa.g4s.com>

Deshon and Landon:

We need to place Officer Ross on Investigatory Suspension pending further Medical Evaluation....

Don

Donald R. Drent

U.S. Operation Manager

G4S Secure Solutions (USA) Inc.

300 Renaissance Center

MC: 482-C31-C22

Detroit, MI 48265

Office: 313 665 7716

Cell: 313 806 1098

don.drent@gm.com

don.drent@usa.g4s.com

Nothing in this message is intended to constitute an electronic signature unless a specific
statement to the contrary is included in this message. Confidentiality Note: This message
is intended only for the person or entity to which it is addressed. It may contain
confidential and/or privileged material. Any review, transmission, dissemination or other
use, or taking of any action in reliance upon this message by persons or entities other
than the intended recipient is prohibited and may be unlawful. If you received this
message in error, please contact the sender and delete it from your computer.

https://mail.google.com/mail/?ui=2&ik=5eab0db62d&view=pt&q=ross&qs=true&search=...  7/24/2015



Christine Ross Litigation
G4S 000308

g4s Mail - Officer Ross

Nothing in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message.

Confidentiality Note: This message is intended only for the person or entity to which it is addressed. It may contain confidential and/or privileged material. Any review, transmission, dissemination or other use, or taking of any action in reliance upon this message by persons or entities other than the intended recipient is prohibited and may be unlawful. If you received this message in error, please contact the sender and delete it from your computer.

---

**Juanita Resar** <juanita.resar@usa.g4s.com>                                    Fri, May 29, 2015 at 4:57 PM
To: "Don Drent (C)" <don.drent@gm.com>
Cc: "Deshon Hill (C)" <deshon.hill@gm.com>, "Landon Pickens (C)" <landon.pickens@gm.com>

Everyone,

Attached please find all forms needed for Christine Ross to take to Concentra Medical Center for the Employee Related Physical.
Should you have any questions, please feel free to contact me.

Thank you,

On Fri, May 29, 2015 at 3:15 PM, Don Drent (C) <don.drent@gm.com> wrote:

Deshon and Landon:

We need to place Officer Ross on Investigatory Suspension pending further Medical Evaluation....

Don

. Donald R. Drent

; U.S. Operation Manager

G4S Secure Solutions (USA) Inc.

300 Renaissance Center

MC: 482-C31-C22

Detroit, MI 48265

· Office: 313 665 7716

· Cell: 313 806 1098

don.drent@gm.com

don.drent@usa.g4s.com

G4S 000309

g4s Mail - Officer Ross

Nothing in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message. Confidentiality Note: This message is intended only for the person or entity to which it is addressed. It may contain confidential and/or privileged material. Any review, transmission, dissemination or other use, or taking of any action in reliance upon this message by persons or entities other than the intended recipient is prohibited and may be unlawful. If you received this message in error, please contact the sender and delete it from your computer.

Nothing in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message.

Confidentiality Note: This message is intended only for the person or entity to which it is addressed. It may contain confidential and/or privileged material. Any review, transmission, dissemination or other use, or taking of any action in reliance upon this message by persons or entities other than the intended recipient is prohibited and may be unlawful. If you received this message in error, please contact the sender and delete it from your computer.

--
Juanita Resar
HR Manager
Detroit Area Office
G4S Secure Solutions (USA) Inc.
22670 Haggerty Rd. Suite 101
Farmington Hills, MI 48335
(248) 477-9714 Office
(248) 225-9503 Mobile
(248) 374-0231 Fax

3 attachments

SO JOB DESCRIPTION.doc
179K

Christine Ross.pdf
59K

Employment Related Physical.docx
277K

Deshon Hill (C) <deshon.hill@gm.com>                    Mon, Jun 1, 2015 at 3:11 PM
To: "Juanita Resar (juanita.resar@usa.g4s.com)" <juanita.resar@usa.g4s.com>
Cc: "Landon Pickens (C)" <landon.pickens@gm.com>

Juanita,

Ross finally returned my call. Ross will be at Site on June 2nd to meet with myself and Landon at 9am.

g4s Mail - Officer Ross

Thanks,

DaShon Hill

Site Coordinator – General Motors Tech Center

North Wall Guardant- Research,RCE-L, RE-EN, Man A, B &C, CWT and Site Ops

G4S Secure Solutions, USA

6250 Chicago Rd, Warren, MI 48090

Office: (586) 947-0243

Cell: 248-343-9741

Fax: (586) 586-906-1090

Email: deshon.hill@gm.com

"Safety is our overriding priority"

From: Juanita Resar [mailto:juanita.resar@usa.g4s.com]
Sent: Friday, May 29, 2015 4:58 PM
To: Don Drent (C)
Cc: Deshon Hill (C); Landon Pickens (C)
Subject: Re: Officer Ross

Everyone,

Attached please find all forms needed for Christine Ross to take to Concentra Medical Center for the Employee Related Physical.

