# EXHIBIT 6

```
 1                    UNITED STATES DISTRICT COURT
 2                    EASTERN DISTRICT OF MICHIGAN
 3                          SOUTHERN DIVISION
 4
 5    EQUAL EMPLOYMENT
 6    OPPORTUNITY COMMISSION,
 7            Plaintiff,
 8                                    Civil Action
 9    -vs-                            Case No. 2:17-cv-13195
10                                    Magistrate:  R. Steven Whalen
11    G4S SECURE SOLUTIONS
12    USA, INC.,
13            Defendant.
14                                                /
15    PAGE 1 TO 84
16
17    The Deposition of DeSHON HILL,
18    Taken at 900 Wilshire Drive,
19    Troy, Michigan,
20    Commencing at 10:00 a.m.,
21    Wednesday, June 6th, 2018,
22    Before Kelly Forfar, CSR-3618.
23
24
25
```



1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF MICHIGAN

3                         SOUTHERN DIVISION

4

5     EQUAL EMPLOYMENT

6     OPPORTUNITY COMMISSION,

7              Plaintiff,

8                                   Civil Action

9     -vs-                          Case No. 2:17-cv-13195

10                                  Magistrate:  R. Steven Whalen

11    G4S SECURE SOLUTIONS

12    USA, INC.,

13              Defendant.

14                                             /

15    PAGE 1 TO 84

16

17    The Deposition of DeSHON HILL,

18    Taken at 900 Wilshire Drive,

19    Troy, Michigan,

20    Commencing at 10:00 a.m.,

21    Wednesday, June 6th, 2018,

22    Before Kelly Forfar, CSR-3618.

23

24

25

Page 2

```
 1   APPEARANCES:
 2   MS. NEDRA CAMPBELL (P58768)
 3   Equal Employment Opportunity Commission
 4   477 Michigan Avenue
 5   Room 865
 6   Detroit, MI  48226
 7   (313)226-3410
 8   Nedra.campbell@eeoc.gov
 9            Appearing on behalf of the Plaintiff.
10
11   MR. J. TRAVIS MIHELICK (P73050)
12   Dinsmore & Shohl, LLP
13   900 Wilshire Drive
14   Suite 300
15   Troy, MI  48084
16   (248)203-1655
17   travis.mihelick@dinsmore.com
18            Appearing on behalf of the Defendant.
19
20
21
22
23
24
25
```

Page 4

1  Troy, Michigan
2  Monday, June 6th, 2018
3  About 10:05 a.m.
4
5
6            DESHON HILL,
7  having first been duly sworn, was examined and testified on
8  her oath as follows:
9
10            EXAMINATION
11  BY MS. CAMPBELL:
12    Q.  Can you please state your name for the record.
13    **A.  DeShon Hill.**
14    Q.  Ms. Hill, my name is Nedra Campbell, I am an
15  attorney for the Equal Employment Opportunity Commission, and
16  I'll be conducting your deposition today.  First, I'm going
17  to go over a few ground rules.  Have you ever been deposed
18  before?
19    **A.  I have not.**
20    Q.  Okay.  So I am going to ask you that you please
21  make sure that you give a verbal response to all of my
22  questions so that the court reporter who is sitting to my
23  left can take down everything that we say.  I am also going
24  to ask that you please let me finish my question and I, in
25  turn, will let you finish your answer so that we can get a

Page 3

```
 1               TABLE OF CONTENTS
 2   Witness                                    Page
 3   DeSHON HILL
 4
 5   Examination by Ms. Campbell                   4
 6   Examination by Mr. Mihelick                  66
 7   Re-Examination by Ms. Campbell               76
 8
 9
10
11               EXHIBITS
12   Exhibit                                    Page
13   DEPOSITION EXHIBIT NUMBER 1                  43
14   DEPOSITION EXHIBIT NUMBER 2                  43
15   DEPOSITION EXHIBIT NUMBER 3                  57
16
17       (Exhibits attached to transcript)
18
19
20
21
22
23
24
25
```

Page 5

1  complete record, okay?
2    **A.  Understood.**
3    Q.  If at any time you need to take a break, just let
4  me know and we can do that, this is not like an endurance
5  race.  I don't anticipate that your deposition will take that
6  long but if -- you know, if you need to take a break, just
7  let me know and that's not a problem.
8    **A.  Okay.**
9    Q.  If you do answer my questions, I am going to assume
10  that you understood my questions.  If for some reason you
11  don't understand my question, please let me know and I will
12  try to rephrase it, okay?
13    **A.  Okay.**
14    Q.  Are you taking any medications that would impair
15  your ability to testify today?
16    **A.  No.**
17    Q.  Have you ever been arrested?
18    **A.  No.**
19    Q.  Have you ever been convicted of committing a crime?
20    **A.  No.**
21    Q.  Let me just go over some background information.
22  What is your current mailing address?
23    **A.  It is 13207 Herbert in Warren, Michigan,**
24  **H-E-R-B-E-R-T.**
25    Q.  And how long have you lived there?

EEOC vs G4S SECURE SOLUTIONS USA, INC.
HILL, DESHON 06/06/2018

Job 6874
6..9

Page 6

1    A.  I have lived there for about six months.
2    Q.  And what is your previous mailing address?
3    A.  It was on Quinkert, I don't remember the address.
4  Quinkert, Q-U-I-N-K-E-R-T, that was in Roseville.
5    Q.  How long did you live at the Quinkert address?
6    A.  Approximately a year.
7    Q.  Did you receive the subpoena demanding your
8  appearance to attend this deposition?
9    A.  I just got a letter in the mail probably like last
10  Friday.  Because of the change of address from the Quinkert
11  Street, I guess that's where it went.
12    Q.  Okay.  And the letter in the mail included a
13  subpoena?
14    A.  No, the letter stated that there was a deposition,
15  I think on the 15th.
16    Q.  Okay.  And how did you hear about the deposition on
17  today's date?
18    A.  I talked to Travis and Landon Pickens, my boss,
19  told me that they have been trying to give me a subpoena.
20    Q.  Okay.  So you live approximately, what, 25, 30
21  minutes from the City of Detroit; is that right?
22    A.  Yes.
23    Q.  About 25, 30 minutes from the federal courthouse in
24  downtown Detroit?
25    A.  I am not sure of the location where the federal

Page 7

1  building is.
2    Q.  Do you know where the Lafayette Coney Island is on
3  Lafayette in downtown Detroit?
4    A.  No.
5    Q.  What do you know in downtown Detroit?
6    A.  I know where like Hart Plaza, the GM building, I
7  know that area.
8    Q.  Okay.  If this goes to trial, would you have a
9  problem with going to court in the federal district court?
10    A.  No.
11    Q.  And if I need to subpoena you, at least for now I
12  would use that Herbert Avenue address?
13    A.  Yes.
14    Q.  What is your e-mail address?
15    A.  It is DeShon, D-E-S-H-O-N, dot Hill at live dot
16  com.
17    Q.  Now you just mentioned Landon Pickens.  Have you
18  discussed, other than with Landon Pickens, your deposition
19  with anyone?
20    A.  I have not.
21    Q.  Did you do anything to prepare for today's
22  deposition?
23    A.  I have been trying to remember the exact specifics
24  but it was so long ago.
25    Q.  So you didn't review any documents?

Page 8

1    A.  I don't have any documents.
2    Q.  So you have no documents to review.  And you didn't
3  review any documents?
4    A.  Correct.
5    Q.  And I want to ask you a few questions about your
6  educational background.  Where did you attend high school?
7    A.  Finney in Detroit, Michigan; F-I-N-N-E-Y.
8    Q.  Did you graduate?
9    A.  I did.
10    Q.  And what year did you graduate?
11    A.  1992.
12    Q.  After you graduated from high school, did you
13  continue your education?
14    A.  Off and on because I was working taking care of my
15  children.
16    Q.  Where did you go?
17    A.  I went to Wayne County for a semester and then I
18  went to Macomb.  I graduated from there, and then transferred
19  to Madonna.
20    Q.  Okay.  So you went to Wayne County Community
21  College for one semester, right?
22    A.  Yes.
23    Q.  And then at some point you went to Macomb Community
24  College?
25    A.  Correct.

Page 9

1    Q.  And how long were you at Macomb Community College?
2    A.  Approximately three years.
3    Q.  And then at some point you transferred to Madonna?
4    A.  Correct.
5    Q.  And what year did you graduate from Madonna?
6    A.  2016.
7    Q.  What was your degree in?
8    A.  Applied science.
9    Q.  So you obtained a BS in applied science?
10    A.  Yes.
11    Q.  What is applied science?
12    A.  It is for paralegal.
13    Q.  Okay.  So beyond the formal education that we have
14  discussed, have you had any other formal education?
15    A.  No.
16    Q.  I want to go back and ask you some questions about
17  your employment background.
18        After high school, what was the -- you know, your
19  first full-time job?
20    A.  It was with Burns Security, B-U-R-N-S.
21    Q.  When did you start with Burns Security?
22    A.  Approximately -- I think it was 1996.  I can't
23  recall the exact year.
24    Q.  Okay.  What did you do for Burns Security?
25    A.  I was a shift supervisor.

EEOC vs G4S SECURE SOLUTIONS USA, INC.
HILL, DESHON 06/06/2018

Job 6874
10..13

Page 10

1    Q.  What were your responsibilities as a shift
2    supervisor?
3        A.  To oversee the officers, ensure the policies and
4    procedures were adhered to, and also doing payroll.
5        Q.  How long did you work for Burns?
6        A.  I think approximately two years.
7        Q.  Okay.  So you think you left in approximately 1998?
8        A.  Yes.
9        Q.  Okay.  After leaving Burns Security, what position
10   did you have next?
11       A.  A shift supervisor with -- it was Pinkerton at the
12   time.
13       Q.  Okay.  So how long did you work for Pinkerton?
14       A.  It probably was a couple of years before they
15   transferred to Securitas because I have been at the same
16   site -- they just changed contract houses.
17       Q.  Okay.  So you have been at the Warren Tech Center
18   since --
19       A.  Since '98.
20       Q.  -- since 1998, okay.
21           So you were at Pinkerton from approximately 1998
22   until it became Securitas?
23       A.  Correct.
24       Q.  Do you know approximately when that was?
25       A.  I can't recall the exact year.

Page 11

1        Q.  Okay.  And you worked as a shift supervisor for
2    Pinkerton.  What were your responsibilities as a shift
3    supervisor for Pinkerton?
4        A.  Training, payroll, overseeing the officers, post
5    checks.
6        Q.  What type of training did you conduct?
7        A.  They have annual training every year so it was
8    either like report writing, fire prevention, confined space.
9        Q.  When Pinkerton became Securitas, did you remain a
10   shift supervisor?
11       A.  I did.
12       Q.  And how long were you a shift supervisor for
13   Securitas?
14       A.  Up until the contract changed and we became G4S.
15       Q.  Okay.  When you say the contract changed, what does
16   that mean?
17       A.  I am sorry, when they -- every couple of years the
18   contract goes up for bid and then another company gets a
19   chance to bid for that contract.
20       Q.  Okay.  And at some point the contract was bidded on
21   by G4S; is that right?
22       A.  Yes.
23       Q.  So then you started working for G4S?
24       A.  Correct.
25       Q.  And how long did you work for G4S?

Page 12

1        A.  Up until January of this year when we transferred
2    to Allied.
3        Q.  Okay.  So you worked for G4S from
4    approximately -- well, you are not really sure when Securitas
5    took over but from the Securitas days until January of 2018;
6    is that right?
7        A.  Correct.
8        Q.  And your current employer is Allied?
9        A.  Allied Barton.
10       Q.  Allied Barton.  Is it B-A-R-T-O-N?
11       A.  Yes.
12       Q.  And that's because Allied Barton bidded on the
13   contract and actually was successful?
14       A.  Correct.
15       Q.  So are you still a shift supervisor?
16       A.  I am a security coordinator.
17       Q.  So I want to go back.  So it sounds like you've
18   never been a line officer; is that correct?
19       A.  For about a month when they first brought me in and
20   then they transferred me to a supervisor.
21       Q.  So when you first started working at Burns, you
22   were a line officer for about one month?
23       A.  Uh-huh, yes.
24       Q.  Okay.  So as a line officer, and I understand this
25   is at Burns, what were your responsibilities?

Page 13

1        A.  Building patrols and also greeted customers at our
2    lobby desk, signed in visitors also.
3        Q.  Was there a position where a person would just sit
4    at the lobby desk?
5        A.  No.
6        Q.  So -- and this is all at the Warren Tech Center,
7    right?  Since you started with Burns, you have worked at the
8    Warren Tech Center?
9        A.  Yes -- no, I am sorry, Burns is at the Wayne
10   Community College --
11       Q.  Okay.
12       A.  And when I went to Pinkerton, at that point, then I
13   was at the Warren Tech Center.
14       Q.  Okay.  So since you worked at Pinkerton in
15   approximately 1998, you worked at the Warren Tech Center?
16       A.  Correct.
17       Q.  And let me ask you this.  At the Warren Tech
18   Center, are there any positions where there are security
19   guards who are at a lobby desk?
20       A.  Yes, we have positions there.
21       Q.  And do you know what their responsibilities are?
22       A.  They are processing visitors, ensuring only
23   authorized access is allowed.
24       Q.  Do you know how much walking they do on like a
25   typical day?

Page 14

1    A.  On a typical day, I am not sure.
2    Q.  What about a typical hour?
3    A.  How much walking?
4    Q.  Yes.
5    A.  If they are rotated out with another officer, they
6  are doing a building patrol or doing partial inspections,
7  like maybe a half an hour; it all can vary.
8    Q.  Okay.  So what does it vary on?
9    A.  Depending on our staffing, depending on if we have
10  special events going on.
11    Q.  Is it possible that a person could be assigned to
12  the lobby where they greet customers and process visitors and
13  only walk maybe, you know, five minutes out of an hour?
14    A.  That's at our specialized posts.
15    Q.  What are the specialized posts?
16    A.  That's -- they have to interview for that position;
17  we only have a couple of lobbies on the side like that.
18    Q.  Where are those located?
19    A.  We have one at research, one at the design building
20  and one at manufacturing C.
21    Q.  Who do they interview with for the position?
22    A.  Either myself or Landon, it depends on who the
23  coordinator is at that time for that building.
24    Q.  So this has nothing to do with seniority, right?
25    A.  It does not, it is a promotion that they would

Page 15

1  receive because it is a higher pay.
2    Q.  Okay.  So you are saying that there are positions
3  where a person might only walk for about, you know, five
4  minutes in an hour but those are specialized posts?
5    A.  Correct.
6    Q.  Okay.  So are there any other positions, any type
7  of lobby positions where a person would not be required to
8  walk --
9    A.  No.
10    Q.  -- the entire time?
11    A.  No.
12    Q.  So how is the lobby manned if the person is
13  constantly walking?
14    A.  Walking around inside the lobby, they may go and
15  check a door, they may be talking to visitors, but they are
16  not sitting the entire time at the lobby desk.
17    Q.  Well, I don't mean the entire time, I said like,
18  you know, fifteen minutes where they are like -- they are
19  pretty much -- they sit down for maybe forty-five minutes and
20  then they walk for maybe fifteen minutes.  Are you saying
21  that there's just a specialized post and those you have to
22  interview for and the rest of the positions, the people are,
23  you know, required to walk around the entire time, if they
24  are, you know, doing like border patrol or --
25    A.  I guess I am not understanding your question.

Page 16

1    Q.  Okay.  So I understand that there are specialized
2  posts, right, and those you have to interview for, right?
3    A.  Correct.
4    Q.  And those are in research, design and manufacturing
5  C, correct?
6    A.  Correct.
7    Q.  So what I want to know is, and I'll ask a better
8  question, what other types of, you know, positions are there
9  beyond the specialized posts?
10    A.  So you want the names of all of our positions that
11  we have at the site?
12    Q.  Yes.
13    A.  Okay.  So we have the specialized lobbies, the
14  regular lobby positions that you don't have to interview for,
15  we have dock positions, inspect trucks, and process all of
16  the visitors that's coming in to that area, and then we have
17  our patrol officers and our gate officers.
18    Q.  Okay.  So you have told me a little bit about what
19  the specialized lobby person does.  What does a regular lobby
20  person do?
21    A.  They do along the same thing except for our
22  specialized lobbies, either ADP is sitting in that building,
23  they may have to grant access to badges.
24    Q.  Okay.
25    A.  It is more of a restricted area.

Page 17

1    Q.  So the regular lobby also will walk maybe five
2  minutes in an hour, right?
3    A.  Correct.
4    Q.  And how about the dock position, what do they do?
5    A.  They process trucks inside of our dock, they may
6  have to go in and inspect the truck, they sign in our
7  contractors to make sure they get escorted.
8    Q.  Is this position located somewhat like near a
9  garage or near a parking area?
10    A.  It is inside of a dock area.
11    Q.  So do these people sit down unless they are
12  processing a truck?
13    A.  They do.
14    Q.  Do you know how many trucks might come through on a
15  typical day?
16    A.  That could vary.
17    Q.  What does it vary based on?
18    A.  Depending on the expected parcels that that
19  particular building is expecting that day.
20    Q.  So say, for example, it is a slow day, is it safe
21  to say that the person doesn't have to, like, get up unless
22  they are processing a truck because, you know, if no trucks
23  are there --
24    A.  There is a lot of activity on the dock, so they are
25  still required to walk around the dock area.

EEOC vs G4S SECURE SOLUTIONS USA, INC.                                          Job 6874
HILL, DESHON 06/06/2018                                                          18..21

Page 18

1    Q.   What type of activity is going on the dock
2    besides the processing of trucks?
3        A.   You have dock workers unloading materials and
4    loading materials, you have contractors coming in for various
5    assignments inside of the building, so they are still
6    processing individuals.
7        Q.   Okay.  So say maybe it is the day before Memorial
8    Day, I know at the federal building, it didn't seem like
9    there was anybody there the Friday before Memorial Day.
10       If there is a day where there is not a lot of
11   trucks coming in, are there still going to be dock workers
12   there?
13       A.   Yes.
14       Q.   So what are they doing?  Because I thought the dock
15   workers helped unload the trucks.
16       A.   But sometimes there are still partial loads inside
17   of the dock that still have to get delivered.
18       Q.   And what is the responsibility of the security dock
19   position when there is not a lot of trucks going through?
20       A.   They are still monitoring making sure no
21   unauthorized individuals enter that building.
22       Q.   Okay.  And where do they monitor from?
23       A.   From their desk, and then they walk and check the
24   dock doors and make sure that they are closed.
25       Q.   And what do the patrol officers do?

Page 19

1        A.   On first shift, they may do escorts, unlocks,
2    provide breaks, it all depends on what the customer is asking
3    that day.  On second shift, they are conducting patrols -- or
4    second and third shift.
5        Q.   Approximately how much sitting do these individuals
6    do?
7        A.   They are constantly moving.
8        Q.   So it is safe to say the patrol officers are not in
9    what would be considered a seated position?
10       A.   Correct.
11       Q.   And how about the gate officers, what do they do?
12       A.   They monitor access coming onto the site, provide
13   directions for visitors that may not know where they are
14   going.
15       Q.   Who is responsible for getting a visitor in to the
16   Warren Tech Center?
17       A.   When they first come onto the site, the gate
18   officer processes.
19       Q.   And do you know who would make the decision as to
20   whether someone could come onto the property?
21       A.   Well, it is up to -- the individual will provide a
22   name, most of the times they are already authorized to come
23   onto the site.
24       Q.   Who is your direct supervisor?
25       A.   Who I report to?

Page 20

1        Q.   Yes.
2        A.   Jeremy Paul, P-A-U-L.
3        Q.   And is that with a J, Jeremy?
4        A.   Yes.
5        Q.   Do you know what his title is?
6        A.   He is a security specialist.
7        Q.   Okay.  So just so I understand this.  At some
8    point, you became a site coordinator -- or security
9    coordinator, right?
10       A.   Yes.
11       Q.   When did you become a security coordinator?
12       A.   2011.
13       Q.   So that's a promotion that you received from G4S?
14       A.   Yes.
15       Q.   And is that a promotion?
16       A.   Yes, it is.
17       Q.   So as a security coordinator, what do you do?
18       A.   I oversee approximately 60 plus employees, I
19   oversee payroll --
20       Q.   I'm sorry.  You oversee how many employees?
21       A.   Approximately 60 plus.  I do a lot of customer
22   contact, I oversee the payroll, training compliance.
23       Q.   Did your responsibilities change from when you
24   worked for G4S as a security coordinator to now?
25       A.   No.