Should you have any questions, please feel free to contact me.

Thank you,

On Fri, May 29, 2015 at 3:15 PM, Don Drent (C) <don.drent@gm.com> wrote:

. Deshon and Landon:

We need to place Officer Ross on Investigatory Suspension pending further Medical Evaluation....

https://mail.google.com/mail/?ui=2&ik=5eab0db62d&view=pt&q=ross&qs=true&search=... 7/22/2016

G4S 000311

# INVESTIGATORY SUSPENSION FORM
## FOR GM ACCOUNT

**DATE:** _June 2, 2015_     **SITE:** _WTC_

**TO:** _Christine Ross_

**FROM:** _DeShon Hill_     _Security Coordinator_
            Name                      Title

**DISTRICT OFFICE:** _Farmington Hill_

**RE:**    **INVESTIGATORY SUSPENSION**

This is to notify you that you are being placed on Investigatory Suspension due to:
*Check appropriate box(s)*

- ☐   Sleeping on the job
- ☐   Theft/Misappropriation
- ☐   Fraud/Falsification of documents
- ☐   Violation of Substance Abuse Policy
- ☐   Violence in the work place
- ☐   Walking off the Job/Post Abandonment
- ☐   Inappropriate behavior/Failure to follow a direct order
- ☐   Bringing a firearm on client property
- ☐   Harassment and/or Discriminatory Conduct
- ☐   Willful/negligent, destruction and/or damage of company/client property
- ☐   Sale, transfer or loan of company/client badge or access card
- ☐   Arrest for criminal activity pending resolutions of the matter
- ☐   Absence of three or more consecutive days without calling in ("No call, no show")
- ☐   Disclosure of proprietary or confidential information
- ☑   Inability to meet Minimum Standards for Security Officers assigned to the GM/Delphi Account
- ☐   Other _____

*As part of the investigation, you will be notified at your last known telephone number as to the date, time and place of an interview.*

I have read this form and have received a copy. My signature below merely acknowledges receipt of this form.

_Christine Ross_                           _(signature)_
Employee Signature    Supervisor's Signature        Security Chief/Ops/SM/ or designee
(Acknowledging Receipt)                              Signature

_6-2-15_                                       _6/2/15_
Date                           Date                         Date

♦ THE UNION MUST BE PROVIDED A COPY AT REPRESENTED SITES ♦

Issued: 8/24/2012 DRD    _Christine Ross._           Page 1 of 1

_G4S Secure Solutions_

EXHIBIT 3
7.31.18
PERIOD 000-031-0000

CASH CONNECTION     3135321BB75     23:84    07/07/2015

PAGE 02

56

# Concentra

*(Patient Must Present Photo ID at Time of Service)*

## Authorization for Examination or Treatment

Patient Name: Christine Ross          Social Security Number: ▮▮▮▮▮▮▮▮

Employer: _____     Date of Birth: ▮▮▮▮▮▮▮

Street Address: **G4S Secure Solutions (USA) Inc.**     Location Number: 02 - GMC
**22670 Haggerty Rd, Suite 101**
**Farmington Hills, MI 48335**
Temporary Staffing Agency: _____

### Work Related

❑ Injury    ❑ Illness

Date of injury _____

### Substance Abuse Testing* (check all that apply)

❑ Regulated drug screen    ❑ Breath alcohol

❑ Collection only    ❑ Hair collect

❑ Non-regulated drug screen    ❑ Rapid drug screen

❑ Other _____

### Type of Substance Abuse Testing

❑ Preplacement    ❑ Reasonable cause

❑ Post-accident    ❑ Random

❑ Follow-up

Special instructions/comments: _____
_____
_____
_____

### Physical Examination

❑ Preplacement    ❑ Baseline    ❑ Annual    ❑ Exit

### DOT Physical Examination

❑ Preplacement    ❑ Recertification

### Special Examination

❑ Asbestos    ❑ Respirator    ❑ Audiogram

❑ Human Performance Evaluation*

❑ HAZMAT    ❑ Medical Surveillance

☑ Other Employee Related Physical

### Billing (check if applicable)

❑ Employee to pay charges

> **EXHIBIT**
> 4
> 7-31-18

★ Due to the nature of these specific services, only the patient and staff are allowed in the testing/treatment area. Please alert your employee so that they can make arrangements for children or others that might otherwise be accompanying them to the medical center.

Authorized by: Juanita Recer          Title: HR Manager
*Please print*

Phone: 248 , 477 9714          May 29th, 205
*Date*

Concentra now offers urgent care services for non-work related illness and injury. We accept many insurance plans.

*(Copies of this form are available at www.concentra.com)*

© 2008 Concentra Inc. All Rights Reserved. 05/05

Christine Ross Litigation
G4S 000307