Page 21

1        Q.   So back in 2015, you oversaw 60 plus employees,
2    right?
3        A.   Correct.
4        Q.   What types of employees were these?  Were these all
5    security officers?
6        A.   Yes, security officers and security supervisors.
7        Q.   How many security supervisors did you oversee?
8        A.   For what timeframe?
9        Q.   So did it change?
10       A.   Yes.
11       Q.   Okay.  So starting when you first got your
12   promotion, how many security supervisors did you supervise?
13       A.   Approximately four to five.
14       Q.   And when did it change?
15       A.   It changed recently this year.
16       Q.   How many do you currently supervise?
17       A.   I currently have three and we have two openings.
18       Q.   So in 2015 you were supervising four to five
19   security supervisors?
20       A.   Yes.
21       Q.   Do you recall the names of those individuals?
22       A.   I know Anthony Taylor was one, Darlene Kreska,
23   K-R-E-S-K-A.  I can't remember the others because they may
24   have some people that may have transferred or quit.
25       Q.   Did you supervise a Phil or Thoung Ho, H-O?

Page 22

1   A.  Yes, ma'am.
2   Q.  Do you know where he is located now?
3   A.  I do not.
4   Q.  Does he work for your company?
5   A.  He doesn't, not that I am aware.
6   Q.  How big is your company, your current company?
7   A.  It is across the whole U.S.
8   Q.  And how big was G4S Secure Solutions?
9   A.  The same, they are global also.
10   Q.  Did you receive any type of training on the
11  Americans with Disabilities Act while you were working for
12  G4S?
13   A.  I can't recall.
14   Q.  Have you ever received any type of training on the
15  Americans with Disabilities Act?
16   A.  I can't recall.
17   Q.  Do you know what the Americans with Disabilities
18  Act is?
19   A.  No.
20   Q.  I am sorry?
21   A.  No.
22   Q.  In terms of your, like, job responsibilities, do
23  you have to schedule employees?
24   A.  Either myself or the shift supervisor would.
25   Q.  How do -- and this is related to G4S.  How did you

Page 23

1   all do schedules of the security officers?
2   A.  The schedule was wrote out every two weeks for them
3   to review.
4   Q.  You said wrote out every two weeks for what?
5   A.  For the officers to look at, sorry.
6   Q.  So there is a little noise, so you can't
7   necessarily hear as well.
8   Okay.  So it was rolled out every two weeks?
9   MR. MIHELICK:  Do you want me to turn it off?
10   MS. CAMPBELL:  I am okay.
11  BY MS. CAMPBELL:
12   Q.  For the officers, how, like -- how do they see it?
13  Was it posted somewhere?
14   A.  It was posted in the security office.
15   Q.  What day was it posted on, like, what days of the
16  week?
17   A.  It was either every Monday or Friday it was posted.
18   Q.  Okay.  So it was every Monday or Friday but you
19  don't remember which one?
20   A.  I can't remember because of how the pay week ends
21  and I can't remember that far back.
22   Q.  Okay.  But you know it was on a certain day of the
23  week?
24   A.  Correct.
25   Q.  So if you were not in the office, how would you

Page 24

1   know what the schedule was?
2   A.  The officer would have to go -- well, they would
3   have to go downstairs to sign in and out for payroll, so the
4   schedule would be right there for them to view.
5   Q.  Okay.  And you said you have to go and sign in and
6   out for payroll, what do you mean by that?
7   A.  They have documentation they have to sign in.
8   Let's say an officer is there at 6 o'clock, they would go
9   downstairs and sign for 06, and if -- if the supervisor had
10  any information that they would give them at that time, they
11  could give them also.
12   Q.  So when a person reports to work -- a security
13  officer reports to work, for payroll purposes they would sign
14  in?
15   A.  Yes.
16   Q.  And if a person has been on vacation or on medical
17  leave for a couple of weeks, how do they know what the
18  schedule is?
19   A.  Usually if any schedule changes, the supervisor
20  would contact them and let them know.
21   Q.  Okay.  What if it is not necessarily like a
22  schedule change, but the schedule just was posted and they
23  are not in, you know, the office so to speak, or not, in
24  fact, going to work, so how do they find out about it?
25   A.  If they are off for medical leave, they would have

Page 25

1   to call us prior to their returning to work so if there was a
2   schedule change, their supervisor could inform them.
3   Q.  And if someone is out of work for maybe vacation or
4   some other reason, how do they know about the schedule?
5   A.  Well we only scheduled -- do the change like every
6   two weeks.
7   Q.  Okay.  Are the schedules usually the same?
8   A.  Yes.
9   Q.  So it is not like a work environment where one, you
10  know, set of two weeks, you could be working first shift and
11  the next set of two weeks, you could be working the second
12  shift, correct?
13   A.  Exactly.
14   Q.  What days of the week do security officers work?
15   A.  Well, they are there 365; they are there all the
16  time.
17   Q.  Okay.  So this is not like a five-day-a-week
18  program?
19   A.  No.
20   Q.  And how many shifts do you all work?
21   A.  There are three shifts.
22   Q.  Do you know what the hours are for the first shift?
23   A.  For the patrols they were 6:00 to 2:00 and 2:00 to
24  10:00 and then 10:00 to 6:00.  Our lobbies open up at 7:00.
25  The gate hours, it depends on which gate they were assigned

Page 26

1 to, they open up at different times. You may have a gate
2 open up at 5:00, one may open up at 6:00, so it would depend
3 on where the officer was posted.
4     Q. Okay. So it could be either you or a shift
5 supervisor putting the schedule out?
6     A. Correct.
7     Q. Who would make a decision to take someone from one
8 position, like a specialized post position, to another
9 position like the patrol position?
10     A. We usually don't change the specialized positions
11 but as far as like docks, patrols, and the gates, we have the
12 right to rotate those officers if we needed to.
13     Q. So who makes a decision to rotate an officer?
14     A. Either myself or a shift supervisor would be able
15 to make that decision.
16     Q. And why would you make that decision to rotate an
17 officer?
18     A. Because we want to make sure the officers
19 are -- not to get complacent in one position but to make sure
20 that they are staying abreast on all the positions -- aware
21 of the positions.
22     Q. Okay. So you were saying that you didn't want
23 people to get complacent in one position, right?
24     A. Correct.
25     Q. Now is it also accurate that sometimes security

Page 27

1 officers will stay in the same position for years at a time?
2     A. In the specialized lobbies, yes.
3     Q. What about the other lobbies, like the dock?
4     A. We rotate them as well.
5     Q. And how often do you rotate them?
6     A. That can vary, it may be every couple of months; it
7 can all vary also. If we have openings in one position and
8 we need to move some officers around to make those
9 adjustments, we do that also.
10     Q. What if an officer has a medical condition that
11 precludes her from engaging in excessive walking, how would
12 you all deal with that?
13     A. For any restrictions, that comes from our branch
14 office but at the tech center, we have to be able to walk and
15 perform CPR, first aid and things like that.
16     Q. Okay. What if you can walk but you just can't
17 engage in excessive walking or if you have a restriction for
18 no excessive walking?
19     A. We didn't have any restrictions but if it came to
20 that, that would come from our branch office.
21     Q. When you say, "we didn't have any restrictions,"
22 what does that mean?
23     A. At the site, an officer -- we can't have an officer
24 with any restrictions at the site.
25     Q. Let me ask you. So what if an employee asks

Page 28

1 you -- or told you, hey, I have these restrictions, I need a
2 reasonable accommodation, how would you respond to that? How
3 would you process that request?
4     A. If they can't do excessive walking, I would have to
5 talk to my HR manager to see if they have any available
6 positions for this officer that, you know, would accommodate
7 them.
8     Q. I am going to ask you some questions about the G4S
9 Secure Solutions discipline policies.
10     Did they have a progressive discipline policy?
11     A. Yes.
12     Q. Can you describe it for us.
13     A. There was a verbal warning, a formal written, a
14 final written, and from there went to suspension and from
15 there it would go to removal from the site, they would be
16 referred back to the branch office.
17     Q. Okay. Would there be any type of documentation in
18 a personnel file to reflect that a person has received a
19 verbal warning?
20     A. Yes.
21     Q. Can you describe that documentation?
22     A. It is a disciplinary warning, it would describe the
23 infraction and it would list the date and the incident that
24 occurred.
25     Q. Okay. Would there be any type of documentation in

Page 29

1 a person's personnel file that would reflect that the person
2 received a formal written warning?
3     A. Yes.
4     Q. And what would that look like?
5     A. It would look the same as the verbal except just
6 the verbiage would change.
7     Q. So would it say --
8     A. It would show -- I am sorry, it would show the
9 progression.
10     Q. Okay. So it would say, you know, you received a
11 formal written warning?
12     A. Yes.
13     Q. And that you were verbally warned prior to this on
14 this date?
15     A. Correct.
16     Q. And then after the formal written warning, what did
17 you say happens, the removal?
18     A. No, after the formal, then there is a final -- a
19 final written.
20     Q. What happens after someone receives a final written
21 warning?
22     A. The next point would be suspension.
23     Q. Is there documentation in the personnel file
24 reflecting that someone has received a final written warning?
25     A. Yes.

EEOC vs G4S SECURE SOLUTIONS USA, INC.
HILL, DESHON 06/06/2018

Job 6874
30..33

Page 30

1    Q.  At some point are the verbal, the formal written
2  and the final written warnings deemed too old to act on?
3    A.  After a year.
4    Q.  After a year.
5       So if you haven't had any disciplinary issues
6  within the last year, you could consider yourself as not had
7  any disciplinary issues?
8    A.  Correct.
9    Q.  And then at that point, you would go back to giving
10  the person a verbal warning?
11    A.  Correct.
12    Q.  What happens when someone is suspended?
13    A.  We can either have them serve the time off or we
14  can have them work and then it would be a paper suspension
15  only.
16    Q.  And that decision is up to --
17    A.  It is up to management.
18    Q.  And when you say management, who does that include?
19    A.  The coordinator or the security chief.
20    Q.  In 2015, who was the security chief?
21    A.  Landon Pickens.
22    Q.  And then you were the coordinator, right?
23    A.  Correct.
24    Q.  Is there any paperwork reflecting that someone has
25  been suspended in their personnel file?

Page 31

1    A.  I am sorry, what?
2    Q.  Is there any paperwork in the personnel file that
3  will reflect that a person has been placed on suspension?
4    A.  Yes.
5    Q.  What does that paperwork look like?
6    A.  It has a company letterhead, it has the infraction
7  why the person is suspended, and the date, and then myself or
8  whomever was serving the suspension would sign off on the
9  paperwork.
10    Q.  Now what happens when a person is no longer on
11  suspension, is there any paperwork that reflects that the
12  person is not on suspension anymore?
13    A.  No, we just bring them back to work, depending on
14  the outcome of whatever investigation was going on.
15    Q.  When a person is suspended, do they have their
16  badge taken from them?
17    A.  Yes.
18    Q.  Do they have their parking pass taken from them?
19    A.  Yes.
20    Q.  Is there any other company equipment that they have
21  taken from them?
22    A.  Their control key.
23    Q.  Anything else?
24    A.  No.
25    Q.  Is there any type of documentation in the file that

Page 32

1  reflects that a person has had this equipment taken from them
2  or, you know, basically --
3    A.  It is a checklist, a personnel checklist.
4    Q.  Okay, personnel checklist.
5       If the person is removed from suspension, is there
6  any documentation that would reflect that they have received
7  those items back?
8    A.  No.
9    Q.  So what happens if a person is removed from
10  suspension and they are not terminated?
11    A.  They are not terminated -- we let them know to come
12  back to the site for a meeting and let them know what was the
13  outcome of the investigation and return them back to work.
14    Q.  And do they get their badge back at that time?
15    A.  Yes, their badge, their keys and their site tag.
16    Q.  And they also get their parking pass back, right?
17    A.  Yes, that's a site tag, I am sorry.
18    Q.  Okay.  So the parking pass and the site tag is the
19  same thing?
20    A.  Yes.
21    Q.  Is there one person responsible for providing these
22  items to the employee?
23    A.  No.
24    Q.  So is there one person responsible for taking these
25  items from the employee?

Page 33

1    A.  I am sorry, what do you mean as far as --
2    Q.  So, for example, you might have a security badge
3  and only one person in the office is responsible for
4  receiving the badge, and they have a person sign off on it
5  that they received it and they might, you know, do whatever,
6  lock it up in a place, I don't know.  I am just asking is
7  there one person that does that or could it be either you or
8  the security chief or is it HR?
9    A.  Oh, it could be myself or it could be the security
10  chief.
11    Q.  Okay.  Approximately how many suspensions have you
12  been involved with since you were working at G4S?
13    A.  I can't recall.
14    Q.  Has it been a lot?
15    A.  There has been a few, yes.
16    Q.  And so there has been a few but you don't really
17  know --
18    A.  I don't know the exact number.
19    Q.  Okay.  So is it less than ten?
20    A.  No.
21    Q.  How many times has a person come off a suspension
22  and been returned to work?  Is that something that happens
23  frequently or --
24    A.  It is not something that happens frequently.
25    Q.  Okay.  So most situations, once a person is

Page 34

1 suspended, is that person usually terminated?
2 A. Depending on the outcome. We mostly suspend if an
3 officer was caught sleeping or if they are doing
4 falsification. It would have to be something extreme for us
5 to do a suspension on an officer.
6 Q. Do you ever go straight for a termination without
7 suspending an officer?
8 A. We don't do the termination, that's HR's
9 department, we just do removals from the site.
10 Q. I see. And what if someone fails to report to work
11 on a certain day, what happens?
12 A. If they perform a no-call/no-show, it depends on
13 the circumstances, but two or more no-call/no-shows are
14 automatic removal from the site.
15 Q. Okay. And you said it depends on the
16 circumstances. Like what types of circumstances might it
17 depend on?
18 A. If they were in the hospital and can provide
19 documentation why they couldn't contact the site, things of
20 that nature.
21 Q. Is there any paperwork that you would submit asking
22 for a person to be removed?
23 A. Yes, there is a separation form.
24 Q. And who would fill out the separation form?
25 A. Either a coordinator like myself or one of the

Page 35

1 chiefs.
2 Q. When is a separation form filled out?
3 A. For the removal?
4 Q. Yes.
5 A. Once we conclude our investigation and it is found
6 that the employee can't return to the site, we fill out --
7 Q. And just so I am clear, there is a separation form
8 done when the employee is removed. However, if a person is
9 on suspension and they are called back to work, there is no
10 paperwork that is done?
11 A. Correct.
12 Q. I want to ask you some questions about Christine
13 Ross. Do you know who Christine Ross is?
14 A. I remember the name.
15 Q. Beyond the name, do you remember her?
16 A. Yes.
17 Q. Do you remember anything about her on-the-job
18 performance?
19 A. For the whole duration that she was there? I don't
20 remember any issues the whole time she was there, just the
21 one issue -- I know she was removed from the site because of
22 an incident from her medical.
23 Q. Okay. So in terms of her on-the-job performance
24 prior to the incident which we are here for today, you don't
25 remember, you know, anything about her job performance,

Page 36

1 right?
2 A. I don't remember any major issues, no.
3 Q. Okay. So do you remember any minor issues?
4 A. No, no.
5 Q. Okay. So you don't remember any major or minor
6 issues with her job performance?
7 Do you know who her direct supervisor was?
8 A. At that time, I don't.
9 Q. Okay. And it sounds like you had a lot of security
10 officers that you supervised but you also had security
11 supervisors, right?
12 A. Yes.
13 Q. So those are the individuals who would know about
14 her job performance?
15 A. Yes.
16 Q. So is it safe to say that you didn't have a whole
17 lot of, like, you know, firsthand knowledge about a security
18 officer's job performance; is that right?
19 A. I mean, I do if I go and do like individual
20 assessments, but on a daily basis, that would more so be the
21 shift supervisor that works with them hand in hand.
22 Q. Okay. So before the incident that we -- you know,
23 we will get to that in a minute, but before that incident,
24 had you really spoken and interacted with Christine Ross?
25 A. Yes, I interact with all of the officers.

Page 37

1 Q. And did you have an office onsite?
2 A. Yes.
3 Q. And what hours did you keep in 2015?
4 A. I believe 7:00 to 3:00. But those hours can vary,
5 sometime I may come in on the second shift just to touch
6 bases with those officers, I may come in on the third shift.
7 But the basic was 7:00 to 3:00 at that time, I believe.
8 Q. I am going to go back to the question about a
9 no-call/no-show. If someone doesn't show up for that one
10 day, does -- is there any documentation that is put in the
11 file that that person doesn't show up that one day?
12 A. If they don't show up? We usually wait until the
13 second day, because like I say, it could be an emergency or
14 something that happened, and so we wouldn't fill paperwork
15 out until we actually contacted that employee just to find
16 out what was going on. But if they can't provide any
17 documentation, then we go to the disciplinary stage.
18 Q. Okay. So you usually wait until the second day and
19 then if the person doesn't show up, the supervisor contacts
20 the employee?
21 A. Correct.
22 Q. And then if the supervisor doesn't hear from the
23 employee, the supervisor might say this person is a
24 no-call/no-show?
25 A. Correct.

Page 38

1    Q.  Okay.  So at some point Christine Ross was changed
2    from her dock position to another position; is that correct?
3        A.  I believe so.  Like I say, we changed so many
4    officers but I believe she was.
5        Q.  Okay.  Did you remove her from her seated security
6    position?
7        A.  The dock is not a -- just a seated position, you
8    still have to be mobile in that position.
9        Q.  Okay.  Did you remove her from any position?
10       A.  She may have had her schedule changed, but she
11   wouldn't have been the only one affected.  If we move one
12   officer, we usually move quite a few people around just to
13   change their positions out.
14       Q.  Okay.  Do you recall removing her from a position
15   in 2015?
16       A.  I don't recall how her schedule was changed.
17       Q.  Okay.  So, I mean, you are saying schedule, I am
18   saying removing from a position, so those are two different
19   things.  To me the schedule is changing someone from first
20   shift to second shift to third shift.
21       A.  Okay.
22       Q.  And the position is changing someone from like a
23   specialized post to a dock position to, you know -- I think
24   you testified about -- there are several different positions
25   that you testified about.  You said there is regular lobby,

Page 39

1    dock position, patrol officers, gate officers and specialized
2    lobby, right?
3        A.  Correct.
4        Q.  So those are five different security officer
5    positions?
6        A.  Okay.
7        Q.  I am asking.
8        A.  Yes, yes, yes.
9        Q.  Okay.  So when I ask did you remove her from her
10   security position, I wanted to know if you moved her from one
11   of those positions to another one of those positions?
12       A.  She may have been moved to another position.
13       Q.  Okay.  So you said she may have been moved.  Do you
14   not remember if you moved her or not?
15       A.  She may have been.  The only ones that we would not
16   move are our specialized positions, so if she was a regular
17   position, I am sure she was rotated to a different position.
18       Q.  Okay.  Do you remember whether you removed her from
19   one position and put her in another position?
20       A.  I don't recall if I made the change or one of the
21   shift supervisors made it.
22       Q.  So if she testified that in 2015 you moved her from
23   a dock position to a position where she had to engage in what
24   she calls excessive walking, you wouldn't be able to dispute
25   that; is that correct?

Page 40

1        A.  No, not at this point.
2        Q.  And if she said that she told you that she had a
3    medical condition that required her to stay in her position
4    that she had been in and you said that she could not stay in
5    that position, you would have no way to dispute that either?
6        A.  No, but we wouldn't keep an officer -- the dock
7    officers also have to be move around, so she wasn't
8    in that seated position, she would still have to move around
9    in that dock; that is not a position where you just sit all
10   day.
11       Q.  I understand what you are saying but I just want to
12   make sure I understand.  You know, you said that you
13   supervise 60 employees, it has been a while, I want to, you
14   know, test what you remember about the situation.
15       A.  Okay.
16       Q.  Because if you don't remember about it now, I'm
17   presuming you won't be able to remember it when we go to
18   trial next year?
19       A.  Okay.
20       Q.  So, you know, if you don't remember, then you don't
21   remember, right?
22       A.  Right.
23       Q.  And you won't be able to testify about it today and
24   you won't be able to testify about it in a year, right?
25       A.  Right.

Page 41

1        Q.  So you have got a lot of employees, it sounds like
2    you guys have -- you know, now you have got a new employer,
3    and I just want to understand what you remember about this
4    situation.
5        A.  Okay.
6        Q.  You know, it is possible that you don't remember.
7    And so that's what I am saying, I mean, she is saying that
8    you moved her, and from what I am hearing is that you don't
9    recall either way whether you did or not but it is possible?
10       A.  Correct.
11       Q.  Okay.  And you don't recall either way whether you
12   told her, hey, I can move you regardless of what your medical
13   condition is?
14       A.  I don't recall that conversation.
15       Q.  But it is your testimony that you are entitled to
16   move all of the security officers to any of the positions
17   regardless of their medical condition?
18       A.  Correct.
19       Q.  If Christine Ross testified that she had been in
20   the same position for a multiple number of years without
21   being moved, would you dispute that or --
22       A.  Yes.
23       Q.  Okay.  Is there any documentation in a personnel
24   file that will reflect what position a person is in?
25       A.  Not in their personnel file, no.

EEOC vs G4S SECURE SOLUTIONS USA, INC.
HILL, DESHON 06/06/2018

Job 6874
42..45

Page 42

1    Q.  Okay.  Is there any documentation that would
2   reflect where a person is located, period?
3    A.  Besides the schedules that we place out, no.
4    Q.  Okay.  And the schedules are those -- those are in
5   paper form?
6    A.  Yes.
7    Q.  How long are the schedules maintained?
8    A.  Approximately a year; a year plus the current year.
9    Q.  And who maintains the schedules?
10   A.  We used to maintain them at the site but during the
11  transition all of the information was sent to the branch
12  office.
13   Q.  When you say, "all of the information was sent to
14  the branch office," can you --
15   A.  I am sorry, any personnel files that we had that
16  had G4S name on there, it would go to the branch office.  Or
17  if an officer was removed from the site, that stuff goes to
18  the branch office as well.
19   Q.  Okay.  Do you recall Christine Ross ever telling
20  you that she could not do the position that you put her in?
21   A.  I don't recall.
22   Q.  Do you recall any conversations with anyone at G4S
23  about trying to accommodate Ross's medical condition?
24   A.  No.
25   Q.  Was Christine Ross ever suspended?

Page 43

1    A.  Yes.
2    Q.  Why was she suspended?
3    A.  There was a medical incident where she was supposed
4   to respond, and I can't remember all of the specifics, but I
5   remember the individuals having a medical condition and she
6   did not -- her duties as an officer, she didn't perform those
7   duties as far as rendering aid to that person.
8    Q.  Okay.  So who was the person that you are talking
9   about?
10   A.  I can't recall, it could have been a GM or a
11  contract employee.
12   Q.  Okay.  I mean, this is the first I have ever heard
13  of this.
14
15        (Deposition Exhibit No(s) 1
16         marked for identification.)
17
18  BY MS. CAMPBELL:
19   Q.  Ms. Hill, I have handed you a document that has
20  been marked as Exhibit 1 and it is G4S 305 for the record.
21        I would ask that you look at this document and look
22  up when you have done so.
23
24        (Deposition Exhibit No(s) 2
25         marked for identification.)

Page 44

1   BY MS. CAMPBELL:
2    Q.  Okay.  So you have had a chance to read this?
3    A.  Yes.
4    Q.  Prior to today, have you ever seen this document?
5    A.  No.
6    Q.  So you see where it says after shift preference
7   DeShon Hill, site coordinator, changed my position to a
8   37-hour position on dock on Monday, Tuesday, Wednesday, I
9   believe.  And then is says something about patrolling the
10  building; do you see that sentence?  It is in the first
11  paragraph.
12   A.  Yes.
13   Q.  What is shift preference?
14   A.  Shift preference, every year the officers get to
15  bid on a different position based on their seniority.  It is
16  just for the shift, this does not pertain to the actual post
17  that they are going to be in but the actual -- like if they
18  were to go -- like a first-shift person, if they want to go
19  to the second shift, they can bid on a different shift --
20   Q.  Okay.
21   A.  -- but still that wouldn't have anything to do with
22  their post.
23   Q.  Okay.  So when shift preference occurs or after
24  shift preference occurs, are you saying that you would not
25  have changed the positions during that same timeframe?

Page 45

1    A.  Yeah, because officers get to bid on their
2   different shifts so we get a lot of movement during shift
3   preference.
4    Q.  So that could have been after the shift preference,
5   that's when she was changed to another position?
6    A.  Yes, yes.
7    Q.  And you see the date is on here, May 26th, 2015.
8        Okay.  If you look further, it says, "that DeShon
9   stated that she is designated to place an officer wherever
10  she wants and asked me if I can perform my duties.  I stated
11  that I can perform my duties but due to my medical condition
12  I cannot do excessive walking, and she said I will look into
13  your situation and get back with you."
14        So I just read that, and that's her recollection of
15  it.  But as we sit here today, you don't have any
16  recollection of that even with this document?
17   A.  No, just with the shift preference, she would have
18  been moved around depending which shift she bid on.
19   Q.  But I am just asking you, do you have any
20  recollection of any of this that's in this letter, even, you
21  know, looking at it, you might remember, you might not?
22   A.  No.
23   Q.  Okay.  Now you just talked about her being placed
24  on a suspension for not rendering medical aid to someone,
25  right?

Page 46

1    A.  Yes.
2    Q.  I am going to hand you a document that has been
3  marked as Exhibit 2.  I'll ask that you look at the document
4  and then look up when you have done so.
5    A.  Okay.
6    Q.  Okay.  So it is my understanding, based on what I
7  have heard from people from G4S Secure Solutions, that
8  Ms. Ross was placed on investigatory suspension because she
9  sent this letter in and that she had some medical issues in
10  terms of excessive walking.  Is it your understanding that
11  she actually was placed on a suspension because of not
12  rendering aid to an employee?
13    A.  Correct.  She couldn't -- if I remember correctly,
14  if a person -- like, if a person can't do CPR or first aid,
15  they don't meet the minimum requirement to be at our site
16  because everybody is first aid and CPR trained.
17    Q.  Right.  So I am just trying to understand where is
18  this coming from, this whole CPR thing?  Like I said, I have
19  never heard that.
20    A.  That was checked off, the inability to meet minimum
21  standards.
22    Q.  Okay.  Was there an incident that happened around
23  this time in June?
24    A.  Yes.
25    Q.  Okay.  What was it?

Page 47

1    A.  It had to have been -- she was the one that
2  responded to a medical and she couldn't -- she just stood
3  there and didn't do anything to help the employee.
4    Q.  Was she, like -- did anything else happen to her
5  beyond being suspended?
6    A.  Once the suspension -- if a person is suspended for
7  something like this, then the HR department will send them,
8  like, for a fit-for-duty appointment.
9    Q.  Okay.  So if she was suspended because she couldn't
10  do CPR, or that was the allegation, why wasn't she just sent
11  for a CPR test?
12        MR. MIHELICK:  Objection, form and foundation.
13        Go ahead, you can answer.
14        THE WITNESS:  Oh, that's up to our HR department.
15  BY MS. CAMPBELL:
16    Q.  Is there any paperwork that would show that she
17  was, you know, suspended because of the CPR issue?
18    A.  No, it would just be this form here, because she
19  wouldn't have met the standard.
20    Q.  Okay.  But from what it sounds like you are saying
21  that she would have been sent for a fit-for-duty -- let me
22  ask you this.  What is a fit-for-duty?
23    A.  It is a physical, basically, is what it is.
24    Q.  And where are the physicals conducted?
25    A.  They usually will send them to Concentra for that.

Page 48

1    Q.  Have you ever gone to Concentra for a physical?
2    A.  When I first got hired, yeah.
3    Q.  And do you recall, what did the physician check
4  for?
5    A.  Like have you bending down, lifting your legs,
6  things like that.
7    Q.  Blood pressure?
8    A.  Yeah, blood pressure.
9    Q.  Why would a person be sent for a physical if they
10  don't perform CPR?
11    A.  I am trying to remember with her.  If they can't
12  perform CPR --
13    Q.  Yeah, I mean, if they don't?
14    A.  If they can't bend down or they can't -- if they
15  physically -- most of the time if we sent somebody for
16  something like that, they can't bend down, they can't do the
17  compressions, so they can't perform the steps for CPR.
18    Q.  Would there be any paperwork anywhere that would
19  talk about this incident involving Ross's failure to provide
20  CPR to someone?
21    A.  I believe this would have been the only form.  If
22  there was, it was in her personnel file.
23    Q.  I am not playing hide the ball, I really have never
24  heard of this CPR thing.  It was my understanding that
25  Juanita Resar placed -- I won't say Juanita Resar, but

Page 49

1  management, along with HR, placed her on a suspension while
2  they investigated her medical situation.  And it was never a
3  question of whether she could perform CPR, so that's why I am
4  asking.
5        COURT REPORTER:  How do you spell Juanita's last
6  name?
7        MS. CAMPBELL:  It's R-E-S-A-R.
8        COURT REPORTER:  Thank you.
9  BY MS. CAMPBELL:
10    Q.  Okay.  So at any rate at some point she was placed
11  on a suspension and you do recall her being placed on that
12  suspension, right?
13    A.  Yes, looking at this form, yes.
14    Q.  Okay.  We have different information about why she
15  was placed on the suspension but you recall her being placed
16  on a suspension.  Was her badge taken?
17    A.  Yes, her badge and her keys would have been taken.
18    Q.  Who took them?
19    A.  I can't recall if I did or if Landon did, I can't
20  recall.
21    Q.  What happened after she was placed on a suspension?
22    A.  I believe at that point is when HR sent her for the
23  physical.
24    Q.  So HR sent her for a physical, and that was with
25  Concentra, right?

Page 50

1    A.   Yes.

2    Q.   And this was just a routine physical?

3         MR. MIHELICK:  Objection, form and foundation.

4         You can answer if you know.

5         THE WITNESS:  I don't know if it is a routine

6    or -- I am not sure of all of the logistics for what type of

7    physical it was.

8    BY MS. CAMPBELL:

9    Q.   But it was your understanding it was similar to

10   what you just testified about?

11   A.   Yes.

12   Q.   After she was sent on a physical, what happened

13   next?

14   A.   If they didn't return her back to site, then she

15   didn't pass the physical.  Because I don't remember her

16   coming back to the site, so she must have been removed from

17   the GM account.

18   Q.   Okay.  So you don't recall either way what happened

19   after she was sent for the physical?

20   A.   No.

21   Q.   Did you recall her being on FMLA at any point?

22   A.   I don't recall if she was or wasn't.

23   Q.   When she was removed from, the account as you said,

24   there still remained those positions that you have already

25   testified about, right, all of those five positions?

Page 51

1    A.   Yes.

2    Q.   So nothing changed where the position that she had

3    been working, we will say in April of 2015, that position

4    still was available or still there, right?

5    A.   Yes.

6    Q.   Do you recall her trying to obtain unemployment

7    benefits?

8    A.   I don't recall.

9    Q.   So then I guess you don't also recall whether you

10   participated in a hearing for her unemployment benefits?

11   A.   I don't know, I can't -- I don't remember offhand,

12   I am sorry.

13   Q.   Okay.  I am going to ask you some questions about

14   individuals who I just don't know.  Do you know a Ray

15   McFarland?

16   A.   Yes, he used to work there.

17   Q.   Okay.  What did he do?

18   A.   During what timeframe?  Because at one time point

19   he was a shift supervisor and then he worked at our I.D.

20   center, so it depends on what timeframe.

21   Q.   We will say 2015.

22   A.   I can't remember if he was a shift supervisor

23   during that time or if he worked in our -- I can't remember.

24   Q.   Okay.  So but at some point he worked for G4S

25   Secure Solutions as either a shift supervisor or in the I.D.

Page 52

1    department?

2    A.   Correct.

3    Q.   How about Mr. Sommers?

4    A.   He was a shift supervisor.

5    Q.   Do you know his first name?

6    A.   Andrew.

7    Q.   And that's someone that you supervised?

8    A.   Correct.

9    Q.   And at some point did you also supervise Ray

10   McFarland?

11   A.   I believe for a short period of time.

12   Q.   When Christine Ross's position was changed, would

13   she have had a different supervisor?

14   A.   I can't remember what shift she was on.  Most of

15   the time our supervisors stay in the same position so -- I

16   can't remember who was her supervisor at the time.

17   Q.   Okay.  Would there be any paperwork in her

18   personnel file that would reflect a different supervisor?

19   A.   In the personnel file, no.

20   Q.   Would it be anywhere?

21   A.   On the schedule -- on the schedule it would show

22   where each supervisor worked.

23   Q.   Okay.  And I want to go back to your testimony

24   about the shift preference being different and distinct from

25   the positions.  I just want to make sure I understand this.

Page 53

1    If the lobby doesn't open until a certain time, is it safe to

2    say if you have like a lobby position, you are not going to

3    be working on certain shifts?

4    A.   Well, the lobby is open 7:00 to 5:00.

5         You can work a different position, like if we have

6    an open post, I mean, if someone calls off, you may be asked

7    to come in early or holdover, so that can happen as well.

8    Q.   Okay.  But I just want to understand, if you have

9    been accustomed to working in the lobby in the daytime and

10   your position has changed from, you know, a lobby position or

11   a dock position to, you know, a roving guard position,

12   wouldn't your times change as well?

13   A.   Yes.

14   Q.   Okay.  Because different positions start at

15   different times?

16   A.   Correct.

17   Q.   And so it is possible that she could have

18   had -- Christine Ross could have had a different supervisor

19   once the position was changed?

20   A.   The position or her shift?  The position?

21   Q.   Yes, her position.  I mean, I know you don't recall

22   her being changed into a position, but it is going to be her

23   testimony that she was actually changed from one position to

24   another position.

25   A.   Okay.

Page 54

1   Q.  And so I just want to understand that when that
2   happens, the time that she was supposed to report to work
3   could also change, right?
4   A.  Yes.
5   Q.  And also the supervisor could change also?
6   A.  It could change also, yes.
7   Q.  I am going to ask you, again, some people.  Do you
8   know a Kara Nickholds?
9   A.  No.
10  Q.  And that was N-I-C-K-H-O-L-D-S.
11  A.  No.
12  Q.  Do you know a Bryant Carter?
13  A.  He worked for G4S.
14  Q.  What did Bryant Carter do?
15  A.  He was a branch manager.
16  Q.  Where is the branch located?
17  A.  We had one in Warren, the other one is in
18  Farmington Hills.
19  Q.  And how about a Tanzania Pickens?
20  A.  Tanzania Pickens?
21      No, I don't recall that name.
22  Q.  Okay.  And how about a Tracy Williams?
23  A.  Yes.
24  Q.  Who is Tracy Williams?
25  A.  She is a site coordinator.

Page 55

1   Q.  Was she a site coordinator in 2015?
2   A.  I can't recall because she has been promoted.  She
3   was a shift supervisor but I can't remember her promotion
4   date.
5   Q.  Okay.  So she was either a shift supervisor or a
6   site coordinator?
7   A.  Correct.
8   Q.  How about Denise Pollington?
9   A.  She was HR manager.
10  Q.  Where was she located?
11  A.  She would have been at the branch office.
12  Q.  Was she in Farmington?
13  A.  I think she was in Farmington, I can't recall.
14  Q.  How about Nina Ivory?
15  A.  No.
16  Q.  And a Sue Kreischer, K-R-E-I-S-C-H-E-R?
17  A.  Yes, she worked at the branch office also.
18  Q.  Do you know what she did?
19  A.  I can't remember her exact title, she helped us a
20  lot with recruiting.
21  Q.  And how about Chelsea Palmer?
22  A.  No.
23  Q.  And do you know of a Rhonda Lopez?
24  A.  No.
25  Q.  Erica Stringer?

Page 56

1   A.  Erica was in charge of our benefits.
2   Q.  And Donald Drent?
3   A.  Yes, he was our operational manager.
4   Q.  Was he in your chain of command?
5   A.  I was in his chain of command.
6   Q.  Okay, I understand.  So he -- you reported to who
7   when you were the site coordinator?
8   A.  I report to Landon.
9   Q.  And then did Landon report to Don Drent?
10  A.  Yes.
11  Q.  How often did Don Drent get involved with issues
12  involving security officers?
13  A.  It depends on the circumstance but if a person was
14  going to be removed from the site, then we have to
15  involve -- involve Don.
16  Q.  And did he work for G4S Secure Solutions?
17  A.  Yes.
18  Q.  Did Phil Ho ever work for G4S Secure Solutions?
19  A.  Yes.
20  Q.  I am assuming he did since you supervised him?
21  A.  Yes, but we were at Securitas as well so I am
22  trying to remember the exact time that Phil was there.
23  Q.  Oh, okay.
24      MS. CAMPBELL:  Off the record.  I want to take a
25  brief record.

Page 57

1
2       (Whereupon a break was held.)
3
4       (Deposition Exhibit No(s) 3
5       marked for identification.)
6
7   BY MS. CAMPBELL:
8   Q.  Okay.  We are back on the record after taking a
9   brief break.
10      And Ms. Hill, as you know, you were handed a
11  document marked as Exhibit 3.  And it is, for the record, G4S
12  308 through 3011.  Ms. Hill, do you recall receiving these
13  e-mails?  I have given you a printout of the e-mails.
14  A.  Yes.
15  Q.  Okay.  So do you know if the first e-mail, it
16  appears to be to you and Landon saying that Officer Ross
17  needed to be placed on investigatory suspension pending
18  further medical evaluation.  Do you know if that was Don
19  Drent's decision?
20  A.  That would be ultimately Don Drent and Juanita --
21  Q.  Okay.
22  A.  -- together, yes.
23  Q.  So you didn't decide to place Christine Ross on an
24  investigatory suspension, right?
25  A.  Right.

Page 58

1    Q. So is it possible that you don't know why she was
2 placed on an investigatory suspension?
3    MR. MIHELICK: Objection, form and foundation.
4    **THE WITNESS: No -- if it was due to the incident,**
5 **we would have contacted Don to get his evaluation and then**
6 **get HR involved and they make that final decision.**
7 BY MS. CAMPBELL:
8    Q. Okay. I understand that, but you also have been
9 shown Exhibit 1 which was a letter to Juanita Resar, right?
10    **A. Yes.**
11    Q. And in that letter she requested -- Christine Ross
12 requested to be returned to her position and explained that
13 she had a medical condition which meant she couldn't engage
14 in excessive walking, right?
15    **A. Yes.**
16    Q. And prior to today you had not seen that letter,
17 right?
18    **A. Correct, I don't recall seeing that letter.**
19    Q. Okay. So what I am saying is that this letter is
20 dated May 26th, 2015, right?
21    **A. Yes.**
22    Q. And then an e-mail comes from Don Drent with a
23 carbon copy to you, Landon Pickens and Juanita Resar, right?
24    **A. Yes.**
25    Q. And then she is placed on an investigatory

Page 59

1 suspension, right?
2    **A. Yes.**
3    Q. So what I am saying is that you did not make the
4 decision to place her on an investigatory suspension, right?
5    **A. The medical must have happened during the same time**
6 **for her to be placed on suspension, the incident with her and**
7 **the medical, not performing the CPR.**
8    Q. So we don't have any paperwork about this alleged
9 medical?
10    **A. Right.**
11    Q. And like I said, I am not trying to hide the ball
12 or anything. It is my understanding that you did not make a
13 decision to place her on the suspension, right?
14    **A. Correct.**
15    Q. So it is possible that you don't really know why
16 she was placed on a suspension?
17    MR. MIHELICK: Objection, form and foundation.
18    **THE WITNESS: She would have been placed on**
19 **suspension because she could not perform her job duties. So**
20 **if we had an incident that involved Ms. Ross, we would have**
21 **contacted Don Drent and contacted Juanita to get their final**
22 **evaluation.**
23 BY MS. CAMPBELL:
24    Q. But wouldn't you have also told the EEOC about this
25 and not told the EEOC that it was because of a conflict in

Page 60

1 medical information?
2    MR. MIHELICK: I'll object as to form and
3 foundation.
4    **THE WITNESS: That's the HR department, it wouldn't**
5 **be for -- that's not our call to -- that would come from the**
6 **HR department, I mean, they handle all of the notifications**
7 **like that.**
8 BY MS. CAMPBELL:
9    Q. I am just trying to figure out why I am being told
10 that there was some kind of CPR issue which I have never
11 heard of, and I am just, you know, asking you because I am
12 looking at these e-mails and it doesn't appear that you made
13 the decision to place her on the suspension in the first
14 place.
15    **A. Correct.**
16    Q. And so I do have this which happened a few days
17 prior, you know, Exhibit 1 is a letter that happened on
18 May 26th, 2015. And then on May 29th, 2015, we are receiving
19 a letter, an e-mail from Don Drent saying that she has to be
20 placed on this investigatory suspension but I don't see
21 anywhere in this e-mail that it references the CPR issue.
22    MR. MIHELICK: I'll object to form and foundation,
23 I am not sure that was a question.
24 BY MS. CAMPBELL:
25    Q. And you don't know of anything -- any type of

Page 61

1 documentation that would substantiate your claim that she was
2 placed on a suspension due to her having a CPR issue, right?
3    MR. MIHELICK: I'll object as to
4 mischaracterization, I think she testified that Exhibit 2
5 says that.
6    MS. CAMPBELL: She did not testify that Exhibit 2
7 references the CPR issue and Exhibit 2 speaks for itself. It
8 doesn't reference the CPR issue.
9    **THE WITNESS: It is the inability to meet certain**
10 **standards that would mean that person could not perform the**
11 **duties of the officer that is required by the client.**
12 BY MS. CAMPBELL:
13    Q. Right. It doesn't say anything about CPR, right?
14    **A. Correct.**
15    Q. So if Juanita Resar testifies next week that she
16 received this letter and took that as her not being able to
17 perform the position and that's why she was placed on
18 investigatory suspension, then to me that would be equally
19 possible so --
20    MR. MIHELICK: I'll object.
21    Sorry, go ahead.
22 BY MS. CAMPBELL:
23    Q. So, I mean, if you don't remember, you don't
24 remember, but for this issue, you are telling me that you
25 specifically remember a CPR issue and that is why she was

EEOC vs G4S SECURE SOLUTIONS USA, INC.
HILL, DESHON 06/06/2018

Job 6874
62..65

Page 62
1  placed on an investigatory suspension, right?
2    A.  That's what I recall.
3    Q.  Okay.  And then after she was placed on the
4  suspension she was sent to Concentra for a physical?
5    A.  Correct.
6    Q.  And she was not tested on CPR?
7    A.  I can't --
8    MR. MIHELICK:  Object, form and foundation.
9    Go ahead.  You can answer.
10    THE WITNESS:  I am trying to recall if she -- if we
11  tested her before we sent her to Concentra.  I can't recall.
12  BY MS. CAMPBELL:
13    Q.  Do you all perform the tests for CPR?
14    A.  We do, at the site, yes.
15    Q.  Is there paperwork in the personnel file when a
16  person has been tested on CPR?
17    A.  Their CPR card.
18    Q.  How often is an officer tested on CPR?
19    A.  Every two years unless there is a circumstance
20  where we would observe that the officer can't perform.  Like
21  if we do a drill, and we test the officers if they can do
22  CPR, first aid, they get tested on that as well, that may
23  happen a couple times a year.
24    Q.  And it is my understanding that you guys don't make
25  any exceptions for anyone, everyone has to be able to perform

Page 63
1  CPR?
2    A.  Correct, that's a requirement.
3    Q.  If you look on page 310 of this exhibit, at the
4  very end it appears to be an e-mail.  Do you see that?
5    A.  Yes.
6    Q.  Okay.  So it looks like you all set up a meeting
7  with Christine Ross on June 2nd to meet with her; is that
8  right?
9    A.  Yes, according to the document.
10    Q.  Do you recall that meeting?
11    A.  Vaguely.
12    Q.  Is that the meeting where she would have been
13  placed on a suspension?
14    A.  Yes.
15    Q.  Do you recall who was there?
16    A.  I do not.  Besides myself it would have been either
17  Landon or another coordinator to sit in a meeting with me.
18    Q.  Would the union rep have been present?
19    A.  Yes.
20    Q.  Who was the union rep at that time?
21    A.  I don't recall.
22    Q.  Do you know who it is now?
23    A.  Yes, it is Tina Brown currently.
24    Q.  How many officers are currently working in the dock
25  position right now?

Page 64
1    A.  There is currently two -- no, I am sorry, there is
2  about three, because they rotate.
3    Q.  What are their hours?
4    A.  6:00 to 2:00 and 2:00 to 8:00.
5    Q.  What are their names?
6    A.  We have Ronald Mets, M-E-T-S; Ashleen Temple,
7  Richard Bova.
8    Q.  How long has Ronald Mets been in the dock position?
9    A.  He has been there for a couple of years but he
10  rotates out, he may be a day at the dock and a day on patrol;
11  he's not at the dock his entire 40-hour shift.
12    Q.  How long has Ashleen Temple been in the dock
13  position?
14    A.  A couple of years as well because they all rotate.
15    Q.  Okay.  Has she been in there a couple of years or
16  has she rotated out?
17    A.  They rotated out.
18    Q.  Okay.  So when you say a couple of years, what do
19  you mean?
20    A.  Since she has been with the company.
21    Q.  Okay.  And she is currently in the dock position?
22    A.  When you say dock position, she is dock and patrol,
23  because she's not strictly at the dock.
24    Q.  Is there anyone that is strictly at the dock?
25    A.  No.

Page 65
1    Q.  How long has Richard Bova been in the dock
2  position?
3    A.  Maybe a year, if that.  But he is patrol as well.
4    Q.  Do you supervise these employees?
5    A.  The shift supervisor.
6    Q.  Who do you supervise?
7    A.  I supervise the shift supervisor and the officers
8  but their direct contact is the shift supervisor.
9    Q.  So I take it you wouldn't have a problem with me
10  deposing them and asking them questions about that position?
11    A.  No.
12    Q.  Is there a certain time of the day that would be
13  most convenient for you all for me to take their deposition?
14    A.  Richard works second shift, Ashleen and Ron work
15  first shift, which is the 6:00 to 2:00.
16    Q.  Okay.  And Richard is in the position -- the dock
17  position right now as well?
18    A.  Yes.
19    Q.  But he does patrol as well?
20    A.  Yes.
21    MS. CAMPBELL:  I have no further questions.  Thank
22  you.
23    MR. MIHELICK:  Ms. Hill, I have a couple follow-up
24  ones, just a little bit of cleanup.
25    EXAMINATION

EEOC vs G4S SECURE SOLUTIONS USA, INC.
HILL, DESHON 06/06/2018

Job 6874
66..69

Page 66

1 BY MR. MIHELICK:
2     Q.  What is your ZIP in Warren, Michigan?
3     A.  In Warren it's 48089.
4     Q.  All right.  And then you talked about how Pinkerton
5 became Securitas, Securitas became G4S and G4S became Allied.
6 Do you know when Pinkerton became Securitas, about what year?
7     A.  It might have been 2002, maybe.
8     Q.  All right.  And then what about Securitas becoming
9 G4S?
10     A.  I know that was in 2012.
11     Q.  So you said that you were promoted to security
12 coordinator in 2011.  Was that under Securitas that you were
13 promoted?
14     A.  It was under Securitas but we were in the middle of
15 the transition going into the G4S happening.
16     Q.  Okay.  All right.  Going back to the lobby
17 positions.  Would you characterize the lobby position as a
18 seated position?
19     A.  The specialized lobby --
20     Q.  I don't want to talk about specialized posts right
21 now.  You said there were general lobby positions, right?
22     A.  Yes.
23     Q.  All right.  Would you characterize those general
24 lobby positions as seated positions?
25     A.  Yes.

Page 67

1     Q.  Where is that person sitting at?
2     A.  At the main lobby?
3     Q.  Yes.
4     A.  Where the front entrance is; it depends on what
5 building.
6     Q.  How many seated lobby positions -- are there any
7 current seated lobby positions?
8     A.  Yes, there are regular lobby positions.
9     Q.  And how many are there?
10     A.  I think there is approximately three.
11     Q.  Was there ever a point in time where GM eliminated
12 seated lobby positions?
13     A.  I mean, we had cut a post, so yes.
14     Q.  Okay.  Those lobby positions, are those permanent
15 positions or are they part of the rotation for patrols and
16 docks?
17     A.  They are part of the rotation.
18     Q.  Okay.  So is there ever a scenario -- since you
19 have been there, has there been a scenario where someone has
20 been in a seated lobby position for years at a time?
21     A.  Only with our specialized lobbies because you have
22 to be promoted for that position.
23     Q.  Okay.  So the only, you know, quote, unquote,
24 permanent positions are the specialized posts?
25     A.  Yes.

Page 68

1     Q.  Are there any minimum requirements or minimum
2 qualifications for the specialized posts?
3     A.  What do you mean as far as --
4     Q.  Like, could any employee be put in that specialized
5 post or are there minimum training or qualifications that you
6 need to have?
7     A.  Besides the interview, depending on the lobby,
8 there are additional training for those lobbies.
9     Q.  Okay.  So are any of the specialized posts you have
10 to be former law enforcement?
11     A.  No.
12     Q.  So do any of them require you to have a -- your
13 pistol certification or anything like that?
14     A.  No.
15     Q.  So really anyone can do a specialized post position
16 as long as you are able to pass the interview and are
17 qualified for it?
18     A.  Correct.
19     Q.  Are any of the specialized post positions seated
20 positions?
21     A.  They sit in the lobby so, yes.
22     Q.  Do you know if Ms. Ross ever -- do you have to
23 apply for a specialized post position?
24     A.  You do.
25     Q.  Do you know if Ms. Ross ever applied for a

Page 69

1 specialized post position?
2     A.  Not that I recall, no.
3     Q.  Are you involved in the process of reviewing and
4 interviewing specialized post applications?
5     A.  Yes.
6     Q.  But you don't recall Ms. Ross ever submitting that
7 application?
8     A.  No.
9     Q.  The other positions that -- the non-specialized
10 positions, do all site officers rotate through all positions?
11     A.  Yes.
12     Q.  And that's part of your keeping them, you said, I
13 think, abreast of what each position requires?
14     A.  Right.
15     Q.  The dock position, in this Exhibit 1, Ms. -- this
16 purportedly is a letter written by Ms. Ross.  She
17 distinguishes between a dock 10 position and a regular dock
18 position.  Is there -- do you know what she is talking about
19 there?
20     A.  No, because all of the docks are basically the
21 same, you still have to inspect trucks and things of that
22 nature.
23     Q.  So there is no different positions within the dock?
24     A.  No.
25     Q.  What is involved in inspecting a truck?

EEOC vs G4S SECURE SOLUTIONS USA, INC.
HILL, DESHON 06/06/2018

Job 6874
70..73

Page 70

1    A.  They have to be able to climb up on the truck; they
2    have a mirror that they look inside the truck and they check
3    the shippers that have come in and out, the truck driver.
4        Q.  Does a dock position require greater physical
5    activity than a patrol position since you are climbing in and
6    out of trucks?
7        A.  I would say yes.
8        Q.  Did you ever make a decision to remove Ms. Ross
9    from a specific post?
10       A.  I don't recall removing her specifically or moving
11   her to a different position but we rotate officers all the
12   time.
13       Q.  Right.  So if she -- if someone is taken off a
14   post, it could be for several reasons, right?  One is just a
15   rotation of officers like you have talked about, correct?
16       A.  Correct.
17       Q.  One is because as a supervisor you have the
18   authority to specifically assign or de-assign someone from a
19   post, correct?
20       A.  Correct.
21       Q.  Do you ever recall specifically assigning or
22   de-assigning Ms. Ross from any post?
23       A.  Specifically, no, I would never single anyone out,
24   so no.
25       Q.  So if she was ever moved, as far as you are aware,

Page 71

1    it was part of a regular rotation?
2        A.  Correct.
3        Q.  And the seniority that you discussed only gives
4    union members the ability to select their shift, right, not
5    their post?
6        A.  Correct.
7        Q.  The post assignments are your -- as a shift
8    supervisor, your discretion?
9        A.  Right.
10       Q.  We talked about the progressive discipline policy
11   and then we talked about no-call/no-shows; do you remember
12   testifying about that?
13       A.  Yes.
14       Q.  For two or more no-call/no-shows, do you have to go
15   through the progressive discipline policy or can that you go
16   right to removal from the site?
17       A.  That would go right to the removal.
18       Q.  Is there ever a situation during this shift
19   preference where only one person is rotated out of a post?
20       A.  No.
21       Q.  It is mass rotations; is that fair?
22       A.  Yes.
23       Q.  I am sorry.  Go ahead.
24       A.  With the exception of specialized lobbies.
25       Q.  Right.  Just assume here, unless I say otherwise, I

Page 72

1    am talking about non-specialized posts.
2        A.  Okay.
3        Q.  Do you ever recall a situation where there was a
4    rotation from a post that only included one employee?
5        A.  No.
6        Q.  You testified that you don't recall a conversation
7    about Ms. Ross's medical condition, and I just want to
8    clarify.  When you say you don't recall, are you saying it
9    may have happened but you don't remember or that it never
10   happened?
11       A.  Us discussing her medical condition, you mean her
12   discussing it?
13       Q.  Yes.
14       A.  I don't recall that, I don't think -- no.
15       Q.  No, as in it never happened?  And, again, if you
16   don't remember --
17       A.  I don't recall.  I don't recall.
18       Q.  Okay.  So it may have or it may not have?
19       A.  Or may not have, right.
20       Q.  Okay.  But you can't say one way or another either
21   that it did happen or it did not happen?
22       A.  Correct.
23       Q.  Okay.  I just wanted to clarify that.
24           This is going back to Exhibit 2, this suspension
25   form here, it says, "From DeShon Hill, Security Coordinator";

Page 73

1    do you see where it says that up top?
2        A.  Yes.
3        Q.  And that's you, correct?
4        A.  Correct.
5        Q.  And it is signed at the bottom, it looks like it is
6    signed by Christine Ross, do you see where it kind of looks
7    like that?
8        A.  Yes.
9        Q.  Did you give this form to her?
10       A.  Yes, if I signed it, yes, I was present.
11       Q.  Okay.  The other signature is your signature on
12   there?
13       A.  This one?
14       Q.  Yes.
15       A.  Yes, that's mine.
16       Q.  Okay.  So did you watch Christine Ross sign this?
17       A.  Yes.
18       Q.  So you know for a fact this was signed by Christine
19   Ross and you, correct?
20       A.  Yes.
21       Q.  And you filled this out?
22       A.  Correct.
23       Q.  And it looks like it says, "This is to notify you
24   that you are being placed on Investigatory Suspension due
25   to," and then it says check appropriate box, and the box that

Page 74

1 is checked say, "Inability to meet Minimum Standards for
2 Security Officers assigned to the GM/Delphi Account"; do you
3 see where that's done?
4    A.  Yes.
5    Q.  Okay.  And so when you filled this out, you filled
6 this out because -- because she was unable to perform CPR?
7    A.  Correct.
8    Q.  And there is no -- there is nowhere on here where
9 you have to write why you checked that box, right?
10    A.  No.
11    Q.  So when you filled this out, it was the CPR
12 incident, correct?
13    A.  That's what I recall, yes.
14    Q.  If an officer is removed from the site, how is that
15 officer's schedule or shift or post replaced?
16    A.  We fill it with different officers until either the
17 officer comes back.  If that officer doesn't come back, then
18 we will post for that position, and then someone else can bid
19 for it.
20    Q.  Okay.  Is it fair to say it is not filled by a
21 specific person but it is filled as part of the rotation?
22    A.  Correct.
23    Q.  And then you were asked some questions about your
24 testimony today and then your future testimony at trial.  You
25 know, just, you know, do you think that there are things that

Page 75

1 you could look at or people that you could talk to that might
2 jog your memory further in the future; I mean, it is
3 possible, right?
4    A.  It is possible.
5    Q.  This 6-2 -- this Exhibit 2 right here, this would
6 have been -- was this done at that June 2nd meeting?
7    A.  Yes.
8    Q.  Okay.  So the June 2nd date isn't necessarily the
9 date that the incident happened, it is the date that this
10 form was presented to Ms. Ross?
11    A.  Correct.
12    Q.  So the incident could have happened before
13 May 26th, correct?
14    A.  It could have.
15    Q.  Okay.  This was -- the June 2nd date only
16 references the date you met with her and signed the form?
17    A.  Correct.
18    Q.  After Ms. Ross was placed on suspension, did you
19 ever see her again?
20    A.  No.
21    Q.  Did you ever talk to her again?
22    A.  No.
23    Q.  So --
24    A.  Not that I recall, no, after that meeting.
25    Q.  Are you aware of any events that happened after

Page 76

1 this meeting with respect to Ms. Ross?
2    A.  Not that I remember, no.
3    Q.  As part of her EEOC complaint, she says, "I was the
4 only black female in a sit-down potion in my building.  The
5 other lobbies was white males.  The position I was in, a
6 white male was placed in it."  Would you agree with that
7 statement?
8    A.  No.
9    Q.  Why not?
10    A.  Because in our other lobbies, there are black
11 females there.  And her position was rotated between -- we
12 have black and white officers there, so she was not the only
13 one moved.
14        MR. MIHELICK:  I have no further questions.
15
16              RE-EXAMINATION
17 BY MS. CAMPBELL:
18    Q.  You just testified when counsel asked you a
19 question about the general lobby position, I guess -- I don't
20 know if you misspoke but you had previously testified about a
21 regular lobby position.  Are those the same positions?
22    A.  The same positions as --
23    Q.  When he used the word general and you testified
24 about the lobby position, is a general lobby position -- is
25 that the same as a regular lobby position?

Page 77

1    A.  Yes.
2    Q.  And you just testified that there are people that
3 you might be able to talk to that would refresh your
4 recollection about the events.  Who would those people be?
5        MR. MIHELICK:  Objection, form and foundation.
6        You can answer.
7        THE WITNESS:  I am trying to remember who would
8 have been her shift supervisor during that time, and if they
9 are still there, they might be able to assist.
10 BY MS. CAMPBELL:
11    Q.  Okay.  So as we sit here today, you don't know who
12 those people might be?
13    A.  No.
14    Q.  Did anyone talk to you about Christine Ross after,
15 you know, the suspension on June 2nd, that you recall?
16    A.  No.
17    Q.  So you don't recall talking to anyone about the
18 EEOC charge?
19    A.  No.
20    Q.  And is it your testimony that despite the e-mail,
21 Don Drent's e-mail on Exhibit 3 where he is telling you and
22 Landon that we need to place Officer Ross on an investigatory
23 suspension pending further medical evaluation, despite that
24 e-mail, is it your testimony that you made the decision to
25 place her on an investigatory suspension?

EEOC vs G4S SECURE SOLUTIONS USA, INC.
HILL, DESHON 06/06/2018

Job 6874
78..81

Page 78

1   A.  No, that would not have been my sole discretion,
2   that is up to Don Drent and HR.
3       Q.  Okay.  But it is my understanding based upon
4   what -- you know, you just testified when counsel asked you
5   that you completed Exhibit 2 and that you made the decision
6   to suspend her for CPR purposes?
7       A.  At the discretion of the operations manager and our
8   HR manager.
9       Q.  Okay.  So are you saying that you made the decision
10  to place her on a suspension due to the CPR incident, and
11  that you consulted with HR and Don Drent?
12      A.  I did not make the decision, I conducted the
13  meeting with Ross.
14      Q.  Who made the decision?
15      A.  HR makes the decision and our operational manager.
16      Q.  Okay.  So when you say HR, you are meaning Juanita
17  Resar, right?
18      A.  Yes.
19      Q.  Okay.  And Juanita Resar is the person who the
20  letter of May 26th, 2015 is directed to by Christine Ross,
21  right?
22      A.  Yes.
23      Q.  And then the operations person is Don Drent,
24  correct?
25      A.  Correct.

Page 79

1       Q.  Okay.  So I am just trying to understand the
2   testimony that you just provided to counsel about your
3   signature being on Exhibit 2 and when you checked that box
4   that's what you meant and it was a CPR incident.  So is it
5   your testimony that they made the decision to suspend her
6   because of the CPR incident and that you were just checking
7   the box per what they said?
8       A.  I made the recommendation, they make the final
9   decision.
10      Q.  Okay.  When did the CPR event happen,
11  approximately?  If she's placed on a suspension June 2nd,
12  2015, I am not looking for the exact date but, you know,
13  approximately when would it have happened?
14          MR. MIHELICK:  I am going to object to form and
15  foundation.
16          You can answer if you know.
17          THE WITNESS:  I can't recall.  When that incident
18  happened, we would have contacted our HR and operational
19  manager letting them know what was going on with the officer.
20  BY MS. CAMPBELL:
21      Q.  Okay.  And how would you have contacted HR?
22      A.  Via phone.
23      Q.  So you would not have sent an e-mail?
24      A.  Correct.
25      Q.  And how long would you have waited to place her on

Page 80

1   a suspension due to an issue like this?
2       A.  Usually they will give us a response immediately.
3       Q.  So if there is a CPR issue, you would have moved
4   quickly to suspend her?
5       A.  Yes.
6       Q.  When was her last day of active employment?
7       A.  I don't recall.
8       Q.  Would it surprise you if I told you that I was
9   informed, at least by Juanita Resar, that her last day of
10  active employment was May 6th, 2015?  I am just trying to
11  understand the procedure and whether -- you know, why would
12  she have been suspended for a CPR issue that -- you know, in
13  June 2nd, 2015 and when would this, you know, alleged CPR
14  issue have happened?
15      A.  I can't recall the dates.
16      Q.  So you don't recall when the CPR issue happened,
17  right?
18      A.  No.
19      Q.  And there is no paperwork reflecting that the CPR
20  issue occurred that says CPR issue, right?
21      A.  Not that I recall, no.
22      Q.  Can you think of anything that I can request that
23  would, you know, verify the CPR issue, any type of
24  documentation?
25          MR. MIHELICK:  Objection, form and foundation.

Page 81

1       You can answer if you know.
2       THE WITNESS:  No.
3   BY MS. CAMPBELL:
4       Q.  Is it that you don't remember or you can't think of
5   anything or you don't --
6       A.  I can't think of anything right now.
7       Q.  Okay.  So you don't -- okay.  If you think of
8   something, will you let counsel know?
9       A.  Yes.
10          MR. MIHELICK:  She can let you know, I don't
11  represent her.
12          MS. CAMPBELL:  Okay.  That would be fine.
13          MR. MIHELICK:  She's not an employee.
14          MS. CAMPBELL:  That would be fine, but she is a
15  former supervisor of your client, and generally speaking
16  attorneys don't want to get into the habit of contacting
17  people who could bind the company, so that's why I defer to
18  counsel, because it is your client's liability.
19          But if he said it is okay for you to contact me, so
20  when we close I will give you my business card and I will let
21  you e-mail me any information.  If you think that there is a
22  document that I can request from your former employer, then I
23  will do that.
24          MR. MIHELICK:  That wasn't the question.
25          MS. CAMPBELL:  I have no further questions.

EEOC vs G4S SECURE SOLUTIONS USA, INC.                                   Job 6874
HILL, DESHON 06/06/2018                                                  82..84

Page 82

1     MR. MIHELICK: I want to go on the record and say
2  she can contact you if she remembers any other documents, but
3  that wasn't a carte blanche about anything. So if you do
4  think of any other documents, feel free to contact
5  Ms. Campbell over here and let her know what there is.
6        MS. CAMPBELL: She said she could not recall if
7  there were any documents that I could request regarding the
8  CPR issue, and so I asked her if she would let you know --
9        MR. MIHELICK: That's fine.
10       MS. CAMPBELL: -- and then you said that you don't
11 represent her and that I can communicate with her -- we can
12 communicate with each other about that.
13       MR. MIHELICK: Well, then, we will strike that, we
14 will go back to, you can come through me.
15       MS. CAMPBELL: Regardless, I mean, sometimes you
16 walk out of a deposition and you think, oh, that will, you
17 know, give them this information --
18       THE WITNESS: Okay.
19       MS. CAMPBELL: -- and then as long as we get the
20 information, you know --
21       THE WITNESS: Okay.
22       MS. CAMPBELL: And I am representing the government
23 and I want, you know -- I want to know what happened, what
24 the real story is.
25       MR. MIHELICK: If you can think of anything else,

Page 83

1  just go ahead and contact me and then I will make sure that
2  gets to Ms. Campbell.
3        THE WITNESS: Okay.
4
5        (Off the record at approximately 12:17 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 84

CERTIFICATE OF REPORTER

STATE OF MICHIGAN )
            ) SS
COUNTY OF  OAKLAND)

            I hereby certify that on the date and at
the place hereinbefore set forth, I reported stenographically
the proceedings held in the matter hereinbefore set forth,
and that the testimony so recorded was subsequently
transcribed by me with the use of computer-aided
transcription under my direction and supervision, and that
the foregoing is a full, true and accurate transcript of my
original stenotype notes.

DATE: 06/19/2018            *Kelly Forfar*

                          Kelly Forfar

                          (CSR-3618)

                          Certified Reporter

Notary Public:

County of Oakland

My Commission Expires:

January 4, 2021

**Exhibits**

**Exhibit 1** 3:13 43:20 58:9 60:17 69:15

**Exhibit 2** 3:14 46:3 61:4,6,7 72:24 75:5 78:5 79:3

**Exhibit 3** 3:15 57:11 77:21

**0**

**06** 24:9

**1**

**1** 43:15,20 58:9 60:17 69:15

**10** 69:17

**10:00** 25:24

**10:05** 4:3

**12:17** 83:5

**13207** 5:23

**15th** 6:15

**1992** 8:11

**1996** 9:22

**1998** 10:7,20,21 13:15

**2**

**2** 43:24 46:3 61:4,6,7 72:24 75:5 78:5 79:3

**2002** 66:7

**2011** 20:12 66:12

**2012** 66:10

**2015** 21:1,18 30:20 37:3 38:15 39:22 45:7 51:3,21 55:1 58:20 60:18 78:20 79:12 80:10,13

**2016** 9:6

**2018** 4:2 12:5

**25** 6:20,23

**26th** 45:7 58:20 60:18 75:13 78:20

**29th** 60:18

**2:00** 25:23 64:4 65:15

**2nd** 63:7 75:6,8,15 77:15 79:11 80:13

**3**

**3** 57:4,11 77:21

**30** 6:20,23

**3011** 57:12

**305** 43:20

**308** 57:12

**310** 63:3

**365** 25:15

**37-hour** 44:8

**3:00** 37:4,7

**4**

**40-hour** 64:11

**48089** 66:3

**5**

**5:00** 26:2 53:4

**6**

**6** 24:8

**6-2** 75:5

**60** 20:18,21 21:1 40:13

**6:00** 25:23,24 26:2 64:4 65:15

**6th** 4:2 80:10

**7**

**7:00** 25:24 37:4,7 53:4

**8**

**8:00** 64:4

**9**

**98** 10:19

**A**

**a.m.** 4:3

**ability** 5:15 71:4

**able** 26:14 27:14 39:24 40:7,17, 23,24 61:16 62:25 68:16 70:1 77:3,9

**about** 4:3 6:1,16,23 8:5 9:16 12:19,22 14:2 15:3 16:18 17:4 19:11 24:24 25:4 27:3 28:8 35:12, 17,25 36:13,17 37:8 38:24,25 40:14,16,23,24 41:3 42:23 43:9 44:9 45:23 48:19 49:14 50:10,25 51:13 52:3,24 54:19,22 55:8,14, 21 59:8,24 61:13 64:2 65:10 66:4, 6,8,20 69:18 70:15 71:10,11,12 72:1,7 74:23 76:19,20,24 77:4,14, 17 79:2 82:3,12

**abreast** 26:20 69:13

**access** 13:23 16:23 19:12

**accommodate** 28:6 42:23

**accommodation** 28:2

**according** 63:9

**account** 50:17,23 74:2

**accurate** 26:25

**accustomed** 53:9

**across** 22:7

**act** 22:11,15,18 30:2

**active** 80:6,10

**activity** 17:24 18:1 70:5

**actual** 44:16,17

**actually** 12:13 37:15 46:11 53:23

**additional** 68:8

**address** 5:22 6:2,3,5,10 7:12,14

**adhered** 10:4

**adjustments** 27:9

**ADP** 16:22

**affected** 38:11

**after** 8:12 9:18 10:9 29:16,18,20 30:3,4 44:6,23 45:4 49:21 50:12, 19 57:8 62:3 75:18,24,25 77:14

**again** 54:7 72:15 75:19,21

**ago** 7:24

**agree** 76:6

**ahead** 47:13 61:21 62:9 71:23 83:1

**aid** 27:15 43:7 45:24 46:12,14,16 62:22

**allegation** 47:10

**alleged** 59:8 80:13

**Allied** 12:2,8,9,10,12 66:5

**allowed** 13:23

**along** 16:21 49:1

**already** 19:22 50:24

**also** 4:23 10:4 13:1,2 17:1 22:9 24:11 26:25 27:7,9 32:16 36:10 40:7 51:9 52:9 54:3,5,6 55:17 58:8 59:24

**Americans** 22:11,15,17

**Andrew** 52:6

**annual** 11:7

**another** 11:18 14:5 26:8 38:2 39:11,12,19 45:5 53:24 63:17 72:20

**answer** 4:25 5:9 47:13 50:4 62:9 77:6 79:16 81:1

**Anthony** 21:22

**anticipate** 5:5

**any** 5:3,14 7:25 8:1,3 9:14 13:18 15:6 22:10,14 24:10,19 27:13,19, 21,24 28:5,17,25 30:5,7,24 31:2, 11,20,25 32:6 34:21 35:20 36:2,3, 5 37:10,16 38:9 41:16,23 42:1,15, 22 45:15,19,20 47:16 48:18 49:10 50:21 52:17 59:8 60:25 62:25 67:6 68:1,4,9,12,19 70:22 75:25 80:23 81:21 82:2,4,7

**anybody** 18:9

**anymore** 31:12

**anyone** 7:19 42:22 62:25 64:24 68:15 70:23 77:14,17

**anything** 7:21 31:23 35:17,25 44:21 47:3,4 59:12 60:25 61:13 68:13 80:22 81:5,6 82:3,25

**anywhere** 48:18 52:20 60:21

**appear** 60:12

**appearance** 6:8

**appears** 57:16 63:4

**application** 69:7

**applications** 69:4

**applied** 9:8,9,11 68:25

**apply** 68:23

**appointment** 47:8

**appropriate** 73:25

**approximately** 6:6,20 9:2,22 10:6,7,21,24 12:4 13:15 19:5 20:18,21 21:13 33:11 42:8 67:10 79:11,13 83:5

**April** 51:3

**are** 5:14 12:4,15 13:18,19,21,22 14:5,6,15,18 15:2,4,6,15,18,20, 22,24 16:1,4,8 17:11,22,23,24 18:5,11,14,16,20,24 19:3,7,8,13, 22 22:9 24:23,25 25:7,15,21,22 26:19,20 30:1 32:10,11 34:3,13 35:9,24 36:13 38:17,18,24 39:4, 16 40:11 41:15 42:4,7 43:8 44:17, 24 47:20,24 53:2 57:8 60:18 61:24 63:24 64:3,5 67:6,8,9,14, 15,17,24 68:1,5,8,9,16,19 69:3,20 70:5,25 71:7 72:8 73:24 74:25 75:25 76:10,21 77:2,9 78:9,16

**area** 7:7 16:16,25 17:9,10,25

**around** 15:14,23 17:25 27:8 38:12 40:7,8 45:18 46:22

**arrested** 5:17

**Ashleen** 64:6,12 65:14

**ask** 4:20,24 8:5 9:16 13:17 16:7 27:25 28:8 35:12 39:9 43:21 46:3 47:22 51:13 54:7

**asked** 45:10 53:6 74:23 76:18

78:4 82:8

**asking** 19:2 33:6 34:21 39:7 45:19 49:4 60:11 65:10

**asks** 27:25

**assessments** 36:20

**assign** 70:18

**assigned** 14:11 25:25 74:2

**assigning** 70:21

**assignments** 18:5 71:7

**assist** 77:9

**assume** 5:9 71:25

**assuming** 56:20

**attend** 6:8 8:6

**attorney** 4:15

**attorneys** 81:16

**authority** 70:18

**authorized** 13:23 19:22

**automatic** 34:14

**available** 28:5 51:4

**Avenue** 7:12

**aware** 22:5 26:20 70:25 75:25

---

**B**

---

**B-A-R-T-O-N** 12:10

**B-U-R-N-S** 9:20

**back** 9:16 12:17 21:1 23:21 28:16 30:9 31:13 32:7,12,13,14,16 35:9 37:8 45:13 50:14,16 52:23 57:8 66:16 72:24 74:17 82:14

**background** 5:21 8:6 9:17

**badge** 16:16 32:14,15 33:2,4 49:16,17

**badges** 16:23

**ball** 48:23 59:11

**Barton** 12:9,10,12

**based** 17:17 44:15 46:6 78:3

**bases** 37:6

**basic** 37:7

**basically** 32:2 47:23 69:20

**basis** 36:20

**became** 10:22 11:9,14 20:8 66:5,6

**because** 6:10 8:14 10:15 12:12 15:1 17:22 18:14 21:23 23:20 26:18 35:21 37:13 40:16 45:1 46:8,11,16 47:9,17,18 50:15 51:18 53:14 55:2 59:19,25 60:11 64:2,14,23 67:21 69:20 70:17 74:6 76:10 79:6 81:18

**become** 20:11

**becoming** 66:8

**been** 4:7,17 5:17,19 6:19 7:23 10:15,17 12:18 24:16 30:25 31:3 33:12,14,15,16,22 38:11 39:12, 13,15 40:4,13 41:19 43:10,20 45:4,18 46:2 47:1,21 48:21 49:17 50:16 51:3 53:9 55:2,11 58:8 59:18 62:16 63:12,16,18 64:8,9, 12,15,20 65:1 66:7 67:19,20 75:6 77:8 78:1 80:12

**before** 4:18 10:14 18:7,9 36:22, 23 62:11 75:12

**being** 41:21 45:23 47:5 49:11,15 50:21 52:24 53:22 60:9 61:16 73:24 79:3

**believe** 37:4,7 38:3,4 44:9 48:21 49:22 52:11

**bend** 48:14,16

**bending** 48:5

**benefits** 51:7,10 56:1

**besides** 18:2 42:3 63:16 68:7

**better** 16:7

**between** 69:17 76:11

**beyond** 9:13 16:9 35:15 47:5

**bid** 11:18,19 44:15,19 45:1,18 74:18

**bidded** 11:20 12:12

**big** 22:6,8

**bind** 81:17

**bit** 16:18 65:24

**black** 76:4,10,12

**blanche** 82:3

**blood** 48:7,8

**border** 15:24

**boss** 6:18

**bottom** 73:5

**Bova** 64:7 65:1

**box** 73:25 74:9 79:3,7

**branch** 27:13,20 28:16 42:11,14, 16,18 54:15,16 55:11,17

**break** 5:3,6 57:2,9

**breaks** 19:2

**brief** 56:25 57:9

**bring** 31:13

**brought** 12:19

**Brown** 63:23

**Bryant** 54:12,14

**BS** 9:9

**building** 7:1,6 13:1 14:6,19,23 16:22 17:19 18:5,8,21 44:10 67:5 76:4

**Burns** 9:20,21,24 10:5,9 12:21, 25 13:7,9

**business** 81:20

---

**C**

**call** 25:1 60:5

**called** 35:9

**calls** 39:24 53:6

**came** 27:19

**Campbell** 4:11,14 23:10,11 43:18 44:1 47:15 49:7,9 50:8 56:24 57:7 58:7 59:23 60:8,24 61:6,12,22 62:12 65:21 76:17 77:10 79:20 81:3,12,14,25 82:5,6, 10,15,19,22 83:2

**can** 4:12,23,25 5:4 14:7 27:6,7,16 28:12,21 30:13,14 34:18 37:4

41:12 42:14 44:19 45:10,11 47:13 50:4 53:5,7 62:9,21 68:15 71:15 74:18 77:6 79:16 80:22 81:1,10, 22 82:2,11,14,25

**can't** 9:22 10:25 21:23 22:13,16 23:6,20,21 27:16,23 28:4 33:13 35:6 37:16 43:4,10 46:14 48:11, 14,16,17 49:19 51:11,22,23 52:14,16 55:2,3,13,19 62:7,11,20 72:20 79:17 80:15 81:4,6

**cannot** 45:12

**carbon** 58:23

**card** 62:17 81:20

**care** 8:14

**carte** 82:3

**Carter** 54:12,14

**caught** 34:3

**center** 10:17 13:6,8,13,15,18 19:16 27:14 51:20

**certain** 23:22 34:11 53:1,3 61:9 65:12

**certification** 68:13

**chain** 56:4,5

**chance** 11:19 44:2

**change** 6:10 20:23 21:9,14 24:22 25:2,5 26:10 29:6 38:13 39:20 53:12 54:3,5,6

**changed** 10:16 11:14,15 21:15 38:1,3,10,16 44:7,25 45:5 51:2 52:12 53:10,19,22,23

**changes** 24:19

**changing** 38:19,22

**characterize** 66:17,23

**charge** 56:1 77:18

**check** 15:15 18:23 48:3 70:2 73:25

**checked** 46:20 74:1,9 79:3

**checking** 79:6

**checklist** 32:3,4

**checks** 11:5

**Chelsea** 55:21

**chief** 30:19,20 33:8,10

**chiefs** 35:1

**children** 8:15

**Christine** 35:12,13 36:24 38:1 41:19 42:19,25 52:12 53:18 57:23 58:11 63:7 73:6,16,18 77:14 78:20

**circumstance** 56:13 62:19

**circumstances** 34:13,16

**City** 6:21

**claim** 61:1

**clarify** 72:8,23

**cleanup** 65:24

**clear** 35:7

**client** 61:11 81:15

**client's** 81:18

**climb** 70:1

**climbing** 70:5

**close** 81:20

**closed** 18:24

**College** 8:21,24 9:1 13:10

**com** 7:16

**come** 17:14 19:17,20,22 27:20 32:11 33:21 37:5,6 53:7 60:5 70:3 74:17 82:14

**comes** 27:13 58:22 74:17

**coming** 16:16 18:4,11 19:12 46:18 50:16

**command** 56:4,5

**Commission** 4:15

**committing** 5:19

**communicate** 82:11,12

**Community** 8:20,23 9:1 13:10

**company** 11:18 22:4,6 31:6,20 64:20 81:17

**complacent** 26:19,23

**complaint** 76:3

**complete** 5:1

**completed** 78:5

**compliance** 20:22

**compressions** 48:17

**Concentra** 47:25 48:1 49:25 62:4,11

**conclude** 35:5

**condition** 27:10 40:3 41:13,17 42:23 43:5 45:11 58:13 72:7,11

**conduct** 11:6

**conducted** 47:24 78:12

**conducting** 4:16 19:3

**Coney** 7:2

**confined** 11:8

**conflict** 59:25

**consider** 30:6

**considered** 19:9

**constantly** 15:13 19:7

**consulted** 78:11

**contact** 20:22 24:20 34:19 65:8 81:19 82:2,4 83:1

**contacted** 37:15 58:5 59:21 79:18,21

**contacting** 81:16

**contacts** 37:19

**continue** 8:13

**contract** 10:16 11:14,15,18,19, 20 12:13 43:11

**contractors** 17:7 18:4

**control** 31:22

**convenient** 65:13

**conversation** 41:14 72:6

**conversations** 42:22

**convicted** 5:19

**coordinator** 12:16 14:23 20:8,9, 11,17,24 30:19,22 34:25 44:7 54:25 55:1,6 56:7 63:17 66:12 72:25

**copy** 58:23

**correct** 8:4,25 9:4 10:23 11:24 12:7,14,18 13:16 15:5 16:3,5,6 17:3 19:10 21:3 23:24 25:12 26:6, 24 29:15 30:8,11,23 35:11 37:21, 25 38:2 39:3,25 41:10,18 46:13 52:2,8 53:16 55:7 58:18 59:14 60:15 61:14 62:5 63:2 68:18 70:15,16,19,20 71:2,6 72:22 73:3, 4,19,22 74:7,12,22 75:11,13,17 78:24,25 79:24

**correctly** 46:13

**could** 14:11 17:16 19:20 24:11 25:2,10,11 26:4 30:6 33:7,9 37:13 40:4 42:20 43:10 45:4 49:3 53:17, 18 54:3,5,6 59:19 61:10 68:4 70:14 75:1,12,14 81:17 82:6,7

**couldn't** 34:19 46:13 47:2,9 58:13

**counsel** 76:18 78:4 79:2 81:8,18

**County** 8:17,20

**couple** 10:14 11:17 14:17 24:17 27:6 62:23 64:9,14,15,18 65:23

**court** 4:22 7:9 49:5,8

**courthouse** 6:23

**CPR** 27:15 46:14,16,18 47:10,11, 17 48:10,12,17,20,24 49:3 59:7 60:10,21 61:2,7,8,13,25 62:6,13, 16,17,18,22 63:1 74:6,11 78:6,10 79:4,6,10 80:3,12,13,16,19,20,23 82:8

**crime** 5:19

**current** 5:22 12:8 22:6 42:8 67:7

**currently** 21:16,17 63:23,24 64:1,21

**customer** 19:2 20:21

**customers** 13:1 14:12

**cut** 67:13

---

## D

**D-E-S-H-O-N** 7:15

**daily** 36:20

**Darlene** 21:22

**date** 6:17 28:23 29:14 31:7 45:7 55:4 75:8,9,15,16 79:12

**dated** 58:20

**dates** 80:15

**day** 13:25 14:1 17:15,19,20 18:7, 8,9,10 19:3 23:15,22 34:11 37:10, 11,13,18 40:10 64:10 65:12 80:6, 9

**days** 12:5 23:15 25:14 60:16

**daytime** 53:9

**de-assign** 70:18

**de-assigning** 70:22

**deal** 27:12

**decide** 57:23

**decision** 19:19 26:7,13,15,16 30:16 57:19 58:6 59:4,13 60:13 70:8 77:24 78:5,9,12,14,15 79:5,9

**deemed** 30:2

**defer** 81:17

**degree** 9:7

**delivered** 18:17

**demanding** 6:7

**Denise** 55:8

**department** 34:9 47:7,14 52:1 60:4,6

**depend** 26:2 34:17

**depending** 14:9 17:18 31:13 34:2 45:18 68:7

**depends** 14:22 19:2 25:25 34:12, 15 51:20 56:13 67:4

**deposed** 4:17

**deposing** 65:10

**deposition** 4:16 5:5 6:8,14,16 7:18,22 43:15,24 57:4 65:13 82:16

**describe** 28:12,21,22

**Deshon** 4:6,13 7:15 44:7 45:8 72:25

**design** 14:19 16:4

**designated** 45:9

**desk** 13:2,4,19 15:16 18:23

**despite** 77:20,23

**Detroit** 6:21,24 7:3,5 8:7

**did** 6:5,7,16 7:21 8:6,8,9,10,12,16 9:5,21,24 10:5,10,13 11:6,9,11,25 20:11,23 21:7,9,12,14,25 22:10, 25 28:10 29:16 37:1,3 38:5,9 39:9 41:9 43:6 47:4 48:3 49:19 50:21 51:17 52:9 54:14 55:18 56:9,11, 16,18,20 59:3,12 61:6 70:8 72:21 73:9,16 75:18,21 77:14 78:12 79:10

**didn't** 7:25 8:2 18:8 26:22 27:19, 21 36:16 43:6 47:3 50:14,15 57:23

**different** 26:1 38:18,24 39:4,17 44:15,19 45:2 49:14 52:13,18,24 53:5,14,15,18 69:23 70:11 74:16

**direct** 19:24 36:7 65:8

**directed** 78:20

**directions** 19:13

**Disabilities** 22:11,15,17

**disciplinary** 28:22 30:5,7 37:17

**discipline** 28:9,10 71:10,15

**discretion** 71:8 78:1,7

**discussed** 7:18 9:14 71:3

**discussing** 72:11,12

**dispute** 39:24 40:5 41:21

**distinct** 52:24

**distinguishes** 69:17

**district** 7:9

**dock** 16:15 17:4,5,10,24,25 18:1, 3,11,14,17,18,24 27:3 38:2,7,23 39:1,23 40:6,9 44:8 53:11 63:24 64:8,10,11,12,21,22,23,24 65:1, 16 69:15,17,23 70:4

**docks** 26:11 67:16 69:20

**document** 43:19,21 44:4 45:16 46:2,3 57:11 63:9 81:22

**documentation** 24:7 28:17,21, 25 29:23 31:25 32:6 34:19 37:10,

17 41:23 42:1 61:1 80:24

**documents** 7:25 8:1,2,3 82:2,4,7

**Don** 56:9,11,15 57:18,20 58:5,22 59:21 60:19 77:21 78:2,11,23

**Donald** 56:2

**door** 15:15

**doors** 18:24

**dot** 7:15

**down** 4:23 15:19 17:11 48:5,14, 16

**downstairs** 24:3,9

**downtown** 6:24 7:3,5

**Drent** 56:2,9,11 57:20 58:22 59:21 60:19 78:2,11,23

**Drent's** 57:19 77:21

**drill** 62:21

**driver** 70:3

**due** 45:11 58:4 61:2 73:24 78:10 80:1

**duly** 4:7

**duration** 35:19

**during** 42:10 44:25 45:2 51:18,23 59:5 71:18 77:8

**duties** 43:6,7 45:10,11 59:19 61:11

---

**E**

**e-mail** 7:14 57:15 58:22 60:19,21 63:4 77:20,21,24 79:23 81:21

**e-mails** 57:13 60:12

**early** 53:7

**education** 8:13 9:13,14

**educational** 8:6

**EEOC** 59:24,25 76:3 77:18

**either** 11:8 14:22 16:22 22:24 23:17 26:4,14 30:13 33:7 34:25 40:5 41:9,11 50:18 51:25 55:5 63:16 72:20 74:16

**eliminated** 67:11

**else** 31:23 47:4 74:18 82:25

**emergency** 37:13

**employee** 27:25 32:22,25 35:6,8 37:15,20,23 43:11 46:12 47:3 68:4 72:4 81:13

**employees** 20:18,20 21:1,4 22:23 40:13 41:1 65:4

**employer** 12:8 41:2 81:22

**employment** 4:15 9:17 80:6,10

**end** 63:4

**ends** 23:20

**endurance** 5:4

**enforcement** 68:10

**engage** 27:17 39:23 58:13

**engaging** 27:11

**ensure** 10:3

**ensuring** 13:22

**enter** 18:21

**entire** 15:10,16,17,23 64:11

**entitled** 41:15

**entrance** 67:4

**environment** 25:9

**Equal** 4:15

**equally** 61:18

**equipment** 31:20 32:1

**Erica** 55:25 56:1

**escorted** 17:7

**escorts** 19:1

**evaluation** 57:18 58:5 59:22 77:23

**even** 45:16,20

**event** 79:10

**events** 14:10 75:25 77:4

**ever** 4:17 5:17,19 22:14 34:6 42:19,25 43:12 44:4 48:1 56:18 67:11,18 68:22,25 69:6 70:8,21, 25 71:18 72:3 75:19,21

**every** 11:7,17 23:2,4,8,17,18 25:5

27:6 44:14 62:19

**everybody** 46:16

**everyone** 62:25

**everything** 4:23

**exact** 7:23 9:23 10:25 33:18 55:19 56:22 79:12

**Exactly** 25:13

**EXAMINATION** 4:10 65:25

**examined** 4:7

**example** 17:20 33:2

**except** 16:21 29:5

**exception** 71:24

**exceptions** 62:25

**excessive** 27:11,17,18 28:4 39:24 45:12 46:10 58:14

**exhibit** 43:15,20,24 46:3 57:4,11 58:9 60:17 61:4,6,7 63:3 69:15 72:24 75:5 77:21 78:5 79:3

**expected** 17:18

**expecting** 17:19

**explained** 58:12

**extreme** 34:4

---

**F**

---

**F-I-N-N-E-Y** 8:7

**fact** 24:24 73:18

**fails** 34:10

**failure** 48:19

**fair** 71:21 74:20

**falsification** 34:4

**Farmington** 54:18 55:12,13

**federal** 6:23,25 7:9 18:8

**feel** 82:4

**female** 76:4

**females** 76:11

**fifteen** 15:18,20

**figure** 60:9

**file** 28:18 29:1,23 30:25 31:2,25 37:11 41:24,25 48:22 52:18,19 62:15

**files** 42:15

**fill** 34:24 35:6 37:14 74:16

**filled** 35:2 73:21 74:5,11,20,21

**final** 28:14 29:18,19,20,24 30:2 58:6 59:21 79:8

**find** 24:24 37:15

**fine** 81:12,14 82:9

**finish** 4:24,25

**Finney** 8:7

**fire** 11:8

**first** 4:7,16 9:19 12:19,21 19:1,17 21:11 25:10,22 27:15 38:19 43:12 44:10 46:14,16 48:2 52:5 57:15 60:13 62:22 65:15

**first-shift** 44:18

**firsthand** 36:17

**fit-for-duty** 47:8,21,22

**five** 14:13 15:3 17:1 21:13,18 39:4 50:25

**five-day-a-week** 25:17

**FMLA** 50:21

**follow-up** 65:23

**follows** 4:8

**form** 34:23,24 35:2,7 42:5 47:12, 18 48:21 49:13 50:3 58:3 59:17 60:2,22 62:8 72:25 73:9 75:10,16 77:5 79:14 80:25

**formal** 9:13,14 28:13 29:2,11,16, 18 30:1

**former** 68:10 81:15,22

**forty-five** 15:19

**found** 35:5

**foundation** 47:12 50:3 58:3 59:17 60:3,22 62:8 77:5 79:15 80:25

**four** 21:13,18

**free** 82:4

**frequently** 33:23,24

**Friday** 6:10 18:9 23:17,18

**front** 67:4

**full-time** 9:19

**further** 45:8 57:18 65:21 75:2 76:14 77:23 81:25

**future** 74:24 75:2

---

### G

**G4s** 11:14,21,23,25 12:3 20:13, 24 22:8,12,25 28:8 33:12 42:16, 22 43:20 46:7 51:24 54:13 56:16, 18 57:11 66:5,9,15

**garage** 17:9

**gate** 16:17 19:11,17 25:25 26:1 39:1

**gates** 26:11

**general** 66:21,23 76:19,23,24

**generally** 81:15

**give** 4:21 6:19 24:10,11 73:9 80:2 81:20 82:17

**given** 57:13

**gives** 71:3

**giving** 30:9

**global** 22:9

**GM** 7:6 43:10 50:17 67:11

**GM/DELPHI** 74:2

**government** 82:22

**graduate** 8:8,10 9:5

**graduated** 8:12,18

**grant** 16:23

**greater** 70:4

**greet** 14:12

**greeted** 13:1

**ground** 4:17

**guard** 53:11

**guards** 13:19

**guess** 6:11 15:25 51:9 76:19

**guys** 41:2 62:24

---

### H

**H-E-R-B-E-R-T** 5:24

**H-O** 21:25

**habit** 81:16

**half** 14:7

**hand** 36:21 46:2

**handed** 43:19 57:10

**handle** 60:6

**happen** 47:4 53:7 62:23 72:21 79:10

**happened** 37:14 46:22 49:21 50:12,18 59:5 60:16,17 72:9,10, 15 75:9,12,25 79:13,18 80:14,16 82:23

**happening** 66:15

**happens** 29:17,20 30:12 31:10 32:9 33:22,24 34:11 54:2

**Hart** 7:6

**he** 20:6 22:2,4,5 51:16,17,19,22, 23,24 52:4 54:13,15 56:3,4,6,16, 20 64:9,10 65:3,19 76:23 77:21 81:19

**he's** 64:11

**hear** 6:16 23:7 37:22

**heard** 43:12 46:7,19 48:24 60:11

**hearing** 41:8 51:10

**held** 57:2

**help** 47:3

**helped** 18:15 55:19

**her** 4:8 27:11 35:15,17,22,23,25 36:6,7,14 38:2,5,9,10,14,16 39:9, 10,14,18,19,22 40:3 41:8,12 42:20 43:6 45:14,23 47:4 48:11, 22 49:1,2,11,15,16,17,22,24 50:14,15,21 51:6,10 52:16,17 53:20,21,22 55:3,19 58:12 59:4,6, 13,19 60:13 61:2,16 62:11 63:7 70:10,11 72:11 73:9 75:16,19,21

76:3,11 77:8,25 78:6,10 79:5,25 80:4,6,9 81:11 82:5,8,11

**Herbert** 5:23 7:12

**here** 35:24 45:7,15 47:18 71:25 72:25 74:8 75:5 77:11 82:5

**hey** 28:1 41:12

**hide** 48:23 59:11

**high** 8:6,12 9:18

**higher** 15:1

**Hill** 4:6,13,14 7:15 43:19 44:7 57:10,12 65:23 72:25

**Hills** 54:18

**him** 56:20

**hired** 48:2

**his** 20:5 52:5 56:5 58:5 64:11

**Ho** 21:25 56:18

**holdover** 53:7

**hospital** 34:18

**hour** 14:2,7,13 15:4 17:2

**hours** 25:22,25 37:3,4 64:3

**houses** 10:16

**HR** 28:5 33:8 47:7,14 49:1,22,24 55:9 58:6 60:4,6 78:2,8,11,15,16 79:18,21

**HR's** 34:8

---

### I

**I.D.** 51:19,25

**identification** 43:16,25 57:5

**immediately** 80:2

**impair** 5:14

**inability** 46:20 61:9 74:1

**incident** 28:23 35:22,24 36:22,23 43:3 46:22 48:19 58:4 59:6,20 74:12 75:9,12 78:10 79:4,6,17

**include** 30:18

**included** 6:12 72:4

**individual** 19:21 36:19

EEOC vs G4S SECURE SOLUTIONS USA, INC.
HILL, DESHON 06/06/2018

Job 6874
Index: individuals..location

**individuals** 18:6,21 19:5 21:21 36:13 43:5 51:14

**inform** 25:2

**information** 5:21 24:10 42:11,13 49:14 60:1 81:21 82:17,20

**informed** 80:9

**infraction** 28:23 31:6

**inside** 15:14 17:5,10 18:5,16 70:2

**inspect** 16:15 17:6 69:21

**inspecting** 69:25

**inspections** 14:6

**interact** 36:25

**interacted** 36:24

**interview** 14:16,21 15:22 16:2,14 68:7,16

**interviewing** 69:4

**investigated** 49:2

**investigation** 31:14 32:13 35:5

**investigatory** 46:8 57:17,24 58:2,25 59:4 60:20 61:18 62:1 73:24 77:22,25

**involve** 56:15

**involved** 33:12 56:11 58:6 59:20 69:3,25

**involving** 48:19 56:12

**Island** 7:2

**issue** 35:21 47:17 60:10,21 61:2, 7,8,24,25 80:1,3,12,14,16,20,23 82:8

**issues** 30:5,7 35:20 36:2,3,6 46:9 56:11

**items** 32:7,22,25

**Ivory** 55:14

**J**

**January** 12:1,5

**Jeremy** 20:2,3

**job** 9:19 22:22 35:25 36:6,14,18

59:19

**jog** 75:2

**Juanita** 48:25 57:20 58:9,23 59:21 61:15 78:16,19 80:9

**Juanita's** 49:5

**June** 4:2 46:23 63:7 75:6,8,15 77:15 79:11 80:13

**K**

**K-R-E-I-S-C-H-E-R** 55:16

**K-R-E-S-K-A** 21:23

**Kara** 54:8

**keep** 37:3 40:6

**keeping** 69:12

**key** 31:22

**keys** 32:15 49:17

**kind** 60:10 73:6

**know** 5:4,6,7,11 7:2,5,6,7 9:18 10:24 13:21,24 14:13 15:3,18,23, 24 16:7,8 17:14,22 18:8 19:13,19 20:5 21:22 22:2,17 23:22 24:1,17, 20,23 25:4,10,22 28:6 29:10 32:2, 11,12 33:5,6,17,18 35:13,21,25 36:7,13,17,22 38:23 39:10 40:12, 14,20 41:2,6 45:21 47:17 50:4,5 51:11,14 52:5 53:10,11,21 54:8, 12 55:18,23 57:10,15,18 58:1 59:15 60:11,17,25 63:22 66:6,10 67:23 68:22,25 69:18 73:18 74:25 76:20 77:11,15 78:4 79:12,16,19 80:11,12,13,23 81:1,8,10 82:5,8, 17,20,23

**knowledge** 36:17

**Kreischer** 55:16

**Kreska** 21:22

**L**

**Lafayette** 7:2,3

**Landon** 6:18 7:17,18 14:22 30:21 49:19 56:8,9 57:16 58:23 63:17 77:22

**last** 6:9 30:6 49:5 80:6,9

**law** 68:10

**least** 7:11 80:9

**leave** 24:17,25

**leaving** 10:9

**left** 4:23 10:7

**legs** 48:5

**less** 33:19

**letter** 6:9,12,14 45:20 46:9 58:9, 11,16,18,19 60:17,19 61:16 69:16 78:20

**letterhead** 31:6

**letting** 79:19

**liability** 81:18

**lifting** 48:5

**like** 5:4 6:9 7:6 11:8 12:17 13:24 14:7,17 15:17,18,24 17:8,21 18:8 22:22 23:12,15 24:21 25:5,9,17 26:8,9,11 27:3,15 29:4 31:5 34:16,25 36:9,17,19 37:13 38:3, 22 41:1 44:17,18 46:14,18 47:4,7, 8,20 48:5,6,16 53:2,5 59:11 60:7 62:20 63:6 68:4,13 70:15 73:5,7, 23 80:1

**line** 12:18,22,24

**list** 28:23

**little** 16:18 23:6 65:24

**live** 6:5,20 7:15

**lived** 5:25 6:1

**loading** 18:4

**loads** 18:16

**lobbies** 14:17 16:13,22 25:24 27:2,3 67:21 68:8 71:24 76:5,10

**lobby** 13:2,4,19 14:12 15:7,12, 14,16 16:14,19 17:1 38:25 39:2 53:1,2,4,9,10 66:16,17,19,21,24 67:2,6,7,8,12,14,20 68:7,21 76:19,21,24,25

**located** 14:18 17:8 22:2 42:2 54:16 55:10

**location** 6:25

**lock** 33:6

**logistics** 50:6

**long** 5:6,25 6:5 7:24 9:1 10:5,13 11:12,25 42:7 64:8,12 65:1 68:16 79:25 82:19

**longer** 31:10

**look** 23:5 29:4,5 31:5 43:21 45:8, 12 46:3,4 63:3 70:2 75:1

**looking** 45:21 49:13 60:12 79:12

**looks** 63:6 73:5,6,23

**Lopez** 55:23

**lot** 17:24 18:10,19 20:21 33:14 36:9,17 41:1 45:2 55:20

---

## M

**M-E-T-S** 64:6

**ma'am** 22:1

**Macomb** 8:18,23 9:1

**made** 39:20,21 60:12 77:24 78:5, 9,14 79:5,8

**Madonna** 8:19 9:3,5

**mail** 6:9,12

**mailing** 5:22 6:2

**main** 67:2

**maintain** 42:10

**maintained** 42:7

**maintains** 42:9

**major** 36:2,5

**make** 4:21 17:7 18:24 19:19 26:7, 15,16,18,19 27:8 40:12 52:25 58:6 59:3,12 62:24 70:8 78:12 79:8 83:1

**makes** 26:13 78:15

**making** 18:20

**male** 76:6

**males** 76:5

**management** 30:17,18 49:1

**manager** 28:5 54:15 55:9 56:3 78:7,8,15 79:19

**manned** 15:12

**manufacturing** 14:20 16:4

**many** 17:14 20:20 21:7,12,16 25:20 33:11,21 38:3 63:24 67:6,9

**marked** 43:16,20,25 46:3 57:5,11

**mass** 71:21

**materials** 18:3,4

**maybe** 14:7,13 15:19,20 17:1 18:7 25:3 65:3 66:7

**Mcfarland** 51:15 52:10

**me** 4:24 5:4,7,11,21 6:19 12:19, 20 13:17 16:18 23:9 27:25 38:19 45:10 47:21 61:18,24 63:17 65:9, 13 81:19,21 82:14 83:1

**mean** 11:16 15:17 24:6 27:22 33:1 36:19 38:17 41:7 43:12 48:13 53:6,21 60:6 61:10,23 64:19 67:13 68:3 72:11 75:2 82:15

**meaning** 78:16

**meant** 58:13 79:4

**medical** 24:16,25 27:10 35:22 40:3 41:12,17 42:23 43:3,5 45:11, 24 46:9 47:2 49:2 57:18 58:13 59:5,7,9 60:1 72:7,11 77:23

**medications** 5:14

**meet** 46:15,20 61:9 63:7 74:1

**meeting** 32:12 63:6,10,12,17 75:6,24 76:1 78:13

**members** 71:4

**Memorial** 18:7,9

**memory** 75:2

**mentioned** 7:17

**met** 47:19 75:16

**Mets** 64:6,8

**Michigan** 4:1 5:23 8:7 66:2

**middle** 66:14

**might** 15:3 17:14 33:2,5 34:16 37:23 45:21 66:7 75:1 77:3,9,12

**MIHELICK** 23:9 47:12 50:3 58:3 59:17 60:2,22 61:3,20 62:8 65:23

66:1 76:14 77:5 79:14 80:25 81:10,13,24 82:1,9,13,25

**mine** 73:15

**minimum** 46:15,20 68:1,5 74:1

**minor** 36:3,5

**minute** 36:23

**minutes** 6:21,23 14:13 15:4,18, 19,20 17:2

**mirror** 70:2

**mischaracterization** 61:4

**misspoke** 76:20

**mobile** 38:8

**Monday** 4:2 23:17,18 44:8

**monitor** 18:22 19:12

**monitoring** 18:20

**month** 12:19,22

**months** 6:1 27:6

**more** 16:25 34:13 36:20 71:14

**most** 19:22 33:25 48:15 52:14 65:13

**mostly** 34:2

**move** 27:8 38:11,12 39:16 40:7,8 41:12,16

**moved** 39:10,12,13,14,22 41:8, 21 45:18 70:25 76:13 80:3

**movement** 45:2

**moving** 19:7 70:10

**multiple** 41:20

---

## N

**N-I-C-K-H-O-L-D-S** 54:10

**name** 4:12,14 19:22 35:14,15 42:16 49:6 52:5 54:21

**names** 16:10 21:21 64:5

**nature** 34:20 69:22

**near** 17:8,9

**necessarily** 23:7 24:21 75:8

**Nedra** 4:14

**need** 5:3,6 7:11 27:8 28:1 68:6 77:22

**needed** 26:12 57:17

**never** 12:18 46:19 48:23 49:2 60:10 70:23 72:9,15

**new** 41:2

**next** 10:10 25:11 29:22 40:18 50:13 61:15

**Nickholds** 54:8

**Nina** 55:14

**No(s)** 43:15,24 57:4

**no-call/no-show** 34:12 37:9,24

**no-call/no-shows** 34:13 71:11, 14

**noise** 23:6

**non-specialized** 69:9 72:1

**nothing** 14:24 51:2

**notifications** 60:6

**notify** 73:23

**number** 33:18 41:20

---

**O**

**o'clock** 24:8

**oath** 4:8

**object** 60:2,22 61:3,20 62:8 79:14

**Objection** 47:12 50:3 58:3 59:17 77:5 80:25

**observe** 62:20

**obtain** 51:6

**obtained** 9:9

**occurred** 28:24 80:20

**occurs** 44:23,24

**offhand** 51:11

**office** 23:14,25 24:23 27:14,20 28:16 33:3 37:1 42:12,14,16,18 55:11,17

**officer** 12:18,22,24 14:5 19:18 24:2,8,13 26:3,13,17 27:10,23 28:6 34:3,5,7 38:12 39:4 40:6 42:17 43:6 45:9 57:16 61:11 62:18,20 74:14,17 77:22 79:19

**officer's** 36:18 74:15

**officers** 10:3 11:4 16:17 18:25 19:8,11 21:5,6 23:1,5,12 25:14 26:12,18 27:1,8 36:10,25 37:6 38:4 39:1 40:7 41:16 44:14 45:1 56:12 62:21 63:24 65:7 69:10 70:11,15 74:2,16 76:12

**on-the-job** 35:17,23

**once** 33:25 35:5 47:6 53:19

**one** 8:21 12:22 14:19,20 21:22 23:19 25:9 26:2,7,19,23 27:7 32:21,24 33:3,7 34:25 35:21 37:9, 11 38:11 39:10,11,19,20 47:1 51:18 53:23 54:17 70:14,17 71:19 72:4,20 73:13 76:13

**ones** 39:15 65:24

**only** 13:22 14:13,17 15:3 25:5 30:15 33:3 38:11 39:15 48:21 67:21,23 71:3,19 72:4 75:15 76:4, 12

**onsite** 37:1

**open** 25:24 26:1,2 53:1,4,6

**openings** 21:17 27:7

**operational** 56:3 78:15 79:18

**operations** 78:7,23

**Opportunity** 4:15

**other** 7:18 9:14 15:6 16:8 25:4 27:3 31:20 54:17 69:9 73:11 76:5, 10 82:2,4,12

**others** 21:23

**otherwise** 71:25

**our** 13:1 14:9,14 16:10,17,21 17:5,6 25:24 27:13,20 35:5 39:16 46:15 47:14 51:19,23 52:15 56:1, 3 60:5 67:21 76:10 78:7,15 79:18

**out** 14:5,13 23:2,4,8 24:3,6,24 25:3 26:5 34:24 35:2,6 37:15,16 38:13 42:3 60:9 64:10,16,17 70:3, 6,23 71:19 73:21 74:5,6,11 82:16

**outcome** 31:14 32:13 34:2

**over** 4:17 5:21 12:5 82:5

**oversaw** 21:1

**oversee** 10:3 20:18,19,20,22 21:7

**overseeing** 11:4

---

**P**

**P-A-U-L** 20:2

**p.m.** 83:5

**page** 63:3

**Palmer** 55:21

**paper** 30:14 42:5

**paperwork** 30:24 31:2,5,9,11 34:21 35:10 37:14 47:16 48:18 52:17 59:8 62:15 80:19

**paragraph** 44:11

**paralegal** 9:12

**parcels** 17:18

**parking** 17:9 31:18 32:16,18

**part** 67:15,17 69:12 71:1 74:21 76:3

**partial** 14:6 18:16

**participated** 51:10

**particular** 17:19

**pass** 31:18 32:16,18 50:15 68:16

**patrol** 14:6 15:24 16:17 18:25 19:8 26:9 39:1 64:10,22 65:3,19 70:5

**patrolling** 44:9

**patrols** 13:1 19:3 25:23 26:11 67:15

**Paul** 20:2

**pay** 15:1 23:20

**payroll** 10:4 11:4 20:19,22 24:3, 6,13

**pending** 57:17 77:23

**people** 15:22 17:11 21:24 26:23 38:12 46:7 54:7 75:1 77:2,4,12

81:17

**perform** 27:15 34:12 43:6 45:10, 11 48:10,12,17 49:3 59:19 61:10, 17 62:13,20,25 74:6

**performance** 35:18,23,25 36:6, 14,18

**performing** 59:7

**period** 42:2 52:11

**permanent** 67:14,24

**person** 13:3 14:11 15:3,7,12 16:19,20 17:21 24:12,16 28:18 29:1 30:10 31:3,7,10,12,15 32:1, 5,9,21,24 33:3,4,7,21,25 34:1,22 35:8 37:11,19,23 41:24 42:2 43:7, 8 44:18 46:14 47:6 48:9 56:13 61:10 62:16 67:1 71:19 74:21 78:19,23

**person's** 29:1

**personnel** 28:18 29:1,23 30:25 31:2 32:3,4 41:23,25 42:15 48:22 52:18,19 62:15

**pertain** 44:16

**Phil** 21:25 56:18,22

**phone** 79:22

**physical** 47:23 48:1,9 49:23,24 50:2,7,12,15,19 62:4 70:4

**physically** 48:15

**physicals** 47:24

**physician** 48:3

**Pickens** 6:18 7:17,18 30:21 54:19,20 58:23

**Pinkerton** 10:11,13,21 11:2,3,9 13:12,14 66:4,6

**pistol** 68:13

**place** 33:6 42:3 45:9 57:23 59:4, 13 60:13,14 77:22,25 78:10 79:25

**placed** 31:3 45:23 46:8,11 48:25 49:1,10,11,15,21 57:17 58:2,25 59:6,16,18 60:20 61:2,17 62:1,3 63:13 73:24 75:18 76:6 79:11

**playing** 48:23

**Plaza** 7:6

**please** 4:12,20,24 5:11

**plus** 20:18,21 21:1 42:8

**point** 8:23 9:3 11:20 13:12 20:8 29:22 30:1,9 38:1 40:1 49:10,22 50:21 51:18,24 52:9 67:11

**policies** 10:3 28:9

**policy** 28:10 71:10,15

**Pollington** 55:8

**position** 10:9 13:3 14:16,21 17:4,8 18:19 19:9 26:8,9,19,23 27:1,7 38:2,6,7,8,9,14,18,22,23 39:1,10,12,17,19,23 40:3,5,8,9 41:20,24 42:20 44:7,8,15 45:5 51:2,3 52:12,15 53:2,5,10,11,19, 20,21,22,23,24 58:12 61:17 63:25 64:8,13,21,22 65:2,10,16,17 66:17,18 67:20,22 68:15,23 69:1, 13,15,17,18 70:4,5,11 74:18 76:5, 11,19,21,24,25

**positions** 13:18,20 15:2,6,7,22 16:8,10,14,15 26:10,20,21 28:6 38:13,24 39:5,11,16 41:16 44:25 50:24,25 52:25 53:14 66:17,21,24 67:6,7,8,12,14,15,24 68:19,20 69:9,10,23 76:21,22

**possible** 14:11 41:6,9 53:17 58:1 59:15 61:19 75:3,4

**post** 11:4 15:21 26:8 38:23 44:16, 22 53:6 67:13 68:5,15,19,23 69:1, 4 70:9,14,19,22 71:5,7,19 72:4 74:15,18

**posted** 23:13,14,15,17 24:22 26:3

**posts** 14:14,15 15:4 16:2,9 66:20 67:24 68:2,9 72:1

**potion** 76:4

**precludes** 27:11

**preference** 44:6,13,14,23,24 45:3,4,17 52:24 71:19

**prepare** 7:21

**present** 63:18 73:10

**presented** 75:10

**pressure** 48:7,8

**presuming** 40:17

**pretty** 15:19

**prevention** 11:8

**previous** 6:2

**previously** 76:20

**printout** 57:13

**prior** 25:1 29:13 35:24 44:4 58:16 60:17

**probably** 6:9 10:14

**problem** 5:7 7:9 65:9

**procedure** 80:11

**procedures** 10:4

**process** 14:12 16:15 17:5 28:3 69:3

**processes** 19:18

**processing** 13:22 17:12,22 18:2, 6

**program** 25:18

**progression** 29:9

**progressive** 28:10 71:10,15

**promoted** 55:2 66:11,13 67:22

**promotion** 14:25 20:13,15 21:12 55:3

**property** 19:20

**provide** 19:2,12,21 34:18 37:16 48:19

**provided** 79:2

**providing** 32:21

**purportedly** 69:16

**purposes** 24:13 78:6

**put** 37:10 39:19 42:20 68:4

**putting** 26:5

---

### Q

**Q-U-I-N-K-E-R-T** 6:4

**qualifications** 68:2,5

**qualified** 68:17

**question** 4:24 5:11 15:25 16:8 37:8 49:3 60:23 76:19 81:24

**questions** 4:22 5:9,10 8:5 9:16 28:8 35:12 51:13 65:10,21 74:23 76:14 81:25

**quickly** 80:4

**Quinkert** 6:3,4,5,10

**quit** 21:24

**quite** 38:12

**quote** 67:23

---

### R

**R-E-S-A-R** 49:7

**race** 5:5

**rate** 49:10

**Ray** 51:14 52:9

**RE-EXAMINATION** 76:16

**read** 44:2 45:14

**real** 82:24

**really** 12:4 33:16 36:24 48:23 59:15 68:15

**reason** 5:10 25:4

**reasonable** 28:2

**reasons** 70:14

**recall** 9:23 10:25 21:21 22:13,16 33:13 38:14,16 39:20 41:9,11,14 42:19,21,22 43:10 48:3 49:11,15, 19,20 50:18,21,22 51:6,8,9 53:21 54:21 55:2,13 57:12 58:18 62:2, 10,11 63:10,15,21 69:2,6 70:10, 21 72:3,6,8,14,17 74:13 75:24 77:15,17 79:17 80:7,15,16,21 82:6

**receive** 6:7 15:1 22:10

**received** 20:13 22:14 28:18 29:2, 10,24 32:6 33:5 61:16

**receives** 29:20

**receiving** 33:4 57:12 60:18

**recently** 21:15

**recollection** 45:14,16,20 77:4

**recommendation** 79:8

**record** 4:12 5:1 43:20 56:24,25 57:8,11 82:1 83:5

**recruiting** 55:20

**reference** 61:8

**references** 60:21 61:7 75:16

**referred** 28:16

**reflect** 28:18 29:1 31:3 32:6 41:24 42:2 52:18

**reflecting** 29:24 30:24 80:19

**reflects** 31:11 32:1

**refresh** 77:3

**regarding** 82:7

**regardless** 41:12,17 82:15

**regular** 16:14,19 17:1 38:25 39:16 67:8 69:17 71:1 76:21,25

**related** 22:25

**remain** 11:9

**remained** 50:24

**remember** 6:3 7:23 21:23 23:19, 20,21 35:14,15,17,20,25 36:2,3,5 39:14,18 40:14,16,17,20,21 41:3, 6 43:4,5 45:21 46:13 48:11 50:15 51:11,22,23 52:14,16 55:3,19 56:22 61:23,24,25 71:11 72:9,16 76:2 77:7 81:4

**remembers** 82:2

**removal** 28:15 29:17 34:14 35:3 71:16,17

**removals** 34:9

**remove** 38:5,9 39:9 70:8

**removed** 32:5,9 34:22 35:8,21 39:18 42:17 50:16,23 56:14 74:14

**removing** 38:14,18 70:10

**rendering** 43:7 45:24 46:12

**rep** 63:18,20

**rephrase** 5:12

**replaced** 74:15

**report** 11:8 19:25 34:10 54:2 56:8,9

**reported** 56:6

**reporter** 4:22 49:5,8

**reports** 24:12,13

**represent** 81:11 82:11

**representing** 82:22

**request** 28:3 80:22 81:22 82:7

**requested** 58:11,12

**require** 68:12 70:4

**required** 15:7,23 17:25 40:3 61:11

**requirement** 46:15 63:2

**requirements** 68:1

**requires** 69:13

**Resar** 48:25 58:9,23 61:15 78:17, 19 80:9

**research** 14:19 16:4

**respect** 76:1

**respond** 28:2 43:4

**responded** 47:2

**response** 4:21 80:2

**responsibilities** 10:1 11:2 12:25 13:21 20:23 22:22

**responsibility** 18:18

**responsible** 19:15 32:21,24 33:3

**rest** 15:22

**restricted** 16:25

**restriction** 27:17

**restrictions** 27:13,19,21,24 28:1

**return** 32:13 35:6 50:14

**returned** 33:22 58:12

**returning** 25:1

**review** 7:25 8:2,3 23:3

**reviewing** 69:3

**Rhonda** 55:23

**Richard** 64:7 65:1,14,16

**right** 6:21 8:21 11:21 12:6 13:7 14:24 16:2 17:2 20:9 21:2 24:4

26:12,23 30:22 32:16 36:1,11,18
39:2 40:21,22,24,25 45:25 46:17
49:12,25 50:25 51:4 54:3 57:24,
25 58:9,14,17,20,23 59:1,4,10,13
61:2,13 62:1 63:8,25 65:17 66:4,
8,16,20,21,23 69:14 70:13,14
71:4,9,16,17,25 72:19 74:9 75:3,5
78:17,21 80:17,20 81:6

**rolled** 23:8

**Ron** 65:14

**Ronald** 64:6,8

**Roseville** 6:4

**Ross** 35:13 36:24 38:1 41:19
42:19,25 46:8 53:18 57:16,23
58:11 59:20 63:7 68:22,25 69:6,
16 70:8,22 73:6,16,19 75:10,18
76:1 77:14,22 78:13,20

**Ross's** 42:23 48:19 52:12 72:7

**rotate** 26:12,13,16 27:4,5 64:2,14
69:10 70:11

**rotated** 14:5 39:17 64:16,17
71:19 76:11

**rotates** 64:10

**rotation** 67:15,17 70:15 71:1
72:4 74:21

**rotations** 71:21

**routine** 50:2,5

**roving** 53:11

**rules** 4:17

_____

**S**

**safe** 17:20 19:8 36:16 53:1

**said** 15:17 23:4 24:5 34:15 38:25
39:13 40:2,4,12 45:12 46:18
50:23 59:11 66:11,21 69:12 79:7
81:19 82:6,10

**same** 10:15 16:21 22:9 25:7 27:1
29:5 32:19 41:20 44:25 52:15
59:5 69:21 76:21,22,25

**say** 4:23 11:15 17:20,21 18:7
19:8 24:8 27:21 29:7,10,17 30:18
36:16 37:13,23 38:3 42:13 48:25
51:3,21 53:2 61:13 64:18,22 70:7

71:25 72:8,20 74:1,20 78:16 82:1

**saying** 15:2,20 26:22 38:17,18
40:11 41:7 44:24 47:20 57:16
58:19 59:3 60:19 72:8 78:9

**says** 44:6,9 45:8 61:5 72:25 73:1,
23,25 76:3 80:20

**scenario** 67:18,19

**schedule** 22:23 23:2 24:1,4,18,
19,22 25:2,4 26:5 38:10,16,17,19
52:21 74:15

**scheduled** 25:5

**schedules** 23:1 25:7 42:3,4,7,9

**school** 8:6,12 9:18

**science** 9:8,9,11

**seated** 19:9 38:5,7 40:8 66:18,24
67:6,7,12,20 68:19

**second** 19:3,4 25:11 37:5,13,18
38:20 44:19 65:14

**Secure** 22:8 28:9 46:7 51:25
56:16,18

**Securitas** 10:15,22 11:9,13 12:4,
5 56:21 66:5,6,8,12,14

**security** 9:20,21,24 10:9 12:16
13:18 18:18 20:6,8,11,17,24 21:5,
6,7,12,19 23:1,14 24:12 25:14
26:25 30:19,20 33:2,8,9 36:9,10,
17 38:5 39:4,10 41:16 56:12
66:11 72:25 74:2

**see** 23:12 28:5 34:10 44:6,10
45:7 60:20 63:4 73:1,6 74:3 75:19

**seeing** 58:18

**seem** 18:8

**seen** 44:4 58:16

**select** 71:4

**semester** 8:17,21

**send** 47:7,25

**seniority** 14:24 44:15 71:3

**sent** 42:11,13 46:9 47:10,21 48:9,
15 49:22,24 50:12,19 62:4,11
79:23

**sentence** 44:10

**separation** 34:23,24 35:2,7

**serve** 30:13

**serving** 31:8

**set** 25:10,11 63:6

**several** 38:24 70:14

**she** 35:19,20,21 38:4,10 39:12,
13,15,16,17,22,23,24 40:2,4,7,8
41:7,19 42:20 43:2,3,5,6 45:5,9,
10,12,17,18 46:8,9,11,13 47:1,2,
4,9,10,16,18,21 49:3,10,14,21
50:12,14,16,19,22,23 51:2 52:13,
14 53:17,23 54:2,25 55:1,2,5,9,
10,11,12,13,17,18,19 58:1,11,13,
25 59:16,18,19 60:19 61:1,4,6,15,
17,25 62:3,4,6,10 63:12 64:15,16,
20,21,22 69:16,18 70:13,25 74:6
76:3,12 80:12 81:10,14 82:2,6,8

**she's** 64:23 79:11 81:13

**shift** 9:25 10:1,11 11:1,2,10,12
12:15 19:1,3,4 22:24 25:10,12,22
26:4,14 36:21 37:5,6 38:20 39:21
44:6,13,14,16,19,23,24 45:2,4,17,
18 51:19,22,25 52:4,14,24 53:20
55:3,5 64:11 65:5,7,8,14,15 71:4,
7,18 74:15 77:8

**shifts** 25:20,21 45:2 53:3

**shippers** 70:3

**short** 52:11

**show** 29:8 37:9,11,12,19 47:16
52:21

**shown** 58:9

**side** 14:17

**sign** 17:6 24:3,5,7,9,13 31:8 33:4
73:16

**signature** 73:11 79:3

**signed** 13:2 73:5,6,10,18 75:16

**similar** 50:9

**since** 10:18,19,20 13:7,14 33:12
56:20 64:20 67:18 70:5

**single** 70:23

**sit** 13:3 15:19 17:11 40:9 45:15
63:17 68:21 77:11

**sit-down** 76:4

EEOC vs G4S SECURE SOLUTIONS USA, INC.
HILL, DESHON 06/06/2018

Job 6874
Index: site..taken

**site** 10:16 16:11 19:12,17,23 20:8 27:23,24 28:15 32:12,15,17,18 34:9,14,19 35:6,21 42:10,17 44:7 46:15 50:14,16 54:25 55:1,6 56:7, 14 62:14 69:10 71:16 74:14

**sitting** 4:22 15:16 16:22 19:5 67:1

**situation** 40:14 41:4 45:13 49:2 71:18 72:3

**situations** 33:25

**six** 6:1

**sleeping** 34:3

**slow** 17:20

**sole** 78:1

**Solutions** 22:8 28:9 46:7 51:25 56:16,18

**some** 5:10,21 8:23 9:3,16 11:20 20:7 21:24 25:4 27:8 28:8 30:1 35:12 38:1 46:9 49:10 51:13,24 52:9 54:7 60:10 74:23

**somebody** 48:15

**someone** 19:20 25:3 26:7 29:20, 24 30:12,24 34:10 37:9 38:19,22 45:24 48:20 52:7 53:6 67:19 70:13,18 74:18

**something** 33:22,24 34:4 37:14 44:9 47:7 48:16 81:8

**sometime** 37:5

**sometimes** 18:16 26:25 82:15

**somewhat** 17:8

**somewhere** 23:13

**Sommers** 52:3

**sorry** 11:17 13:9 20:20 22:20 23:5 29:8 31:1 32:17 33:1 42:15 51:12 61:21 64:1 71:23

**sounds** 12:17 36:9 41:1 47:20

**space** 11:8

**speak** 24:23

**speaking** 81:15

**speaks** 61:7

**special** 14:10

**specialist** 20:6

**specialized** 14:14,15 15:4,21 16:1,9,13,19,22 26:8,10 27:2 38:23 39:1,16 66:19,20 67:21,24 68:2,4,9,15,19,23 69:1,4 71:24

**specific** 70:9 74:21

**specifically** 61:25 70:10,18,21, 23

**specifics** 7:23 43:4

**spell** 49:5

**spoken** 36:24

**staffing** 14:9

**stage** 37:17

**standard** 47:19

**standards** 46:21 61:10 74:1

**start** 9:21 53:14

**started** 11:23 12:21 13:7

**starting** 21:11

**state** 4:12

**stated** 6:14 45:9,10

**statement** 76:7

**stay** 27:1 40:3,4 52:15

**staying** 26:20

**steps** 48:17

**still** 12:15 17:25 18:5,11,16,17,20 38:8 40:8 44:21 50:24 51:4 69:21 77:9

**stood** 47:2

**story** 82:24

**straight** 34:6

**Street** 6:11

**strictly** 64:23,24

**strike** 82:13

**Stringer** 55:25

**stuff** 42:17

**submit** 34:21

**submitting** 69:6

**subpoena** 6:7,13,19 7:11

**substantiate** 61:1

**successful** 12:13

**Sue** 55:16

**supervise** 21:12,16,25 40:13 52:9 65:4,6,7

**supervised** 36:10 52:7 56:20

**supervising** 21:18

**supervisor** 9:25 10:2,11 11:1,3, 10,12 12:15,20 19:24 22:24 24:9, 19 25:2 26:5,14 36:7,21 37:19,22, 23 51:19,22,25 52:4,13,16,18,22 53:18 54:5 55:3,5 65:5,7,8 70:17 71:8 77:8 81:15

**supervisors** 21:6,7,12,19 36:11 39:21 52:15

**supposed** 43:3 54:2

**sure** 4:21 6:25 12:4 14:1 17:7 18:20,24 26:18,19 39:17 40:12 50:6 52:25 60:23 83:1

**surprise** 80:8

**suspend** 34:2 78:6 79:5 80:4

**suspended** 30:12,25 31:7,15 34:1 42:25 43:2 47:5,6,9,17 80:12

**suspending** 34:7

**suspension** 28:14 29:22 30:14 31:3,8,11,12 32:5,10 33:21 34:5 35:9 45:24 46:8,11 47:6 49:1,11, 12,15,16,21 57:17,24 58:2 59:1,4, 6,13,16,19 60:13,20 61:2,18 62:1, 4 63:13 72:24 73:24 75:18 77:15, 23,25 78:10 79:11 80:1

**suspensions** 33:11

**sworn** 4:7

---

**T**

---

**tag** 32:15,17,18

**take** 4:23 5:3,5,6 26:7 56:24 65:9, 13

**taken** 31:16,18,21 32:1 49:16,17 70:13

**taking** 5:14 8:14 32:24 57:8

**talk** 28:5 48:19 66:20 75:1,21 77:3,14

**talked** 6:18 45:23 66:4 70:15 71:10,11

**talking** 15:15 43:8 69:18 72:1 77:17

**Tanzania** 54:19,20

**Taylor** 21:22

**tech** 10:17 13:6,8,13,15,17 19:16 27:14

**telling** 42:19 61:24 77:21

**Temple** 64:6,12

**ten** 33:19

**terminated** 32:10,11 34:1

**termination** 34:6,8

**terms** 22:22 35:23 46:10

**test** 40:14 47:11 62:21

**tested** 62:6,11,16,18,22

**testified** 4:7 38:24,25 39:22 41:19 50:10,25 61:4 72:6 76:18, 20,23 77:2 78:4

**testifies** 61:15

**testify** 5:15 40:23,24 61:6

**testifying** 71:12

**testimony** 41:15 52:23 53:23 74:24 77:20,24 79:2,5

**tests** 62:13

**thing** 16:21 32:19 46:18 48:24

**things** 27:15 34:19 38:19 48:6 69:21 74:25

**think** 6:15 9:22 10:6,7 38:23 55:13 61:4 67:10 69:13 72:14 74:25 80:22 81:4,6,7,21 82:4,16, 25

**third** 19:4 37:6 38:20

**thought** 18:14

**Thoung** 21:25

**three** 9:2 21:17 25:21 64:2 67:10

**through** 17:14 18:19 57:12 69:10 71:15 82:14

**time** 5:3 10:12 14:23 15:10,16,17, 23 24:10 25:16 27:1 30:13 32:14 35:20 36:8 37:7 46:23 48:15 51:18,23 52:11,15,16 53:1 54:2 56:22 59:5 63:20 65:12 67:11,20 70:12 77:8

**timeframe** 21:8 44:25 51:18,20

**times** 19:22 26:1 33:21 53:12,15 62:23

**Tina** 63:23

**title** 20:5 55:19

**today** 4:16 5:15 35:24 40:23 44:4 45:15 58:16 74:24 77:11

**today's** 6:17 7:21

**together** 57:22

**told** 6:19 16:18 28:1 40:2 41:12 59:24,25 60:9 80:8

**top** 73:1

**touch** 37:5

**Tracy** 54:22,24

**trained** 46:16

**training** 11:4,6,7 20:22 22:10,14 68:5,8

**transferred** 8:18 9:3 10:15 12:1, 20 21:24

**transition** 42:11 66:15

**Travis** 6:18

**trial** 7:8 40:18 74:24

**Troy** 4:1

**truck** 17:6,12,22 69:25 70:1,2,3

**trucks** 16:15 17:5,14,22 18:2,11, 15,19 69:21 70:6

**Tuesday** 44:8

**turn** 4:25 23:9

**two** 10:6 21:17 23:2,4,8 25:6,10, 11 34:13 38:18 62:19 64:1 71:14

**type** 11:6 15:6 18:1 22:10,14 28:17,25 31:25 50:6 60:25 80:23

**types** 16:8 21:4 34:16

**typical** 13:25 14:1,2 17:15

---

**U**

**U.S.** 22:7

**Uh-huh** 12:23

**ultimately** 57:20

**unable** 74:6

**unauthorized** 18:21

**under** 66:12,14

**understand** 5:11 12:24 16:1 20:7 40:11,12 41:3 46:17 52:25 53:8 54:1 56:6 58:8 79:1 80:11

**understanding** 15:25 46:6,10 48:24 50:9 59:12 62:24 78:3

**understood** 5:2,10

**unemployment** 51:6,10

**union** 63:18,20 71:4

**unless** 17:11,21 62:19 71:25

**unload** 18:15

**unloading** 18:3

**unlocks** 19:1

**unquote** 67:23

**until** 10:22 11:14 12:1,5 37:12,15, 18 53:1 74:16

**up** 11:14,18 12:1 17:21 19:21 25:24 26:1,2 30:16,17 33:6 37:9, 11,12,19 43:22 46:4 47:14 63:6 70:1 73:1 78:2

**upon** 78:3

**use** 7:12

**used** 42:10 51:16 76:23

**usually** 24:19 25:7 26:10 34:1 37:12,18 38:12 47:25 80:2

---

**V**

**vacation** 24:16 25:3

**Vaguely** 63:11

**various** 18:4

**vary** 14:7,8 17:16,17 27:6,7 37:4

**verbal** 4:21 28:13,19 29:5 30:1, 10

**verbally** 29:13

**verbiage** 29:6

**verify** 80:23

**view** 24:4

**visitor** 19:15

**visitors** 13:2,22 14:12 15:15 16:16 19:13

---

### W

**wait** 37:12,18

**waited** 79:25

**walk** 14:13 15:3,8,20,23 17:1,25 18:23 27:14,16 82:16

**walking** 13:24 14:3 15:13,14 27:11,17,18 28:4 39:24 45:12 46:10 58:14

**wanted** 39:10 72:23

**warned** 29:13

**warning** 28:13,19,22 29:2,11,16, 21,24 30:10

**warnings** 30:2

**Warren** 5:23 10:17 13:6,8,13,15, 17 19:16 54:17 66:2,3

**watch** 73:16

**Wayne** 8:17,20 13:9

**Wednesday** 44:8

**week** 23:16,20,23 25:14 61:15

**weeks** 23:2,4,8 24:17 25:6,10,11

**well** 12:4 15:17 19:21 23:7 24:2 25:5,15 27:4 42:18 53:4,7,12 56:21 62:22 64:14 65:3,17,19 82:13

**went** 6:11 8:17,18,20,23 13:12 28:14

**white** 76:5,6,12

**whole** 22:7 35:19,20 36:16 46:18

**whomever** 31:8

**Williams** 54:22,24

**word** 76:23

**work** 10:5,13 11:25 22:4 24:12, 13,24 25:1,3,9,14,20 30:14 31:13 32:13 33:22 34:10 35:9 51:16 53:5 54:2 56:16,18 65:14

**worked** 11:1 12:3 13:7,14,15 20:24 51:19,23,24 52:22 54:13 55:17

**workers** 18:3,11,15

**working** 8:14 11:23 12:21 22:11 25:10,11 33:12 51:3 53:3,9 63:24

**works** 36:21 65:14

**write** 74:9

**writing** 11:8

**written** 28:13,14 29:2,11,16,19, 20,24 30:1,2 69:16

**wrote** 23:2,4

---

### Y

**year** 6:6 8:10 9:5,23 10:25 11:7 12:1 21:15 30:3,4,6 40:18,24 42:8 44:14 62:23 65:3 66:6

**years** 9:2 10:6,14 11:17 27:1 41:20 62:19 64:9,14,15,18 67:20

---

### Z

**ZIP** 66:2

# DEPOSITION EXHIBITS

# OF

# DESHON HILL

# (EXHIBITS 1-3 ONLY)

May. 27. 2015  9:00AM                                          NC. 5201   P. 1

May 26, 2015

Juanita Resar
G4S Solutions
Human Resources Specialist
Fax:  248-374-0230

Dear Ms. Resar:

My name is Christine Ross. I work at the Warren Tech Center. I am writing you this letter to discuss an issue that I am having with my patrol. My post was Dock 10, a desk position and a 32-hour position. After shift preference Deshon Hill (site coordinator), who does the scheduling, changed my position to a 37-hour position and Dock on Monday and Tuesday and Wednesday, Thursday and Friday, patrolling the building. I called her and stated that I have the highest seniority on my shift. I asked her why did she change my hours and post?

I have FMLA and cannot do excessive walking.  Deshon stated that she's designated to place an officer wherever she wants and asked me if I can perform my duties. I stated that I can perform my duties but due to my medical condition (Mixed Connective Tissue Disease), I cannot do excessive walking and she said I will look into your situation and get back with you. On Tuesday, May 5, I saw Sgt. Tracy Williams and asked her did Deshon Hill look into my situation and she said Deshon said she's not going to change anything. On Wednesday, May 6, I reported to work. I began to conduct my patrols and was not trained to use the scanner or the locations of barcodes to scan the building. It took me eight hours to complete the building patrol. At approximately 2030, I saw Sgt Phil and stated to him that my foot was in a lot of pain and I don't know if I can handle this excess walking and he said to just take your time. The next day, I couldn't stand on my foot. I was bed-ridden for two days and the pain lasted a week. My doctor has ordered me to limit my walking (see FMLA report).

Ms. Resar, I'm a faithful employee, never a complaint against me and always at work on time. I never missed work. I always show courtesy to clients. I always perform my duties. I enjoy my job, but I am unable to do the foot patrols. Due to my medical condition, I am requesting that you please return me to my post at DK10.

If you require additional information or would like to speak with me, please feel free to call me at 313-372-7628.



Christine Ross Litigation
G4S 000305

# INVESTIGATORY SUSPENSION FORM
# FOR GM ACCOUNT

DATE: __June 2, 2015__    SITE: __WTC__

TO: __Christine Ross__

FROM: __DeShon Hill__        __Security Coordinator__
             Name                  Title

DISTRICT OFFICE: __Farmington Hill__

RE:    **INVESTIGATORY SUSPENSION**

This is to notify you that you are being placed on Investigatory Suspension due to:
*Check appropriate box(s)*

- ☐ Sleeping on the job
- ☐ Theft/Misappropriation
- ☐ Fraud/Falsification of documents
- ☐ Violation of Substance Abuse Policy
- ☐ Violence in the work place
- ☐ Walking off the Job/Post Abandonment
- ☐ Inappropriate behavior/Failure to follow a direct order
- ☐ Bringing a firearm on client property
- ☐ Harassment and/or Discriminatory Conduct
- ☐ Willful/negligent, destruction and/or damage of company/client property
- ☐ Sale, transfer or loan of company/client badge or access card
- ☐ Arrest for criminal activity pending resolutions of the matter
- ☐ Absence of three or more consecutive days without calling in ("No call, no show")
- ☐ Disclosure of proprietary or confidential information
- ☑ Inability to meet Minimum Standards for Security Officers assigned to the GM/Delphi Account
- ☐ Other _____

*As part of the investigation, you will be notified at your last known telephone number as to the date, time and place of an interview.*

I have read this form and have received a copy. My signature below merely acknowledges receipt of this form.

Employee Signature    Supervisor's Signature      Security Chief/Ops/SM/ or designee
(Acknowledging Receipt)                          Signature

__6-2-15__                      __6/2/15__
Date                 Date                 Date

◆THE UNION MUST BE PROVIDED A COPY AT REPRESENTED SITES◆

Issued: 8/24/2012 DRD    *Christine Ross*        Page 1 of 1

*G4S Secure Solutions*

**Don Drent (C)** <don.drent@gm.com>                                         Fri, May 29, 2015 at 3:15 PM
To: "Deshon Hill (C)" <deshon.hill@gm.com>, "Landon Pickens (C)" <landon.pickens@gm.com>
Cc: Juanita Resar <juanita.resar@usa.g4s.com>

Deshon and Landon:


We need to place Officer Ross on Investigatory Suspension pending further Medical Evaluation....


Don


Donald R. Drent

U.S. Operation Manager

G4S Secure Solutions (USA) Inc.

300 Renaissance Center

MC: 482-C31-C22

Detroit, MI 48265

Office: 313 665 7716

Cell: 313 806 1098

don.drent@gm.com

don.drent@usa.g4s.com


Nothing in this message is intended to constitute an electronic signature unless a specific
statement to the contrary is included in this message. Confidentiality Note: This message
is intended only for the person or entity to which it is addressed. It may contain
confidential and/or privileged material. Any review, transmission, dissemination or other
use, or taking of any action in reliance upon this message by persons or entities other
than the intended recipient is prohibited and may be unlawful. If you received this
message in error, please contact the sender and delete it from your computer.


https://mail.google.com/mail/?ui=2&ik=5eab0db62d&view=pt&q=ross&qs=true&search=...   7/24/2015



Christine Ross Litigation
G4S 000308

g4s Mail - Officer Ross

Nothing in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message.

Confidentiality Note: This message is intended only for the person or entity to which it is addressed. It may contain confidential and/or privileged material. Any review, transmission, dissemination or other use, or taking of any action in reliance upon this message by persons or entities other than the intended recipient is prohibited and may be unlawful. If you received this message in error, please contact the sender and delete it from your computer.

---

**Juanita Resar** <juanita.resar@usa.g4s.com>                           Fri, May 29, 2015 at 4:57 PM
To: "Don Drent (C)" <don.drent@gm.com>
Cc: "Deshon Hill (C)" <deshon.hill@gm.com>, "Landon Pickens (C)" <landon.pickens@gm.com>

Everyone,

Attached please find all forms needed for Christine Ross to take to Concentra Medical Center for the Employee Related Physical.
Should you have any questions, please feel free to contact me.

Thank you,

On Fri, May 29, 2015 at 3:15 PM, Don Drent (C) <don.drent@gm.com> wrote:

Deshon and Landon:

We need to place Officer Ross on Investigatory Suspension pending further Medical Evaluation....


Don


Donald R. Drent

U.S. Operation Manager

G4S Secure Solutions (USA) Inc.

300 Renaissance Center

MC: 482-C31-C22

Detroit, MI 48265

Office: 313 665 7716

Cell: 313 806 1098

don.drent@gm.com

don.drent@usa.g4s.com

Christine Ross Litigation
G4S 000309

g4s Mail - Officer Ross

Nothing in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message. Confidentiality Note: This message is intended only for the person or entity to which it is addressed. It may contain confidential and/or privileged material. Any review, transmission, dissemination or other use, or taking of any action in reliance upon this message by persons or entities other than the intended recipient is prohibited and may be unlawful. If you received this message in error, please contact the sender and delete it from your computer.

Nothing in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message.

Confidentiality Note: This message is intended only for the person or entity to which it is addressed. It may contain confidential and/or privileged material. Any review, transmission, dissemination or other use, or taking of any action in reliance upon this message by persons or entities other than the intended recipient is prohibited and may be unlawful. If you received this message in error, please contact the sender and delete it from your computer.

Juanita Resar
HR Manager
Detroit Area Office
G4S Secure Solutions (USA) Inc.
22670 Haggerty Rd. Suite 101
Farmington Hills, MI 48335
(248) 477-9714 Office
(248) 225-9503 Mobile
(248) 374-0231 Fax

3 attachments

SO JOB DESCRIPTION.doc
179K

Christine Ross.pdf
59K

Employment Related Physical.docx
277K

---

**Deshon Hill (C)** <deshon.hill@gm.com>                            Mon, Jun 1, 2015 at 3:11 PM
To: "Juanita Resar (juanita.resar@usa.g4s.com)" <juanita.resar@usa.g4s.com>
Cc: "Landon Pickens (C)" <landon.pickens@gm.com>

Juanita,

Ross finally returned my call. Ross will be at Site on June 2nd to meet with myself and Landon at 9am.

g4s Mail - Officer Ross

Thanks,

*DeShon Hill*

*Site Coordinator – General Motors Tech Center*

*North West Quadant- Research, RCL-L, RC-LN, Max A, B &C, CWT and Site Ops*

*G4S Secure Solutions, USA*

*6250 Chicago-Rd, Warren, MI 48090*

*Office: (586) 947-0243*

*Cell: 248-343-9741*

*Fax: (586) 586-986-1090*

*Email: deshon.hill@gm.com*

*"Safety is our overriding priority."*

**From:** Juanita Resar [mailto:juanita.resar@usa.g4s.com]
**Sent:** Friday, May 29, 2015 4:58 PM
**To:** Don Drent (C)
**Cc:** Deshon Hill (C); Landon Pickens (C)
**Subject:** Re: Officer Ross

Everyone,

Attached please find all forms needed for Christine Ross to take to Concentra Medical Center for the Employee Related Physical.

Should you have any questions, please feel free to contact me.

Thank you,

On Fri, May 29, 2015 at 3:15 PM, Don Drent (C) <don.drent@gm.com> wrote:

. Deshon and Landon:

We need to place Officer Ross on investigatory Suspension pending further Medical Evaluation....